**No. 24-11892 (consolidated with 25-12813)**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————————————

HISPANIC FEDERATION, *et al.*,

*Plaintiffs-Appellees,*

v.

FLORIDA SECRETARY OF STATE, *et al.*,

*Defendants-Appellants.*

————————————————

On Appeal from the U.S. District Court for the Northern District of
Florida, No. 4:23-cv-00218-MW-MAF (Walker, J.)

————————————————

## BRIEF OF PLAINTIFFS-APPELLEES

————————————————

*Counsel for Plaintiffs-Appellees*
*Listed on Inside Cover*

Cesar Z. Ruiz
Delmarie Alicea
Miranda Galindo
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752

John A. Freedman
Jeremy Karpatkin
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5316

Neda Khoshkhoo
DĒMOS
368 9th Ave., Suite 11-105
New York, NY 10001
(212) 485-6065

Adriel I. Cepeda Derieux
Megan C. Keenan
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St. NW
Washington, DC 20005
(202) 457-0800

Dayton Campbell-Harris
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500

Daniel B. Tilley
Caroline A. McNamara
Nicholas L.V. Warren
ACLU FOUNDATION OF FLORIDA
4343 W Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule R. 26.1-1 (effective December 1, 2025), Plaintiffs-Appellees add and amend the listed individuals below to Defendants-Appellants' Certificate of Interested Persons filed October 31, 2025:

1.     Khoshkhoo, Neda, *Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiffs-Appellees submit the following amended statement of their corporate interests:

1. Plaintiff Hispanic Federation has no parent corporation or any other publicly held corporation owning 10% or more of its stock.

2. Plaintiff Poder Latinx has no parent corporation or any other publicly held corporation owning 10% or more of its stock. It is no longer a fiscally sponsored project of Tides Advocacy.

3. All other Plaintiffs are individual persons.

Under this Court's Local Rule, 26.1-1, Counsel for the Plaintiffs-Appellees further certify that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Plaintiffs-Appellees certify that Defendants-Appellants' Certificate of Interested Persons filed October 31, 2025 with the additions and emendations contained herein, and the Corporate Disclosure Statement contained herein, are complete.

Dated: December 31, 2025                    Respectfully submitted,

                                            /s *Adriel I. Cepeda Derieux*
                                            Adriel I. Cepeda Derieux

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT .......................................................2

STATEMENT OF THE ISSUE ..............................................................2

STATEMENT OF THE CASE ...............................................................2

  I.  Procedural History ........................................................................2

  II.  Proper Record on Appeal...............................................................4

  III.  Factual Background ......................................................................5

    A.  Third Party Voter Registration Organizations (3PVROs) and Voter Registration in Florida..........................................................5

    B.  The Importance of Noncitizens to 3PVROs' Registration Efforts in Florida ..................................................................................7

    C.  Impact on Plaintiffs.......................................................................10

    D.  Lack of Supporting Evidence for Purported Rationales for Citizenship Requirement ...............................................................11

STANDARD OF REVIEW....................................................................17

SUMMARY OF THE ARGUMENT ......................................................18

ARGUMENT .........................................................................................20

  I.  The Citizenship Requirement's categorical bar against noncitizens triggers and fails strict scrutiny. ...............................20

  II.  The narrow "political-function" exception cannot save the Citizenship Requirement. ............................................................23

    A.  The Citizenship Requirement falls outside of the political-function exception's limited scope. .............................................24

    B.  The "political-function exception" cannot save the Citizenship Requirement. ...............................................................................28

      1.  The Citizenship Requirement is not properly tailored............28

i

      a.   The Citizenship Requirement is overinclusive. ................... 28

      b.   The Citizenship Requirement is underinclusive. ................ 30

   2.   Plaintiffs lack the authority or discretion needed for the political-function exception to apply. ....................................... 33

III.   Defendants' remaining arguments wrongly ask this Court to rewrite the challenged statute ..................................................... 40

  A.  The Legislature chose to discriminate against *all* noncitizens, not just a subset of them. .............................................................. 41

  B.  *Salerno* does not compel a different result ................................. 45

IV.   Plaintiffs still prevail under rational-basis review. ................... 48

V.   The Court should disregard the State's reliance on extra-record trial evidence. .................................................................... 51

VI.   Plaintiffs have standing. ........................................................... 54

CONCLUSION ........................................................................................ 57

# TABLE OF AUTHORITIES

## Cases

*Ambach v. Norwick,
  441 U.S. 68 (1979) .............................................................25, 26, 28, 33

American Civil Liberties Union of Florida v. Miami-Dade County
  School Board,
  557 F.3d 1177 (11th Cir. 2009) ...........................................................56

*Bernal v. Fainter,
  467 U.S. 216 (1984) ............22, 23, 24, 26, 28, 29, 30, 33, 34, 36, 38, 40

Bethune-Hill v. Virginia State Board of Elections,
  580 U.S. 178 (2017) ............................................................................23

Bluman v. Federal Election Commission,
  800 F. Supp. 2d 281 (D.D.C. 2011) .........................................38, 39, 40

Board of Trustees of University of Alabama v. Garrett,
  531 U.S. 356 (2001) ............................................................................49

Bowsher v. Synar,
  478 U.S. 714 (1986) ............................................................................56

Bridges v. Wixon,
  326 U.S. 135 (1945) ............................................................................39

Bruni v. City of Pittsburgh,
  824 F.3d 353 (3d Cir. 2016) ...............................................................47

*Cabell v. Chavez-Salido,
  454 U.S. 432 (1982) ..............................24, 25, 26, 27, 28, 29, 31, 32, 33

Cervantes v. Guerra,
  651 F.2d 974 (5th Cir. 1981) .....................................................27, 37, 38

Chapman v. AI Transport,
  229 F.3d 1012 (11th Cir. 2000) ...........................................................51

Citizens United v. Federal Election Commission,
  558 U.S. 310 (2010) ............................................................................39

City of Chicago v. Morales,
  527 U.S. 41 (1999) ..............................................................................45

*City of Cleburne v. Cleburne Living Center,*
   473 U.S. 432 (1985) ................................................................. 50, 51

*City of Los Angeles v. Patel,*
   576 U.S. 409 (2015) ................................................................. 45, 46

*\*Club Madonna v. City of Miami Beach,*
   42 F.4th 1231 (11th Cir. 2022) ............................................... 47, 48

*Connecticut National Bank v. Germain,*
   503 U.S. 249 (1992) ....................................................................... 42

*Dandamudi v. Tisch,*
   686 F.3d 66 (2d Cir. 2012) ........................................................... 21

*Diamond Alternative Energy, LLC v. Environmental Protection
   Agency,*
   606 U.S. 100 (2025) ....................................................................... 55

*Dimmitt v. City of Clearwater,*
   985 F.2d 1565 (11th Cir. 1993) ................................................... 42

*Doe v. City of Albuquerque,*
   667 F.3d 1111 (10th Cir. 2012) ................................................... 46

*Estrada v. Becker,*
   917 F.3d 1298 (11th Cir. 2019) ....................................... 42, 43, 44

*Examining Board of Engineers, Architects & Surveyors v. Flores de
   Otero,*
   426 U.S. 572 (1976) ....................................................................... 26

*Florida Right to Life v. Lamar,*
   273 F.3d 1318 (11th Cir. 2001) ................................................... 40

*Foley v. Connelie,*
   435 U.S. 291 (1978) ................................................................. 25, 33

*\*Graham v. Richardson,*
   403 U.S. 365 (1971) ................................................................. 21, 43

*Greater Birmingham Ministries v. Secretary of State for State of
   Alabama,*
   992 F.3d 1299 (11th Cir. 2021) ................................................... 57

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ........................................................................ 25

*Griffin v. Sirva, Inc.,*
    835 F.3d 283 (2d Cir. 2016) ........................................................ 52

*Heller v. Doe,*
    509 U.S. 312 (1993) ...................................................................... 50

*In re Griffiths,*
    413 U.S. 717 (1973) ................................................................ 26, 27

*Janklow v. Planned Parenthood, Sioux Falls Clinic,*
    517 U.S. 1174 (1996) .................................................................... 45

*LaCourse v. PAE Worldwide,*
    980 F.3d 1350 (11th Cir. 2020) .................................................. 18

*League of Women Voters of Florida v. Florida Secretary of State,*
    66 F.4th 905 (11th Cir. 2023) .................................................... 18

*LeClerc v. Webb,*
    419 F.3d 405 (5th Cir. 2005) ................................................ 42, 43

*Lozano v. City of Hazleton,*
    620 F.3d 170 (3d Cir. 2010) ........................................................ 56

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...................................................................... 55

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ........................................................................ 39

*Miranda v. B & B Cash Grocery Store,*
    975 F.2d 1518 (11th Cir. 1992) .................................................. 52

*National Parks Conservation Association v. Norton,*
    324 F.3d 1229 (11th Cir. 2003) .................................................. 41

*Nyquist v. Mauclet,*
    432 U.S. 1 (1977) .......................................................................... 36

*Palmore v. Sidoti,*
    466 U.S. 429 (1984) ...................................................................... 49

*Plyler v. Doe*,
   457 U.S. 202 (1982) ................................................................. 20

*Romer v. Evans*,
   517 U.S. 620 (1996) ................................................. 49, 50, 51

*Rothe Development Corp. v. Department of Defense*,
   413 F.3d 1327 (Fed. Cir. 2005) .......................................... 48

*Shen v. Commissioner, Florida Department of Agriculture*,
   158 F.4th 1227 (11th Cir. 2025) ......................... 21, 44, 45, 46

*Skafte v. Rorex*,
   430 U.S. 961 (1977) ................................................................. 37

*Sugarman v. Dougall*,
   413 U.S. 634 (1973) ........................................... 25, 30, 37

*Takahashi v. Fish & Game Commission*,
   334 U.S. 410 (1948) ................................................................. 21

*Truax v. Raich*,
   239 U.S. 33 (1915) ................................................................... 25

*United States Department of Agriculture v. Moreno*,
   413 U.S. 528 (1973) ......................................................... 49, 51

*United States v. American Trucking Associations*,
   310 U.S. 534 (1940) ................................................................. 42

*United States v. Carolene Products Co.*,
   304 U.S. 144 (1938) ................................................................. 21

*United States v. Frandsen*,
   212 F.3d 1231 (11th Cir. 2000) ............................................ 45

*United States v. McGarity*,
   669 F.3d 1218 (11th Cir. 2012) ............................................ 38

*United States v. Salerno*,
   481 U.S. 739 (1987) ......................................................... 20, 45

*United States v. Skrmetti*,
   605 U.S. 495 (2025) ......................................................... 21, 39

*Waldman v. Conway,*
  871 F.3d 1283 (11th Cir. 2017)............................................51

*Yick Wo v. Hopkins,*
  118 U.S. 356 (1886) ...........................................................20

**Statutes**

2 U.S.C. § 441e(a) ...............................................................38

28 U.S.C. §1291....................................................................2

28 U.S.C. §1331....................................................................2

42 U.S.C. §1981....................................................................3

Fla. Stat. §97.021.................................................................5

Fla. Stat. §97.0575...............................1, 2, 10, 11, 29, 34, 46, 54

U.S. Const. amend. XIV ......................................................37

U.S. Const. amend. XV........................................................37

**Other Authorities**

Function, *Merriam-Webster's Dictionary* (12th ed.)................................35

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs join Defendants in requesting oral argument. This appeal concerns constitutional rights of significant importance—namely, whether a state can facially discriminate against noncitizens without engaging in the requisite narrow tailoring. Fed. R. App. P. 34(a). Plaintiffs believe that this Court's disposition of this case would be aided by oral presentation to the Court.

## INTRODUCTION

In 2023, Florida's Legislature passed Section 97.0575(1)(f), barring private employers from allowing any noncitizen to collect or handle voter-registration applications on their behalf (Citizenship Requirement). Plaintiffs—three noncitizens engaged in this work and two employers whose workforce include large numbers of resident noncitizens—challenged the law. After discovery, on the parties' cross-motions for summary judgment, the District Court held that this sweeping alienage classification violated the Fourteenth Amendment's Equal Protection Clause and entered summary judgment for the Plaintiffs. Controlling precedent compels that this Court affirm.

Facial alienage classifications trigger strict scrutiny, which the Citizenship Requirement cannot survive. Defendants have not shown that it narrowly serves a compelling—or even legitimate—interest. The summary-judgment record contains not a single example of a noncitizen engaging in fraud, submitting a late application, or otherwise undermining election integrity or efficiency while registering voters. Nor have Defendants explained how banning all noncitizens—including permanent residents, "virtual citizens" in the case law—from collecting or handling voter-registration applications is tailored to address any stated concern.

As for the narrow "political-function exception" to these principles, even if it applied (it doesn't), Defendants offer no rational explanation to

1

justify a blanket ban on all noncitizens performing ministerial registration and delivery tasks when noncitizen State employees already handle the same forms in government offices. Nor do noncitizens who help civic organizations register voters wield anything close to the government-rooted "wide discretion" or "coercive" authority the exception requires.

This Court should affirm the summary-judgment grant below.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §1331. This Court has jurisdiction under 28 U.S.C. §1291 to review the District Court's final decision (reproduced at App.008689-008703).

## STATEMENT OF THE ISSUE

Whether the District Court correctly held that the State's requirement that all individuals "collecting or handling voter registration applications" on behalf of voter-registration organizations be U.S. citizens violates the Equal Protection Clause.

## STATEMENT OF THE CASE

### I.    Procedural History

On May 25, 2023, Plaintiffs—Hispanic Federation and Poder Latinx (Organizational Plaintiffs) and Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico (Individual Plaintiffs)—challenged the Citizenship Requirement, Fla. Stat. §97.0575(1)(f). App.006256-006300. Plaintiffs sought injunctive and declaratory relief on multiple bases,

2

including violations of 42 U.S.C. §1981, the Equal Protection Clause, the First Amendment's rights to speech and association, and the First and Fourteenth Amendments' right to vote and prohibition against vague and overbroad laws. App.006283-006298. The case was consolidated for pre-trial and trial with cases brought by the NAACP and the League of Women Voters. *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, No. 4:23-cv-00215 ("NAACP Dkt."), ECF 86 (N.D. Fla. June 15, 2023) & 117 (July 25, 2023).

On June 8, 2023, Plaintiffs filed an emergency motion to preliminarily enjoin the Citizenship Requirement before it took effect on July 1, 2023. App.006310-006352. After briefing and a hearing, the District Court granted that preliminary injunction. App.001446-001503. Defendants appealed that decision to this Court, and the parties appeared for oral argument on January 25, 2024. *See generally Hispanic Fed'n v. Byrd*, No. 23-12313 (11th Cir.).

On March 1, 2024, after briefing on cross-motions for partial summary judgment, App.007577-007617, App.007619-008653 & App.001566-001636, the District Court ruled for Plaintiffs on their equal protection claim and permanently enjoined the Secretary from enforcing the Citizenship Requirement, reserving for trial the question of whether Plaintiffs also had standing to obtain relief against the Attorney General. App.008679-008687. Because this Court's decision on Defendants' appeal of the preliminary injunction was pending, the District Court's summary-

3

judgment ruling mooted that appeal. *See Hispanic Fed'n v. Byrd*, No. 23-12313, Doc. 77-1, Order (11th Cir. Aug. 27, 2024).

The parties proceeded to trial on the Attorney General's role in enforcing the Citizenship Requirement, and Plaintiffs also presented evidence on their remaining constitutional claims. *Hispanic Fed'n v. Byrd*, No. 4:23-cv-218, Bench Trial Minute Entries, ECF 171-175 (N.D. Fla. 2024). On May 15, 2024, following that trial, the District Court concluded that Plaintiffs had standing to seek relief against the Attorney General, and declined to rule on Plaintiffs' remaining constitutional claims. App.008689-008700. Defendants noticed an appeal from the final judgment, which the Court consolidated with the challenge to a parallel judgment in the jointly administered case below. Order, No. 24-11892, Dkt. 44 (11th Cir. Sept. 10, 2025).

## II.   **Proper Record on Appeal**

The judgment now on appeal was entered at the summary-judgment stage. App.008686-008687; App.008689-008700; App.008702-008703.[1] Accordingly, the proper record for this appeal is the summary-judgment record. HF.Supp.App.0148-0151, App.007577-007617, App.007619-008617, & App.008641-008653. In the District Court, Defendants did not submit a Rule 56(c) statement disputing Plaintiffs'

---

[1] As explained *supra*, the parties proceeded to trial only on the Attorney General's role in enforcing the Citizenship Requirement. 4:23-cv-218, ECF 171-175. Defendants have presented no argument in their opening brief about the Attorney General's role in enforcing the Citizenship Requirement or Plaintiffs' remaining constitutional claims.

statement of material facts. Rather, the Secretary cross-moved for summary judgment, stating that the "Secretary agrees with Plaintiffs: the Equal Protection Clause challenge to the Citizen Restriction should be decided at summary judgment. Material facts aren't in dispute, and the issue is a legal one." App.008642. The District Court noted this posture in its ruling. *See* App.008674 ("Defendant Byrd does not dispute any material facts that Plaintiffs have proffered in support of their Equal Protection claim.").

Consistent with the procedural posture, Plaintiffs' statement of the case focuses on the summary-judgment record on which the District Court ruled. But because Defendants rely heavily on the trial record in their statement of the case, *see infra* at 51-52, Plaintiffs have supplemented these summary-judgment citations with trial evidence that likewise supports those findings.

## III. **Factual Background**

### A. **Third Party Voter Registration Organizations (3PVROs) and Voter Registration in Florida**

In Florida, a "[t]hird-party registration organization" (3PVRO) is "any person, entity, or organization soliciting or collecting voter registration applications." Fla. Stat. §97.021(40). 3PVROs play an important role in registering voters, particularly in reaching "people that otherwise haven't thought about voter registration" and other "underserved" populations. HF.Supp.App.0176-0177 (Morley Dep.).

According to Florida Division of Elections data, as of September 1, 2023: "over 730 thousand voters … were registered … due to the activities of 3PVROs," and "at least one in 20 of the 15.1 million registered voters in Florida have relied on 3PVROs to assist them to register to vote or update their voter registrations." HF.Supp.App.0382-0383, 0419 (Smith Rep.).[2] Discovery produced by Defendants further showed that 3PVROs disproportionately assist Black, Hispanic, and other voters of color. HF.Supp.App.0396-0398 (Smith Rep.). "Black and Hispanic registered voters … are more than five times more likely than White registered voters" to register or update their registration through 3PVROs. HF.Supp.App.1266 (Smith Rebuttal Rep.). These conclusions—both the magnitude of voters assisted, and the demographic disparities—were undisputed at summary judgment and at trial. HF.Supp.App.0605-0606, 0626-0627, 0717-0718 (Stein Dep.); HF.Supp.App.1050-1051, 1124-1125, 1127-1128 (Alford Dep.). *See also* App.004274-004276, 004283, 004310-004311, 004317-004324 (Smith Tr.);[3] App.005001-005003 (Stein Tr.); and App.005186-005187 (Alford Tr.); HF.Supp.App.3739-3741, 3749-3751.

---

[2] According to data the State provided to the U.S. Election Assistance Commission, these numbers "are likely an under count, as the total number of registered voters in Florida who have been assisted by 3PVROs since 2013 could exceed 2.1 million." HF.Supp.App.0384.

[3] Plaintiffs use "Tr." as a shorthand for "Trial" when citing witness trial testimony.

3PVROs like Hispanic Federation and Poder Latinx tailor their voter-registration efforts to engage the eligible Latino electorate.[4] HF.Supp.App.0003, 0017; *see also* HF.Supp.App.2822-2823 (Vélez Dep.); App.003817 (Wassmer Dep.). Their canvassers work directly in the communities they serve, communicate with voters in their native language, and focus their efforts in places where Latino residents regularly gather. HF.Supp.App.0005-0007; HF.Supp.App.0018-0019, 0022-0023; *see also* App.003853-003854 (Vélez Tr.). Through these interactions, 3PVROs conduct "integrated voter engagement efforts" that both register voters and educate them on issues affecting their communities. HF.Supp.App.0018-0019; *see also* App.003809 (Wassmer Tr.). These efforts yield substantial results: since 2016, Hispanic Federation alone has registered more than 90,000 voters in Florida. HF.Supp.App.0004; *see also* App.003854 (Vélez Tr.).

## B. The Importance of Noncitizens to 3PVROs' Registration Efforts in Florida

Many of Hispanic Federation and Poder Latinx's most experienced canvassers are noncitizens with employment work-authorization from the federal government, some of whom rose to leadership roles. HF.Supp.App.3009-3010 (Wassmer Dep.); HF.Supp.App.2832-2833,

---

[4] Citing trial testimony, Defendants assert that Poder Latinx prefers to steer voters to online registration. Br.5. But Poder Latinx's representative explained that online registration is just "another way [voters] can register … [and] giv[es] the voter options," App.003839 (Wassmer Tr.), and other witnesses further explained that online registration is no substitute to in-person paper registration. *See* App.004505-004506 (Scoon Tr.); App.004650-004651 (Elliott Tr.); App.003427 (Nordlund Tr.).

2871-2872, 2889-2890 (Vélez Dep.); HF.Supp.App.0007-0008. Noncitizens made up approximately 70% of Hispanic Federation's canvassers, HF.Supp.App.0007, and 90% of Poder Latinx's staff. HF.Supp.App.0021. *See also* App.003869. Noncitizen canvassers are especially effective in assisting newly naturalized U.S. citizens: they can communicate in the citizen's native language, and explain how Florida voter-registration procedures differ from those in their country of origin. HF.Supp.App.0007-0008, 0022-0023. They also build deep relationships within the communities they serve, including longstanding partnerships with local businesses, which in turn expand the number of locations where voters can be registered. HF.Supp.App.0007, 0022. *See also* App.003701 (Herrera-Lucha Tr.).

At a trial that mostly addressed claims not at issue here,[5] witnesses made clear that noncitizens are essential to these organizations' registration work. For example:

- Frederick Vélez III Burgos, Hispanic Federation's national civic engagement director, testified that noncitizens canvassers bring a unique perspective that resonates with eligible voters. They can speak candidly about leaving countries where they—or their parents—were never able to vote, and explain what it means to live without that opportunity. As Vélez described, when canvassers share these

---

[5] Because the partial summary-judgment order concluded that a factual dispute remained over whether Plaintiffs' injuries could be redressed by an injunction against the Attorney General, Plaintiffs introduced evidence at trial to address that issue. The bulk of trial, however, addressed "a slew of additional theories for why the Citizenship Requirement violates the Constitution." App.008689.

experiences, "you can see when U.S. citizens … [it] clicks on them, and they're like, Wait. This is a right that I'm not using, and in other places people have to leave because they don't have this right." App.003871.

- Plaintiff Norka Martínez explained why noncitizen canvassers' lived experience makes them especially committed to registering voters: "I come from a country where democracy has practically been lost. … And to help the Latino population in this country to support democracy being that they are citizens here. For me, it was very important." App.003795.

- Jared Nordlund, State Advocacy Director for UnidosUS, testified that noncitizen canvassers' deep roots in the community make them especially effective: "A lot of our noncitizen canvassers … live in the community, and so they know where to find people to go register to vote … [M]any of them will know [] where Venezuelans, or Puerto Ricans, or Cubans, [or] Ecuadorians … live in certain conclaves of communities…. [T]hey typically are Spanish dominant, and so communicating with others who are Spanish dominant or Spanish-only speakers helps." App.003377-003378. Mr. Nordlund further explained that UnidosUS finds it harder to hire and retain citizen canvassers than noncitizens, and that in his organization's experience, noncitizens have proved more reliable and enthusiastic about canvassing across election cycles. App.003361-003363, 003365-003366, 003370.

- Esperanza Sánchez, who has registered voters while working for UnidosUS, Hispanic Federation, and Poder Latinx, offered a similar perspective: "I believe the immigrant comes here looking for work. They come to this land to work. And also I believe that whenever we come, be it from Venezuela or Cuba or Colombia—just to be able to participate [civically] over there is difficult, so when we come here, we do our best to defend that participation." App.003465-003466.

### C.    Impact on Plaintiffs

The Citizenship Requirement requires 3PVROs to affirm under penalty of perjury to the Division of Elections that "each person collecting or handling voter registration applications" on its behalf is "a citizen of the United States." Fla. Stat. §97.0575(1)(f). It imposes a $50,000 fine on a 3PVRO for "each such person" (any noncitizen) who collects or handles applications for the organization. *Id.* A related provision authorizes the Attorney General to enforce the Citizenship Requirement and permits the Secretary to refer cases to the Attorney General when he "reasonably believes" a violation has occurred. *Id.* §97.0575(8). This sweeping scheme has profound effects on how 3PVROs operate and whom they can serve.

The Citizenship Requirement's enforcement would have decimated Organizational Plaintiffs' voter-registration work, requiring mass terminations of their outreach staff and management. Beyond eliminating most of their workforce, the Citizenship Requirement would have depleted these organizations of their most experienced canvassers— and with them, critical institutional knowledge and deep ties to the communities they serve. HF.Supp.App.0007-0008, 0021-0023. *See also* App.003818 (Wassmer Tr.); App.003884-003885 (Vélez Tr.). It would have likewise barred each Individual Plaintiff from collecting or handling voter registration applications, preventing them from continuing to work as canvassers. HF.Supp.App.0036-0038; HF.Supp.App.0052-0053; HF.Supp.App.0064-0067; HF.Supp.App.3055-3056, 3100-3101 (Martínez

Dep.); HF.Supp.App.3258 (Herrera-Lucha Dep.); HF.Supp.App.3170 (Pico Dep.). *See also* App.003680-003681, 003691-003692 (Herrera-Lucha Tr.); App.0003712 (Pico); App.003794 (Martínez).

### D. Lack of Supporting Evidence for Purported Rationales for Citizenship Requirement

As the District Court noted, in opposing summary judgment, the Secretary conceded that there was a "dearth of evidence involving noncitizens and 3PVRO issues." App.008684-008685. The summary-judgment record confirms that concession:

1.    Only three purported rationales surfaced in the legislative debate. None of them were substantiated.

First, Senator Burgess stated: "Regarding noncitizens, there are certain rights in our country that only citizens get to enjoy. That includes serving on a jury, running for office, and voting. We're just adding and ensuring that your right to vote is one of them as well." HF.Supp.App.1554; *see also* HF.Supp.App.1571 ("I think the policy call here is that we recognize already [] there are certain rights in our country that only citizens get to enjoy including serving on a jury, running for office, and voting."). But the Citizenship Requirement does not regulate who has the right to vote; it only regulates who may collect or handle voter-registration applications. Fla. Stat. §97.0575(1)(f).

Second, Senator Hutson asserted that "we've had people register folks and not turn[] [in] … the registration," leaving some to believe they

were registered when they were not. HF.Supp.App.1562. He also claimed that "other parties" had altered applicants' information after forms were signed, and said the Legislature wanted "higher scrutiny on those that are doing this" to ensure applications are submitted correctly. HF.Supp.App.1563. When Senator Polsky asked if there was any reason to believe "a noncitizen has done those acts more than … the average Joe person who just didn't do the job correctly," Senator Hutson offered no examples or justification for such a belief. HF.Supp.App.1563-1564.

Third, Senators Hutson and Burgess and Representative McClure asserted that the restriction was important to protect voter privacy. HF.Supp.App.1570 (saying voter registration "is pretty private and sensitive," and legislators "wanted to make sure you … are a legal citizen handling the list and you aren't an illegal doing third-party voter registration"); HF.Supp.App.1571 (similar); HF.Supp.App.1733 (similar). Legislators repeatedly acknowledged, however, that "non-U.S. citizens are allowed to [and do] work for the Division of Elections" and therefore would continue to have access to the same information. HF.Supp.App.1573; *see also* HF.Supp.App.1734.

The Citizenship Requirement's supporters were repeatedly pressed during legislative debate and could not substantiate their concerns. When Senator Jones asked why noncitizens should be banned from collecting applications if "the concern is about security," Senator Burgess circuitously responded: "I think I'll fall back on my previous answer …

It's ultimately a policy call. But those are the reasons why we decided to land on sticking with non-U.S. citizens." HF.Supp.App.1572-1573. Likewise, when Representative Bracy Davis asked "[w]hat evidence is there that non-citizens, including permanent legal residents, are any less honest or more likely to misuse information than U.S. citizens?" Representative McClure conceded: "It doesn't. The purpose of that doesn't contemplate the premise of your question. And instead as it relates to the fines, we are emphasizing and prioritizing that voter's information." HF.Supp.App.1746.

During debate, multiple representatives introduced amendments that would have eliminated the Citizenship Requirement—each of which was rejected—that underscored the gaps between these purported rationales and the Citizenship Requirement. HF.Supp.App.1752-1758:

- Representative Bartleman questioned the inconsistency at the heart of the Citizenship Requirement, noting: "these individuals are legally authorized to work in the United States, and they work for our local election offices, the Florida Department of Highway Safety and Motor Vehicles, where they collect or handle voter registration applications … And some may even work at the State's Division of Elections. So why are they allowed to work for … these government entities and not be allowed to work for a third party?" HF.Supp.App.3598-3599; *see also* HF.Supp.App.1756-1757, App.003313.

- Representative Eskamani highlighted similar inconsistencies, stating: "It just doesn't make sense that we set restrictions because someone doesn't have citizenship status when we have all of these other statuses and well-vetted programs that ensure that these are individuals who we trust to work in our country. We trust them to be our pharmacists. We trust them to be our doctors. We trust them to handle sensitive data in research, and yet, now we're saying they

can't hold a voter registration form. It does not make sense."
HF.Supp.App.3595-3596.

- Senator Jones: "[I]f an authorized person could work in the Division
  of Election, they could work in the DMV, or even at the tax
  collector's office, but suddenly they can't work for a third-party
  voter registration organization because now, it's all of a sudden, a
  security issue, what are we talking about?" HF.Supp.App.1702.

2.     The summary-judgment record reflects that the central
motives for the Citizenship Requirement consisted of xenophobic
assumptions. To be sure, in discovery and litigation, the Secretary
insisted upon several *post hoc* justifications for the Citizenship
Requirement that the Legislature never discussed: "safeguarding
election integrity, preventing voter fraud, ensuring a timely submission
of voter registration applications, and then otherwise promoting
uniformity, efficiency, and confidence in the election—system."
HF.Supp.App.1908    (Sec'y    30(b)(6)    Witness    Dep.); *see    also*
HF.Supp.App.0135 (restating same interests). But when pressed to
substantiate any of those rationales, these assertions quickly broke
down.

When asked how the Citizenship Requirement advances interests
in safeguarding election integrity, uniformity, or efficiency, the
Secretary's 30(b)(6) witness responded only that noncitizens are
"individuals who either are actively committing a crime every day to
individuals who really don't have much stake in the election at all."
HF.Supp.App.1922. Likewise, when asked for any evidence that "lawful
permanent residents are less trustworthy than citizens in collecting voter

14

registration applications," the witness asserted nonresponsively that "citizens have the greatest stake in the election system because they have the legal right to vote," HF.Supp.App.1952-1953, and speculated that because some noncitizens are "here temporarily," their "legal status could end," creating risks that they might either remain "illegally and actively break[] the law" or "leav[e] the country without submitting voter registration applications." HF.Supp.App.1955-1956.

Notably, the Secretary's 30(b)(6) witness was unable to identify "any instances of a noncitizen failing to submit a voter registration application on time," HF.Supp.App.1919-1921, or "any example of noncitizens being deported from the country with voter registration applications still in their possession," HF.Supp.App.1949. When asked if he had "any knowledge of noncitizens failing to submit a completed or compliant" application, he again could provide no examples. HF.Supp.App.1922-1923. Tiffany Morley, a supervisor in the Division of Election's Bureau of Voter Registration Services, likewise testified that she was "not aware" of any investigation or prosecution "relat[ing] to noncitizens working on behalf of 3PVROs" that her office had referred to the Office of Election Crimes and Security, HF.Supp.App.0291, nor of any occasion where her office had "encountered an issue with a non-citizen canvasser or volunteer" working for a 3PVRO, HF.Supp.App.0277. And at a later trial largely focused on claims not on appeal, the Secretary

15

produced no evidence of noncitizens failing to timely submit applications or leaving the country with voter-registration forms.

When asked how the Citizenship Requirement serves an interest in preventing voter fraud, the Secretary's 30(b)(6) witness testified that, "when we talk about noncitizens, we're talking about anyone from permanent residents through individuals who are here illegally," and "there is an indication that if you're already continually breaking one law, you could be prone to breaking another law." HF.Supp.App.1910-1911. But he acknowledged that the term non-citizen includes individuals who are legally present in the United States, HF.Supp.App.1911, and when asked for any examples of "individuals who are noncitizens leaving the United States after committing a voting-related offense," he testified he had "never received a complaint regarding a crime where a crime occurred and then the complaint stated that it was a noncitizen who left." HF.Supp.App.1912. Nor did Defendants present any such evidence at trial.

Importantly, the Secretary's 30(b)(6) witness testified that no similar ban on noncitizens is in place for Florida's Department of State employees: "As long as there is legal authorization to work for the Department of State regardless if it's my office, the Division of Elections, or anywhere else, I don't increase any restrictions against noncitizens for working in my office." HF.Supp.App.2144-2145; *see also* HF.Supp.App.0200. Noncitizens authorized to work in the United States

16

can also review completed voter registration forms as employees of Florida's Supervisors of Elections offices. HF.Supp.App.2363, 2367-2368 (Earley Dep.). Likewise, as the District Court recognized, there is no dispute about "the State's willingness to employ noncitizens at its Department of State, Department of Highway Safety and Motor Vehicles, and Supervisor of Elections' offices" where workers have access to the same information on voter registration applications. App.008684-008685; *see also* App.001476-001477.

3.    The Florida Attorney General identified no independent state interest served by the Citizenship Requirement. As the Attorney General's 30(b)(6) representative testified: "[W]e don't have a state interest in this; [] we defer to the legislature and other election officials to … relay what the state interest is, if there is one … because they are the ones who write the laws." HF.Supp.App.1333. The witness confirmed that the Attorney General's Office was not consulted during the Citizenship Requirement's drafting, HF.Supp.App.1303-1304, 1337-1339; has never prosecuted any noncitizen working on behalf of a 3PVRO, HF.Supp.App.2571, 2614-2615; and is unaware of any documents indicating that a noncitizen ever engaged in unlawful activity while registering voters on a 3PVRO's behalf, HF.Supp.App.2617-2639, 2662.

## STANDARD OF REVIEW

The District Court resolved nearly all issues on summary judgment, reserving only the question of Plaintiffs' standing to sue the Attorney

General for a bench trial. Because Appellees challenge "only questions of law and application of law to the facts" on appeal and do not dispute any factual findings, the distinction is immaterial. Defs'. Br.13, No. 24-11892, Dkt. 53 ("Br."). The standard of review is *de novo* for the legal questions in both the summary-judgment rulings and the post-trial judgment. *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 921 (11th Cir. 2023); *LaCourse v. PAE Worldwide*, 980 F.3d 1350, 1355 n.5 (11th Cir. 2020).

## SUMMARY OF THE ARGUMENT

The District Court correctly found that the Citizenship Requirement violates the Equal Protection Clause. It categorically bans individuals from collecting and handling voter registration applications based on alienage, a protected class. Such classifications are properly reviewed under strict scrutiny, which requires laws to be narrowly tailored. Defendants have not shown how the Citizenship Requirement is properly tailored to further Florida's interest in the timely submission of voter registration applications. There is no evidence of noncitizens engaging in misconduct resulting in untimely voter registration applications or otherwise connecting the law to the State's interest. The Citizenship Requirement's tailoring problem is fatal to it satisfying this level of scrutiny.

To overcome this tailoring problem, Defendants propose two theories that the district court rightly rejected.

18

*First*, Defendants try to dodge strict scrutiny by arguing that the Citizenship Requirement falls under the political-function exception. But the exception is inapplicable. The Supreme Court has long limited the narrow political-function exception to public roles. Defendants ask this Court to be the first to apply the political-function exception to private occupations, a request contrary to controlling precedent that this Court should decline.

Even if Plaintiffs were public actors within the political-function exception's scope—which they're not—the exception would not apply because Defendants cannot show the two needed factors. To start, the Citizenship Requirement is not properly tailored: it is both overinclusive and underinclusive. It is overinclusive because of the broad range of positions it implicates—e.g., canvassers, organizers, drivers—based on nothing other than a person's alienage. And it is underinclusive because noncitizens employed in several State agencies have access to the same personal information on voter-registration forms.

Separately, individuals collecting and handling voter registration forms do not engage in policymaking, nor are they vested with the degree of state discretion needed to trigger the political-function exception. Within the voter-registration process, noncitizen canvassers do not have discretionary power over sensitive areas of citizens' lives. The political-function exception simply doesn't apply.

19

*Second*, Defendants wrongly invoke *United States v. Salerno* and attack a strawman. 481 U.S. 739 (1987). There are no grounds to claim that varying levels of scrutiny ought to apply to different subgroups of immigrants because those subgroups do not exist in the statute. The Citizenship Requirement prohibits *all* noncitizens from collecting or handling voter registration applications. As such, the district court correctly considered whether that classification—not other hypothetical configurations—can overcome strict scrutiny.

The Citizenship Requirement fails even under rational basis review as it lacks a rational connection to any state interest. Animus motivated the law, and nothing else connects the Citizenship Requirement to any interest Defendants propose. Thus, even under the most lenient level of scrutiny, the Citizenship Requirement is unlawful.

Finally, as a matter of process, the Court should only review the summary-judgment record on appeal, not the record presented at trial which focused on different constitutional claims.

## ARGUMENT

## I. The Citizenship Requirement's categorical bar against noncitizens triggers and fails strict scrutiny.

The Fourteenth Amendment extends the equal protection of the laws to "any person," including those who are not U.S. citizens. *Plyler v. Doe*, 457 U.S. 202, 215 (1982); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). Because "[a]liens as a class 'are a prime example of a 'discrete and

20

insular' minority," *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152, n.4 (1938)), the Supreme Court has long held that "classifications based on alienage, like those based on … race, are inherently suspect," *id.* As a result, "laws that classify on the basis of … alienage … trigger strict scrutiny." *United States v. Skrmetti*, 605 U.S. 495, 510 (2025).

That suspicion applies with full force to blanket-alienage restrictions like the Citizenship Requirement, which draw a bright line between U.S. citizens on the one hand and all noncitizens—crucially, including lawful permanent residents who are "virtual citizens," *Shen v. Comm'r, Fla. Dep't of Agric.*, 158 F.4th 1227, 1254-55 (11th Cir. 2025) (citation and quotation marks omitted)—on the other. By painting with the broadest possible brush against noncitizens "as a class," *Graham*, 403 U.S. at 372, Florida has "confined" its "power … to apply its laws" to exceedingly "narrow limits." *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420 (1948). And because it "single[s] out aliens for disparate treatment," the law is "presumptively unconstitutional." *Dandamudi v. Tisch*, 686 F.3d 66, 73 (2d Cir. 2012).

Accordingly, the District Court applied the correct test—strict scrutiny—to the "Legislature's decision to discriminate against all noncitizens, regardless of immigration status," from engaging in voter-registration work. App.008683. And the Citizenship Requirement cannot survive it: Defendants must show they "advance a compelling state

21

interest by the least restrictive means available." *Bernal v. Fainter*, 467 U.S. 216, 219-20 (1984). They have not. So even assuming without deciding, as it did, that Defendants offered a compelling state interest, the District Court properly found no "evidence … to create a genuine dispute as to whether the Citizenship Requirement is the least restrictive means available to further" it. App.008683.

On appeal, Defendants do not even try to show that the Citizenship Requirement is narrowly tailored, nor could they do so. Defendants conceded to a "dearth of evidence involving noncitizens and 3PVRO issues" in the summary-judgment record, App.008647, which the District Court correctly found put beyond "genuine dispute" that the Citizenship Requirement could not be the "least restrictive means to further[]" the State's interests. App.008685. The court also found that Defendants did not "'meaningfully grapple with the tailoring problem posed by the State's willingness to employ noncitizens at its Department of State, Department of Highway Safety and Motor Vehicles, and Supervisor of Elections' offices,'" App.008684-008685, n.2 (quoting ECF 139 at 9), and that the State's own examples of how it regulates noncitizen employees at those agencies "demonstrated less restrictive alternatives to the Citizenship Requirement." *Id.*

Defendants do not even argue that the Citizenship Requirement can survive strict scrutiny (*see* Br.24), forfeiting any claim that it is narrowly tailored. That ought to end the strict-scrutiny inquiry.

22

But the Citizenship Requirement also fails strict scrutiny because the Legislature lacked even a legitimate interest—let alone a compelling one—to categorically ban all noncitizens from collecting or handling voter-registration applications. Nothing in the legislative record connects noncitizens to the "problems with 3PVROs" that Defendants identify. *Compare* HF.Supp.App.1559-1844, *with* Br.5-10. And even if this Court considered Defendants' *post hoc* justifications—those "the legislature in theory could have used but in reality did not," *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189-90 (2017)—those, too, fail to provide a compelling state interest. Defendants point to no instance in the summary-judgment record in which a noncitizen engaged in registration fraud, delivered applications late, or otherwise compromised election integrity while working for a 3PVRO. *See supra* at 11, 15-17. "Without a factual underpinning," their asserted concerns in the timely delivery of voter-registration applications, fraud prevention, and election integrity "lack[] the weight [the Supreme Court] has required of interests properly denominated as compelling." *Bernal*, 467 U.S. at 228.

## II. The narrow "political-function" exception cannot save the Citizenship Requirement.

There is no dispute that the Citizenship Requirement is a blanket classification: Defendants concede that "[a]ll noncitizens are excluded from collecting or handling applications regardless of their alienage status." Br.23. Indeed, they have never disputed that the Citizenship

Requirement "discriminates against all noncitizens," including lawful permanent residents. App.001473. Nor do Defendants dispute that restraints that sweep so indiscriminately as to capture lawful permanent resident aliens are ordinarily subject to "strict scrutiny." App.000308; *see also* Br.14.

Defendants instead invoke the "narrow political-function exception" to the usual rule that strict scrutiny applies. *Bernal*, 467 U.S. at 221. That limited exception applies to "functions of government," meaning roles exercised within government—not over private actors—and involving the direct exercise of state authority, not regulation of private entities. *Cabell v. Chavez-Salido*, 454 U.S. 432, 437-41 (1982). Courts apply a two-part test to determine whether a citizenship-based restriction falls within its ambit: (1) the law must be "sufficiently tailored," and neither overinclusive nor underinclusive, and (2) it must apply "only to 'persons holding state elective or important nonelective … positions'"—that is, "officers who 'participate directly in the formulation, execution, or review of broad public policy.'" *Bernal*, 467 U.S. at 221-22 (quoting *Cabell*, 454 U.S. at 440) (citations omitted). Defendants meet none of these factors.

## A. The Citizenship Requirement falls outside of the political-function exception's limited scope.

At the threshold, the Citizenship Requirement's reach into private employment puts it outside the political-function exception's scope. *See*

24

*Ambach v. Norwick*, 441 U.S. 68, 76 n.6 (1979). That narrow exception "recognize[s] a greater degree of latitude for the States" when they exclude aliens from "*public* employment." *Id.* at 72 (emphasis added).[6] But inherent in its narrowness is the notion that private functions do not "go to the heart of [states'] representative government." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973). It's only the exclusion of aliens from certain "governmental positions" that the Supreme Court has exempted from "demanding scrutiny" and allowed to avoid the "general standard applicable to [alienage] classifications." *Ambach*, 441 U.S. at 68, 74-75.

The constitutional theory behind these cases confirms the point: the political-function exception rests on states' Tenth Amendment "authority … to determine the qualifications of their most important *government* officials." *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991) (emphasis added). And since *Sugarman*, the Supreme Court has consistently confined the exception's application to "public employment" that entails the use of sovereign authority. 413 U.S. 634, 646-47 (1973). *See, e.g.*, *Cabell*, 454 U.S. at 440 (probation officers); *Ambach*, 441 U.S. at 76 (public schoolteachers); *Foley v. Connelie*, 435 U.S. 291, 299-300 (1978) (police officers).

Conversely, the Supreme Court has rejected the very encroachment of the public-function doctrine into "private occupation[s]" that

---

[6] *See also Cabell*, 454 U.S. at 437 (discussing "public/private distinction" as "principle" guiding alienage-restriction review as early as *Truax v. Raich*, 239 U.S. 33 (1915)).

Defendants urge. *Ambach*, 441 U.S. at 76 n.6. In *Ambach*, the Court upheld a ban on aliens serving as public schoolteachers, reasoning that it came within the political-function exception. But that conclusion turned on a crucial limitation: the ban "applie[d] only to teachers employed by and acting as agents of the State." *Id.* The Court contrasted that case with *In re Griffiths*, 413 U.S. 717 (1973), where strict scrutiny applied because the law at issue barred all noncitizens from the Connecticut bar, "implicat[ing] the right to pursue a chosen occupation, *not* access to public employment." *Id.* (emphasis added).

Thus, as *Cabell* later summarized, the political-function cases distinguish "between the economic and political functions of government," exempting alienage bans on specific forms of the latter from strict scrutiny. 454 U.S. at 439-40. Accordingly, the exception extends only to exclusions from public employment; it does not say states can restrict noncitizens from "private enterprises and occupations that are otherwise lawful." *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 603 (1976) (citations omitted). Indeed, the Court has articulated the doctrine as one protecting "aliens['] … right to pursue various occupations." *Bernal*, 467 U.S. at 219-20.

Here, it is undisputed that "3PVROs are … *non-governmental* entities." Br.20. Defendants even argue that the Citizenship Requirement skirts strict-scrutiny review *because* Plaintiffs are non-governmental. *See id.* (claiming exception applies because government

26

lacks "day-to-day insights" into Plaintiffs' operations). But that approach flips the doctrine on its head and Defendants cite no authority for it. *Id.* While treating private actors "differently" from government officials does "make[] sense," that distinction cuts against Defendants, not for them. *Id.* Ultimately, the political-function exception is particularly ill-fitted to canvassers when even lawyers—"professional[s] of responsibility and influence" who are often "leaders in government"—"are not officials of government by virtue of being lawyers." *Griffiths*, 413 U.S. at 729.

Defendants' reliance on *Cervantes v. Guerra*, to suggest the exception reaches more broadly is wrong. Br.17. *Cervantes* falls squarely within precedent limiting the exception to public roles. There, the old Fifth Circuit applied the exception to a quasi-government board that barred noncitizens from serving on it. *Cervantes*, 651 F.2d 974, 976-77 (5th Cir. 1981). The board was publicly funded, "designate[d]" by "State and local governments" to "receive federal funds," and composed in part of "[l]ocal government officials," who made up a third of its governing body. *Id.* at 977. Those features supported the court's assumption that state action could "be found [t]here." *Id.* at 977-78. Thus, far from expanding the political-function exception, *Cervantes* confirms that it stops at public roles; it doesn't empower states to regulate private employers by otherwise unconstitutional means. *See Cabell*, 454 U.S. at 437 ("distin[guishing] between government distribution of public resources and intervention in the private market"). This Court should

27

thus affirm before reaching the political-function exception's two-part test because the regulated function falls outside the doctrine's scope.

### B. The "political-function exception" cannot save the Citizenship Requirement.

If this Court disregards the Supreme Court and becomes the first to apply the political-function exception to "private occupation[s]," *Ambach*, 441 U.S. at 76 n.6, it should still affirm because the Citizenship Requirement flunks *Bernal*'s two-part test. 467 U.S. at 220-21. That test asks whether a citizenship-based restriction is: (1) "sufficiently tailored," and (2) applies "only to 'persons holding state elective or important nonelective executive, legislative, and judicial positions'"—that is, roles that "'participate directly in the formulation, execution, or review of broad public policy.'" *Id.* at 221-22 (quoting *Cabell*, 454 U.S. at 440). The Citizenship Requirement meets none of these factors.

#### 1. *The Citizenship Requirement is not properly tailored.*

#### a. The Citizenship Requirement is overinclusive.

Defendants argue the Citizenship Requirement is not overinclusive because it only targets a subset of noncitizens: those who collect or handle a citizen's voter-registration application. Br.19-20. That misunderstands "overinclusiveness." The question is not whether the challenged law only targets *part* of the suspect class, but whether it "indiscriminately sweep[s]" more than needed to ban persons from a "range of offices and occupations" based just on alienage. *Bernal*, 467 U.S. at 222; *see Cabell*,

454 U.S. at 442 (noting "inquiry is whether [] restriction reaches so far …
to belie the [] claim that it [] only attempt[s] to" leave "an important
[government] function … in the hands of" citizens).

Florida's categorical law against any noncitizen who "collect[s] or
handle[s]," Fla. Stat. §97.0575(1)(f), voter-registration forms does
precisely that: it fails to "specif[y] only one particular post" from which
"the State asserts a right to exclude" noncitizens and sweeps in an array
of roles without any tailoring to the State's claimed objectives, *Bernal*,
467 U.S. at 222.

Consider the evidence before the District Court. While Defendants
have focused on the claimed need to regulate noncitizen "canvassers"
(*e.g.*, Br.6,18), the summary-judgment record had testimony and evidence
showing that the Citizenship Requirement *on its terms* would ban,
impair, or chill noncitizens from serving in a host of roles at 3PVROs,
including as: volunteers (HF.Supp.App.0021); canvassers (App.006415-
006416; App.006405-006406); canvassing supervisors (NAACP Dkt. 54-8
at 3; NAACP Dkt. 204-5 at 1); staff transporting voter-registration forms
(NAACP Dkt. 204-5 at 3); community organizers (NAACP Dkt. 204-8 at
3); quality-control staff (App.006415-006416; App.006385-006387); staff
using computers containing personal information from voter-registration
forms (NAACP Dkt. 204-4 at 94); special-project directors (NAACP Dkt.
204-13 at 1-2); state directors (HF.Supp.App.0033-0036); and even
directors of organizations that conduct voter-registration activities

(NAACP Dkt. 204-4 at 12, 88). Each of these roles and duties would, at some point, easily involve "collecting" or "handling" voter-registration applications and come within the statute's reach.

In short, the Citizenship Requirement "broad[ly] prohibit[s]" noncitizens from an undefined range of private employment bearing "little, if any, relationship" to Defendants' rationale beyond workers' alienage. *Sugarman*, 413 U.S. at 642. That is precisely the kind of overinclusive ban the Supreme Court deemed fatal in *Sugarman*, where it struck down a civil-service citizenship requirement that swept in not just those who "formulat[ed] and execut[ed] important state policy," but also "'the sanitation man' … the typist, and [] the office worker." *Id.* (citation omitted). The same is true here: a noncitizen supervisor can no more "handle" a completed voter-application form than a noncitizen canvasser without exposing their employer to catastrophic fines. A classification that burdens an entire class of lawful workers without evidence that the class poses any distinct risk is, by definition, substantially overinclusive. *Bernal*, 467 U.S. at 222.

### b. The Citizenship Requirement is underinclusive.

The District Court correctly recognized that underinclusiveness has been a hallmark of the Citizenship Requirement since its enactment. App.008684-008685 n.2. At each stage, Defendants have failed to explain how the Citizenship Requirement is correctly tailored to address any concerns the State has over noncitizens "collecting or handling" voter-

30

registration applications, when noncitizen "postal workers and state employees can" and routinely do "handle" the same completed forms. Br.20.

This asymmetry is well-supported in the summary-judgment and trial record. Defendants have never disputed that the very people noncitizen canvassers and 3PVROs return voter-registration forms to— Supervisors of Elections, the Secretary's office, and other state employees—face no similar categorical alienage ban.[7] *See* Br.20. Indeed, noncitizens can and do work in Florida's Division of Elections, Elections Commissions, and in Florida's Department of Highway Safety and Motor Vehicles, where employees routinely handle the same personal information found in completed voter-registration forms. App.007612.

The asymmetry is also fatal: a law is underinclusive for political-function purposes when it "indiscriminately" excludes noncitizens from specific roles, "while leaving out" others that would create the same problem the Legislature claims it tried to cure. *Cabell*, 454 U.S. at 440-41. Florida has done just that. "Legislators," Defendants note, "justified the citizen restriction to protect sensitive information on voter [forms]

---

[7] *See* HF.Supp.App.0200 (Morley Dep.) (Division of Elections witness conceding citizenship not "qualification" to head Division); HF.Supp.App.2145 (Sec'y 30(b)(6) Witness Dep.) (Election Crimes Director conceding work-authorized noncitizens can work in Secretary's office); HF.Supp.App.2363, 2367-2368 (Earley Dep.) (County Supervisor confirming noncitizens can review completed application forms); *see also* App.005037 (VanderGiesen Tr.) (Assistant State Attorney admitting "[i]f [noncitizens] can legally work … they can legally work at the state attorney's office"); HF.Supp.App.3492 (Senator Jones denoting how noncitizens with work authorization "can work in the DMV, or even in the tax collector's office").

from foreign citizens ….” Br.12. But that elides that, as the District Court found, “employees of several state agencies are also responsible for handling completed voter registration applications, and [Florida] apparently has not … exclude[d] all noncitizens from [those] positions.” App.001476-001477. In short, the Legislature enacted the archetypal underinclusive “classification” that “undercut[s] the [] claim that [the challenged law] serves legitimate political ends.” *Cabell*, 454 U.S. at 440.

Nor does Defendants’ assertion that Plaintiffs serve “non-governmental” interests, whereas postal workers and state employees do not (Br.20), cure the problem. Defendants have argued that State employees who “handle” voter-registration forms are different because they undergo “[b]ackground checks and a citizenship screening.” App.008648-008649. But the District Court pinpointed the flaw in that argument: examples of “regulation of [state-agency] noncitizen employees” (like background checks or screenings), *are themselves* proof that “less restrictive alternatives” exist to Florida’s categorical alienage ban. App.008684-008685 n.2. Indeed, Defendants admit that the distinction they rely on has nothing to do with citizenship, but to a claimed difference in the government’s “insight[] into … hiring or firing practices, [] training, or other safeguards when handling a voter registration application.” Br.20.

That confirms underinclusiveness: the State could—and does—use tailored safeguards short of a categorical ban to police the concerns it

claims the Citizenship Requirement meant to address. Its choice not to do so here is yet another way its law fails strict scrutiny and a reason the political-function exception cannot apply.

### 2. Plaintiffs lack the authority or discretion needed for the political-function exception to apply.

Nothing about 3PVRO canvassing resembles the kind of governmental authority that the political-function exception protects. The Supreme Court limits the "narrow" exception to roles "invested either with policymaking responsibility or broad discretion in the execution of public policy [requiring] the routine exercise of authority over individuals." *Bernal*, 467 U.S. at 225-26. Accordingly, it has identified only a limited set of positions that are excepted.

Police officers are excepted because they possess "an almost infinite variety of discretionary powers," that affect "the most sensitive areas of [public] daily life." *Foley*, 435 U.S. at 297. Probation officers are excepted because they exercise a state's "sovereign coercive powers." *Cabell*, 454 U.S. at 459 (Blackmun, J., dissenting). And public schoolteachers are excepted because they have "wide discretion" to shape students' "attitudes … toward[s] government, the political process, and [civic] responsibilities." *Ambach*, 441 U.S. at 78-79.

Private canvassers for nonprofit organizations have none of these attributes. They're not entrusted with "broad discretion in the execution of public policy [] requir[ing] the routine exercise of authority over

33

individuals." *Bernal*, 467 U.S. at 225-26. Their work—collecting completed applications and delivering them to county officials—is "essentially clerical and ministerial." *Id.* That places canvassing alongside the notarial tasks at issue in *Bernal*, where the Court held that a Texas law barring aliens from serving as notaries fell outside the political-function exception because their duties—while necessary to be done "correctly and with integrity"—were too removed from "the heart of representative government." *Id.* The same is true here.

Defendants' own description of canvassing forecloses their theory. They emphasize that a canvasser's remit is to ensure that "any voter registration application … is delivered to the Department of State or the supervisor of elections" within a fixed timeframe. Br.18 (quoting Fla. Stat. §97.0575(5)(a)). "That's the only job of a canvasser," they say. *Id.* In other words, Defendants *concede* that canvassers' sole responsibility is a ministerial delivery obligation. And purely custodial tasks of this kind fall squarely outside the political-function exception. *Bernal*, 467 U.S. at 226. Far from supporting the State, Defendants' description thus confirms that canvassers' duties are nongovernmental, nondiscretionary, and noncoercive, and thus cannot justify a citizenship restriction.

Within this framework, Defendants' core argument boils down this way: (a) voting is the "essential political function in a democracy" and since only citizens can vote, (b) it *must* be that "Florida can exclude *all* noncitizens" from *any* "important step in the process of voting." Br.18-19.

34

But that conclusion doesn't follow from the Supreme Court's political-function cases, in part, because it conflates different meanings of the word "function." In the line of cases that peaked in *Bernal*, the Supreme Court clearly describes political "professional or official *position*[*s*]," such as police officers (*Foley*) or probation officers (*Cabell*). Function, *Merriam-Webster's Dictionary* (12th ed.) (emphasis added). Defendants' argument instead relies on voting's status as a political "[*a*]*ction* for which a person or thing is specially fitted[.]" *Id.* (def.2) (emphasis added). But no case assigns that latter meaning to the "political-function" exemption. And to the extent Defendants suggest *Cervantes* does so, Br.17, they forget that it predates *Bernal*, which they concede is "the Court's most recent alienage case" and therefore controls, *id.*

To be sure, Plaintiffs emphatically agree that voting is our democracy's definitive civic *act*: as the District Court explained, the record below made clear that Plaintiff 3PVROs' purpose and those of their members is "to reach marginalized voters" and "encourage [them] to [] join in citizenship's highest right." App.001500.[8]

But the rest of Defendants' point proves far too much. If mere proximity to voting were enough, states could bar lawfully admitted, work-authorized noncitizens—including LPRs—from working in vast

---

[8] Each Individual Plaintiff spoke to the importance they ascribe to registering new voters. *See, e.g.*, HF.Supp.App.0051-0052 ("voter registration work is important"); HF.Supp.App.0064 ("promoting civic engagement is important to me"); HF.Supp.App.0011 (similar); HF.Supp.App.0017-0018 (similar).

segments of the workforce: e.g., postal carriers who transport mail ballots; IT workers who service election-related technology; workers in printing companies that produce mail ballots or registration forms; drivers who transport election equipment or registration materials; or even journalists who cover elections. All could be recast as performing "political functions" open only to U.S. citizens. But that is not the law. Rather, while resident "alien[s] may be barred from full involvement in the political arena," states must allow them to "play … perhaps even a leadership role in other areas of import to the community." *Nyquist v. Mauclet*, 432 U.S. 1, 12 (1977).

As the District Court explained, Defendants effectively ask the Court to "deviate from settled law" and adopt the kind of boundaryless political-function exemption that the Supreme Court has warned against. App.001478. Under their theory, the "narrow" exception would "swallow the rule" and "depreciate" the "heightened judicial solicitude" warranted in cases involving categorical, alienage-based restrictions. *Bernal*, 467 U.S. at 222 n.7. But the Supreme Court has made clear that ministerial functions—even those touching important government processes—don't become "political" absent sovereign authority or policy discretion. *Id.* at 223, 226. And because noncitizen canvassers exercise neither, Defendants cannot meet the second prong of the political-function exception.

Nor do the cases Defendants cite aid them. Defendants again turn to *Cervantes*—a pre-*Cabell*, pre-*Bernal* decision upholding a ban on noncitizens serving on or voting for the board of directors of a hybrid public-private agency. Br.20-21. But *Cervantes* upheld a restriction on voting *itself*—and only because the old Fifth Circuit read a Supreme Court summary affirmance to establish that casting a ballot in an election falls within the political-function exception. 651 F.2d at 981 (citing *Skafte v. Rorex*, 430 U.S. 961 (1977)). That narrow, vote-specific holding rests on a principled distinction: voting is the *direct* exercise of sovereign authority by members of the political community. It understandably occupies a special constitutional role as the act by which that community constitutes itself, and states have been allowed to confine it to citizens long before the political-function cases. *See, e.g.*, U.S. Const. amend. XIV, §2 (referring to "right to vote" of "citizens"); U.S. Const. amend. XV, §1 (similar); *see also Sugarman*, 413 U.S. at 648 n.13 (describing Reconstruction Congress's understanding that voting and officeholding are sovereign functions that could be limited to citizens). By contrast, registering an eligible voter does not involve making a sovereign choice or exercising discretion.

As for the ban on serving on the agency's board of directors, *Cervantes* emphasized that board members "create[d] policy and exercise[d] discretion," including "design[ing] and carry[ing] out programs tailored to the needs of the poor as they perceive them." 651

37

F.2d at 981-82. Those duties fall squarely within the political-function exception's heartland: they "necessarily exercise broad discretionary power over the formulation or execution of public policies importantly affecting the citizen population." *Bernal*, 467 U.S. at 223-24.

Plaintiffs here stand in an entirely different posture. They wield no discretionary or coercive state power, formulate no public policy, and act nothing like the agency in *Cervantes*. So rather than suggest the District Court got it wrong, *Cervantes* reinforces that the political-function exception is limited to roles imbued with decisionmaking authority— which the ministerial work at issue here decidedly is not.

*Bluman v. Federal Election Commission*, on which Defendants next rely, does not suggest otherwise, for three central reasons.[9] Br.19 (citing 800 F. Supp. 2d 281, 288 (D.D.C. 2011)). First, *Bluman* did not apply the Equal Protection Clause and did not concern a categorical restriction on aliens *as a class*: "[t]he [relevant] statute [] define[d] 'foreign national' to include all foreign citizens *except* those … admitted as lawful permanent residents." 800 F. Supp. 2d at 284 (quoting 2 U.S.C. §441e(a)) (emphasis added). And while *Bluman* boasts broad dicta about some political-function cases, then-Judge Kavanaugh invoked those decisions only by analogy to decide how best to review restrictions on political spending. *Id.* at 288 (noting court reviewed cases "for purposes of First

---

[9] *Bluman* is also an out-of-circuit, trial-court ruling that in no way binds this Court. *United States v. McGarity*, 669 F.3d 1218, 1266 n.66 (11th Cir. 2012), *abrogated on other grounds by Paroline v. United States*, 572 U.S. 434 (2014).

Amendment").[10] Thus, *Bluman* says nothing about the well-settled equal-protection framework that governs this case.

Second, Florida simply lacks the interests at issue in *Bluman*: Congress's unique authority to "prevent[] foreign influence over the U.S. political process." *Id. Bluman* explicitly grounded itself on the notion that the national "government's … regulatory prerogatives are at their apex in matters [concerning] alienage." *Id.* at 290. In that ambit, Congress has powers that Florida cannot call upon to justify its laws. *See id.* (citing *Mathews v. Diaz*, 426 U.S. 67, 84 (1976)); *see also Skrmetti*, 605 U.S. at 548 n.1 (alienage "a suspect class [] vis-à-vis the States" but not Congress because of latter's "broad authority over immigration") (Barrett, J., concurring). Cases—like this one—involving "the relationship between aliens and the States rather than between aliens and the Federal Government," must follow the different path laid out in cases like *Bernal*. *Mathews*, 426 U.S. at 84-85.

Third, on its own terms, *Bluman* addressed activities the court described as core to the process by which voters *choose* political leaders—campaign expenditures and contributions. 800 F. Supp. 2d at 288. The expenditures at issue "finance[d] advertisements, get-out-the-vote drives, rallies, candidate speeches," which made them "an integral [part]

---

[10] A restriction on noncitizens' political *speech* could well fare differently. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech … is accorded aliens residing in this country."). For example, campaign spending can usually be limited to specific amounts, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 345 (2010), while speech in support of a candidate may not.

of the process by which Americans *elect* [government] officials ...." *Id.* (emphasis added). Registering voters is fundamentally different. Registration does not involve influencing, persuading, or guiding a voter's political choices, nor does it require the canvasser and voter to share viewpoints. It just involves collecting and submitting applications for review by State officials. *See* Br.18. Canvassers make no eligibility determinations, wield no governmental authority, exercise no discretion, and hold no policymaking responsibility. Their work is comparable to the clerical or custodial roles the Supreme Court has held fall outside the political-function exception. *Bernal*, 467 U.S. at 227-28.

In short, *Bluman* offers Defendants no support.

## III. Defendants' remaining arguments wrongly ask this Court to rewrite the challenged statute.

Rather than defend the actual statute, Defendants pivot to a different, hypothetical law—one that would target only *some* noncitizens. Br.22-26. They argue that such a law would be a constitutional legislative exercise. But that statute is not before this Court, and the Court cannot rewrite Florida's law. *See Fla. Right to Life v. Lamar*, 273 F.3d 1318, 1326 (11th Cir. 2001) ("We will not ... rewrite the clear terms of a statute ... to reject a facial challenge, and, as a federal court, we must be particularly reluctant to rewrite the terms of a state statute." (quotation marks omitted). No precedent supports Defendants' proposal, and evaluating

whether a subset of the targeted class *might* be lawfully barred from engaging in the conduct at issue would lead to absurd results.

Take, for example, a law that says: "Black people cannot vote in state or federal elections."[11] Of course, some Black people cannot vote for reasons unrelated to race—such as being under the age of 18 or being noncitizens—and the State can lawfully prohibit *them* from voting. Yet under Defendants' position, strict scrutiny would not apply to that law. And under Defendants' formulation of *Salerno*, because there exists a hypothetical circumstance in which the law could be validly applied, the statute would not facially violate the Fourteenth Amendment's Equal Protection Clause. This Court should decline Defendants' invitation to employ a rule that would produce such outlandish results.

### A. The Legislature chose to discriminate against *all* noncitizens, not just a subset of them.

Defendants argue that the District Court erred by refusing to employ rational-basis review for at least some applications of the Citizenship Requirement—e.g., to non-permanent residents. Br.23-24. But the decision not to distinguish between lawful permanent residents and other noncitizens was the Legislature's choice, not the District Court's error. Rather, the District Court correctly recognized it had no

---

[11] Defendants get the law exactly backwards when they concede that "strict scrutiny applies to *any* facial classifications based on *any* race," but say "[a]lienage is different." Br.24. It is not: "[t]he Supreme Court has repeatedly said that when the government … distinguishes … along lines of *race or alienage*, that classification [gets] strict scrutiny." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003) (emphasis added).

authority to "parse" the statute's "text" "into two subgroups to determine the applicable standard of review" when the Legislature grouped noncitizens together. App.001473. Nor should the court have evaluated an undefined "multitude of subcategories" of noncitizens that appear nowhere in the statute, as Defendants suggest. Br.24.

That limitation is particularly sensible where, as here, the Legislature considered—and rejected—amendments that would have allowed lawful permanent residents to register voters and instead enacted the broadest possible alienage classification. *See supra* at 13-14. Nothing shows what a law is meant to do better than the words its lawmakers chose. *See United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940) ("no more persuasive evidence" of statute's purpose than its text). Thus, courts ought to "presume" that the Legislature "says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Here, the statute reflects a conscious policy choice to sweep in *all* noncitizens. Defendants cannot turn to the federal courts to narrow its scope. *See Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1572 n.6 (11th Cir. 1993).

Against this backdrop, Defendants rest on two cases—*Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019), and *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005))—to argue that when "the government excludes a non-permanent resident from collecting or handling a voter registration

application, [it] must only provide a rational basis for that exclusion." Br.23. These cases, however, say nothing of the sort.

In both *LeClerc* and *Estrada*, reviewing courts correctly analyzed the challenged statutes as written, not through the kind of hypothetical lens Defendants invite. In *LeClerc*, the statute expressly limited admission to the Louisiana bar to citizens *or* "resident aliens"—defined as those "who ha[d] attained permanent resident status …." 419 F.3d at 410 (citation omitted). By its terms, the law "effectively prohibit[ed]" *non*immigrant aliens with temporary status from sitting for the bar. *Id.* The Fifth Circuit reasoned that "nonimmigrant" plaintiffs were not a suspect class *themselves* and could not challenge a law that, on its terms, exempted resident aliens from its sweep. *Id.* at 419. But *LeClerc* contrasted the targeted statute at issue with the "total exclusion of all aliens from the practice of law" the Supreme Court deemed "constitutionally infirm" in *Griffiths*. *Id.* at 415, 422 (quoting *Griffiths*, 413 U.S. at 719). Had the Louisiana law in *LeClerc* also "affect[ed] 'resident aliens' or 'permanent resident aliens,'" the court suggested, "strict scrutiny" would have been proper. *Id.* at 416 (quoting *Graham*, 403 U.S. at 371)).

Leaning on *Estrada* fares no better. In *Estrada*, this Court applied rational-basis review to an equal protection challenge of Georgia policy requiring "selective colleges and universities to verify the 'lawful presence' of all the students they admit." 917 F.3d at 1301-10. The policy

43

applied to individuals "not lawfully in the United States," a category defined to include Deferred Action for Childhood Arrivals (DACA) recipients, but *not* noncitizens who were "lawfully admitted" or otherwise had statutory authorization to remain in the country. *Id.* at 1301-02, 1312. As in *LeClerc*, the Court's consideration of whether that subset of noncitizens represented a suspect class simply tracked the statute's text. *Id.*

*Estrada* is thus miles from this case: it is undisputed that all individual Plaintiffs and organizational Plaintiffs' staff have "lawful presence." *See, e.g.*, HF.Supp.App.2833 (Vélez Dep.) at 79; HF.Supp.App.2946-2947 (Wassmer Dep.).[12] And this Court's recent precedent further counsels in favor of applying strict scrutiny to the Citizenship Requirement's text as written. In *Shen*, this Court applied rational basis to a statute that "facially discriminated based on alienage because [it] exempt[ed] United States citizens … *and lawful permanent residents*." 158 F.4th at 1251-52. But *Shen* made clear that, in cases like this one, "[a]pplying strict scrutiny to laws that apply alienage classifications to lawful permanent residents is proper because lawful permanent residents are 'virtual citizens.'" *Id.* at 1255. Like *Estrada*,

---

[12] *See also* App.001449 n.4 ("[T]his Court recognizes that the individual Plaintiffs in these cases are legally permitted to work in the United States, and that the 3PVROs in these two cases who employ noncitizens … employ only those who are legally permitted to work in the United States.").

*Shen* interpreted the statute as written and applied the appropriate level of scrutiny for the class of people at issue. *Id.*

### B. *Salerno* does not compel a different result.

Defendants' reliance on the Supreme Court's discussion of facial challenges in *United States v. Salerno*, misunderstands the standard governing review of alienage-based classifications. *Salerno* says that a plaintiff asserting a facial challenge must show there are "no set of circumstances [] under which the Act would be valid."[13] 481 U.S. at 745. But that doesn't mean a court should focus on classifications found nowhere in the statute. Rather, in the equal-protection context, the *Salerno* framework asks whether no set of facts can justify the *classification made*. And when a law draws a suspect-status restriction— here, a bright-line alienage ban—the inquiry is not whether the statute has some constitutional applications, but whether the classification *itself* is constitutionally permissible.

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015), shows the way. There, petitioners brought a facial Fourth Amendment challenge to an ordinance requiring hotel operators to provide guest information to law enforcement on demand. *Id.* at 417. The City argued that under *Salerno*,

---

[13] Defendants correctly note that the framework is "criticized." Br.22. *Salerno*'s "no set of circumstances" language is dictum—"unsupported by … precedent" and "unnecessary to the holding." *Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (Stevens, J., respecting denial of cert.). The Supreme Court has never treated it as dispositive, *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality op.), and has "ignored [it] in subsequent cases," *Janklow*, 517 U.S. at 1175. *See also United States v. Frandsen*, 212 F.3d 1231, 1235 n.3 (11th Cir. 2000).

the challenge failed because *some* warrantless searches are constitutional. *Id.* at 417-18. The Supreme Court rejected that logic, explaining it would "preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches." *Id.* at 418. And it explained that facial review turns only on "applications of the statute in which it actually authorizes or prohibits conduct." *Id.* So applied here, the inquiry focuses on what the Citizenship Requirement actually prohibits: *all* non-citizens from collecting or handling voter-registration forms. Whether a subset of noncitizens might constitutionally be barred is "irrelevant to [the Court's] analysis." *Id.* at 419.

Still, Defendants would have the Court uphold the Citizenship Requirement, because they claim it might be constitutionally applied to "other aliens" who are not permanent residents. Br.24; *but see infra* at 48-51. But that approach would "divorce[] review of the constitutionality of the statute from [its] terms" and entertain "hypothetical musings about potentially valid *applications*." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012). Put simply: *Salerno* does not call upon or permit courts to rewrite statutes or limit them to narrower terms not reflected in the statutory text. Because the Legislature chose to facially distinguish between U.S. citizens and all aliens, Fla. Stat. §97.0575(1)(f), the Court must evaluate that classification under strict scrutiny, the relevant constitutional test. *See Shen*, 158 F.4th at 1252 ("[W]e usually apply strict scrutiny to alienage classifications ….").

Indeed, Defendants ask the Court to deploy a version of the *Salerno* framework that it has already declined to follow. In *Club Madonna v. City of Miami Beach*, the City argued that federal immigration law did not preempt its heightened recordkeeping and identification-checking requirements for adult-entertainment venues because those could be "validly applied" to some employees. 42 F.4th 1231, 1256 (11th Cir. 2022). This Court rejected that argument outright, reiterating that plaintiffs bringing a facial challenge need not "prove that there is *no* hypothetical situation in which [a challenged law] could be validly applied." *Id.* (emphasis added). Rather, "the question" *Salerno* poses is "whether the statute [as written] fails the relevant constitutional test." *Id.* at 1256. Because the regulations failed that test for conflict preemption, they could not stand. *Id.*

The same result follows here: once the statute fails the governing constitutional standard, hypothetical valid applications cannot save it. As *Doe*—on which *Club Madonna* relied—explained, *Salerno*'s "no set of circumstances" language is "accurately understood not as setting forth a *test* for facial challenges, but [] as describing the *result*" of one "in which a statute fails to satisfy the [proper] constitutional standard." 667 F.3d at 1127. Courts "appl[y] the relevant constitutional test to the challenged statute, without … dream[ing] up whether … some hypothetical … application of the statute might be valid." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016). And once a statute fails that standard—such

47

as strict scrutiny—"it can no longer be constitutionally applied to anyone," leaving "no set of circumstances" in which it is valid. *Doe*, 667 F.3d at 1127 (collecting cases); *see also Club Madonna*, 42 F.4th at 1256.

So too here. Because strict scrutiny is "the test for determining facial unconstitutionality in this case, *Salerno* is of limited relevance," and merely describes the consequence of applying that test. *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1337-38 (Fed. Cir. 2005). And as explained above, Defendants make no attempt to show that the Citizenship Requirement can withstand strict scrutiny, nor do they cite evidence in the summary-judgment record showing that noncitizens, as a class, have such transitory presence that a categorical ban on their collecting or handling voter-registration applications is justified. They simply ask the Court to rewrite the statute. But a State cannot fence out a suspect class, offer no evidence tying that exclusion to an actual problem, and then rely on hypothetical applications to save the law. *Salerno* does not compel that approach, *Club Madonna* forecloses it, and the Equal Protection Clause forbids it.

## IV. Plaintiffs still prevail under rational-basis review.

If any law triggers strict scrutiny, this one does. But the Citizenship Requirement cannot even satisfy rational basis review for at least three reasons: *First*, animus motivated it, *supra* at 11-16, and statutes fail rational basis review where their classification can best be explained by a "desire to harm a politically unpopular group." *Romer v. Evans*, 517

U.S. 620, 634 (1996). State officials' statements in the summary-judgment record reflect that the Citizenship Requirement was driven by generalized suspicion of noncitizens as a class—not by evidence of any problem they caused.

Under oath, the Secretary's representative explained how the law was justified because noncitizens were inherently criminal, "continually breaking" the law and "prone to breaking" more laws just because of their status. HF.Supp.App.1910-1911, 1922 (Sec'y 30(b)(6) Witness Dep.). Senator Hutson similarly defended the Citizenship Requirement by suggesting any noncitizen is "an illegal" who should not be "doing third-party voter registration" work. HF.Supp.App.1570. These are the kind of "biases" that "often accompany irrational (and therefore unconstitutional) discrimination." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001). And while "their presence alone does not [make] a constitutional violation," *id.*, statements that—without factual support—cast all noncitizen participation in voter registration as a threat to the franchise reveal precisely the "bare … desire to harm a politically unpopular group," that cannot justify state action. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

*Second*, there is no rational connection between citizenship status, and the harms Defendants assert. Even under deferential review, a law

must have "some footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993). Here, the State at best identified (*post-hoc*) concerns about timeliness, accuracy, and security of voter-registration applications, but produced no evidence whatsoever that noncitizens are more likely to mishandle forms, submit them late, or misuse voter information. Every instance of misconduct that Defendants cite in the record involved U.S. citizens or individuals whose citizenship status was unknown.[14] And Defendants conceded the "dearth of evidence involving noncitizens and 3PVRO issues." App.008685 (citing App.008647). A classification not "grounded in a sufficient factual context … to ascertain some relation between [it] and the purpose it serve[s]" still fails rational review. *Romer*, 517 U.S. at 632-33.

And *third*, the Citizenship Requirement lacks a connection between its means and its ends. Rational-basis review still demands a discernible "link between classification and objective." *Romer*, 517 U.S. at 632. Here, the District Court correctly found a complete lack of "connective tissue" between the two. App.001480; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) ("[S]tate may not rely on a classification

---

[14] Noncitizen Plaintiffs on the other hand explained that in their work for 3PVROs, they had never been subject to discipline or fines for their work. *See* App.003689-003690 (Herrera-Lucha Tr.), App.003720 (Pico Tr.), App.003797-003798 (Martínez Tr.). Even defense witnesses admitted that they have no reason to believe that noncitizens are "less trustworthy" than U.S. citizens. App.005037 (VanderGiesen Tr.).

50

whose relationship to an asserted goal is so attenuated as to render [it] irrational."). The law sweeps in lawful permanent residents and long-term work-authorized residents while leaving numerous other actors untouched who handle the same forms. A law that is both overinclusive and underinclusive in this way is irrational. *Romer*, 517 U.S. at 632; *Cleburne*, 473 U.S. at 446, 450. Ultimately, even if rational basis review in no way demands that a law "be drawn with [] 'mathematical nicety,'" "the classification here … is not only 'imprecise,' [but] wholly without any rational basis." *Moreno*, 413 U.S. at 538 (citation modified).

## V. The Court should disregard the State's reliance on extra-record trial evidence.

Defendants' factual background section (Br.4-12) ignores the summary-judgment record on Plaintiffs' equal protection claim and instead relies on testimony and evidence from a later bench trial on different claims and other provisions of Florida's election laws.

That distinction matters. While this Court "may *affirm* on any ground supported by the record, regardless of whether that ground was relied upon or even considered below," *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017) (emphasis added), the same is not true for *reversal* based on material outside the summary-judgment record. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1027 (11th Cir. 2000) ("[B]ecause the district court did not have the [trial] testimony … when it granted summary judgment … evidence offered at trial is not relevant to our

review … and we will not consider it.").[15] Here, Defendants did not dispute Plaintiffs' statement of material facts, and the trial evidence they now cite was not before the court when it ruled on partial summary judgment. Those citations cannot inject belated factual disputes and are improper in this appeal.[16]

In any event, even if this Court considered the trial record—which was predominantly developed for claims different from the one at issue—it provides no basis to find clear error or to reverse. If anything, the trial evidence confirms that the District Court's summary-judgment ruling is correct. Defendants' selective use of two pieces of the trial record merits brief attention. *First,* Defendants cite trial testimony from Plaintiffs Humberto Orjuela and Verónica Herrera-Lucha to argue that past travel abroad makes them likely to "leave the state … and not turn in applications on time." Br.10.

Their testimony suggests no such thing. Mr. Orjuela is a permanent resident, (App.003433); authorized to work (App.003434-App.003436);

---

[15] *See Miranda v. B & B Cash Grocery Store*, 975 F.2d 1518, 1532 (11th Cir. 1992) ("[O]nly facts presented during the resolution of the motion for summary judgment, and not … at [a] later bench trial … are relevant to our review of the grant of summary judgment …."); *see also Griffin v. Sirva, Inc.*, 835 F.3d 283, 287 (2d Cir. 2016) (similar).

[16] *Compare, e.g.*, App.008647-008648 (conceding at summary-judgment stage to "dearth of evidence involving noncitizens and 3PVRO issues," arguing "[i]t's enough that noncitizens … may not have ties to communities and may pose a flight risk"), *with* Br.10 (citing *trial testimony* to claim that "with noncitizens, it's rational to assume" greater risk they will "leave the state, given their strong ties to other countries, and not turn in applications on time").

testified he has *never* left Florida with voter-registration applications (App.003443); and considers himself "connected" to this Nation's "political community" (App.003443). This testimony went unchallenged.

Likewise, Ms. Herrera-Lucha's described substantial, long-standing ties to this country: As of 2024, she had lived in the United States for 21 years (App.003673) and in Osceola County for six years with her U.S.-citizen husband and their 11-year-old U.S.-citizen son (App.003671); has no plans to permanently leave Florida or the United States (App.003673); and has been *commissioned by the State as a notary* since 2018 (App.003676). In short, the witnesses Defendants point to as having "ties" to other countries—strong or otherwise—do not support the State's claim that noncitizens are more likely than anyone else to abscond abroad with voter applications.

Separately, Defendants point to trial testimony from a witness about a canvasser who "'left for Mexico' for 10 days and failed to timely deliver three voter registration applications." Br.9, 47 (citing PX847, Email re: Voter Registration Missed Deadline, 4:23-cv-215 (N.D. Fla.)); App.003896-003898 (Vélez Tr.)). But Defendants presented no evidence that the canvasser was a noncitizen. They never asked about the individual's citizenship in discovery or at trial and offer only speculation. *See* App.003896-003898. And even if the canvasser was a noncitizen, nothing in the record supports the claim that lawfully present, work-authorized noncitizens are prone to leave Florida.

*Second*, Defendants' five-page exegesis on "the problems with 3PVROs" (Br.5-10), devotes just *one* paragraph to anything involving noncitizens. It cites Ms. Herrera-Lucha's testimony that she once fired a U.S. citizen and three noncitizens for application irregularities. Br.9 (citing App.003690). But misconduct by three individuals says nothing about why banning *all* noncitizens is even rationally related to preventing similar problems. There is no evidence, for example, that any of these canvassers fled the country, as Defendants insist they might. And the fact Ms. Herrera-Lucha testified to also firing a *U.S. citizen* in the same instance shows the Citizenship Requirement is not tailored to stop that misconduct. In other words, the District Court's conclusion that the Citizenship Requirement lacks "connective tissue" to the State's claimed problem, App.001480-001481, persisted from the preliminary-injunction stage, through summary judgment, and into the trial record.

## VI.  Plaintiffs have standing.

Although Defendants do not contest standing, Plaintiffs summarize their ongoing bases for the Court's benefit.

*First*, Plaintiffs Hispanic Federation and Poder Latinx have standing. Registered 3PVROs who allow non-citizens to collect or handle applications are directly regulated by the Citizenship Requirement. Fla. Stat. §97.0575(1)(f). Hispanic Federation and Poder Latinx are both registered 3PVROs that have consistently conducted voter-registration and civic-engagement activities in Latino communities, relying on non-

citizen volunteers and employees to collect and handle registration applications on the organization's behalf. HF.Supp.App.0003-0006; HF.Supp.App.0017-0020; *see also* App.003852-003855 (Vélez Tr.); App.003809-003810 (Wassmer Tr.), App.003817 (Wassmer Tr.). Both organizations currently maintain active 3PVRO status. *See* Fla. Dep't of State, Third Party Voter Registration Organizations (3PVROs), https://perma.cc/8RLZ-KEA5 (last visited Dec. 9, 2025). And much of their staff comprises noncitizen Florida residents who are lawfully present and authorized to work in the United States, including permanent residents. *See, e.g.*, HF.Supp.App.2833-2834; App.003831 (Wassmer Tr.); App.001449 n.4. The Citizenship Requirement directly impairs the missions and operations of both organizations, preventing them from using their noncitizen-canvasser base and even noncitizen managers or supervisors to register voters.

The Supreme Court recently reaffirmed that when the government directly regulates a plaintiff, Article III standing to challenge that regulation is not a high bar. If "a plaintiff is the 'object' of a government regulation, there [is] 'ordinarily' [] 'little question' that the regulation causes injury … and that invalidating [it] would redress th[ose] [] injuries." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see id.* at 118 (invalidating a regulation "likely" redresses injury because regulated entities would expectedly increase the burdened activity).

55

Hispanic Federation and Poder Latinx fit squarely within that rule. They remain directly regulated by Florida's 3PVRO laws, face substantial penalties that impair their missions, and the injunction continues to redress their ongoing harm. If enforced, the Citizenship Requirement will force them to change their hiring practices, fire large swaths of their workforce, or both. *See Lozano v. City of Hazleton*, 620 F.3d 170, 184-85 (3d Cir. 2010) (recognizing standing where law directly targeted employers and would compel them to refrain from hiring or terminate noncitizen employees on pain of financial sanctions), *vacated and remanded on other grounds*, 563 U.S. 1030 (2011). This is enough for Article III. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (one party with standing sufficient to satisfy case-or-controversy requirement); *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195-96 (11th Cir. 2009).

*Second*, individual plaintiffs have standing. Ms. Martínez and Ms. Pico lawfully reside in the United States and are legally authorized to work through 2029. Since final judgment issued, Ms. Herrera-Lucha naturalized and became a U.S. citizen, but her co-plaintiffs, whose injuries are ongoing, continue to seek relief. Because the Citizenship Requirement would bar these individuals from performing paid canvassing work, their injury remains concrete and redressable under the existing injunction. And even if their immigration status or work authorization changes during the pendency of this appeal, the

organizational plaintiffs continue to satisfy Article III. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1317 (11th Cir. 2021).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court affirm the District Court's order granting summary judgment.

Dated: December 31, 2025                    Respectfully submitted,

                                            /s *Adriel I. Cepeda Derieux*

Cesar Z. Ruiz                               Adriel I. Cepeda Derieux
Delmarie Alicea                             Megan C. Keenan
Miranda Galindo                             AMERICAN CIVIL LIBERTIES
LATINOJUSTICE PRLDEF                         UNION FOUNDATION
475 Riverside Drive, Suite 1901             915 15th St. NW
New York, NY 10115                          Washington, DC 20005
(212) 392-4752                              (202) 457-0800

John A. Freedman                            Dayton Campbell-Harris
Jeremy Karpatkin                            Sophia Lin Lakin
ARNOLD & PORTER KAYE SCHOLER LLP            AMERICAN CIVIL LIBERTIES
601 Massachusetts Ave., N.W.                UNION FOUNDATION
Washington, DC 20001                        125 Broad St., 18th Floor
(202) 942-5316                              New York, NY 10004
                                            (212) 549-2500
Neda Khoshkhoo
DĒMOS                                       Nicholas L.V. Warren
368 9th Ave. Suite 11-105                   ACLU FOUNDATION OF FLORIDA
New York, NY 10001                          1809 Art Museum Drive, St. 203
(212) 485-6065                              Jacksonville, FL 32207
                                            (786) 363-1769

                                            Daniel B. Tilley

Caroline A. McNamara
ACLU FOUNDATION OF FLORIDA
4343 W Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 32, because, excluding the parts of the document exempted by that rule, this document contains 12,845 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

Dated: December 31, 2025                 Respectfully submitted,

                                         /s *Adriel I. Cepeda Derieux*