**No. 24-11892 (consolidated with 25-12813)**

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

———————————————

HISPANIC FEDERATION, *et al.*,

*Plaintiffs-Appellees,*

v.

FLORIDA SECRETARY OF STATE, *et al.*,

*Defendants-Appellants.*

———————————————

On Appeal from the U.S. District Court for the Northern District of Florida, No. 4:23-cv-00218-MW-MAF (Walker, J.)

———————————————

## APPELLEES' SUPPLEMENTAL APPENDIX VOLUME 1 OF 16

———————————————

*Counsel for Plaintiffs-Appellees*
*Listed on Inside Cover*

Cesar Z. Ruiz
Delmarie Alicea
Miranda Galindo
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752

John A. Freedman
Jeremy Karpatkin
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5316

Neda Khoshkhoo
DĒMOS
368 9th Ave., Suite 11-105
New York, NY 10001
(212) 485-6065

Adriel I. Cepeda Derieux
Megan C. Keenan
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St. NW
Washington, DC 20005
(202) 457-0800

Dayton Campbell-Harris
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500

Daniel B. Tilley
Caroline A. McNamara
Nicholas L.V. Warren
ACLU FOUNDATION OF FLORIDA
4343 W Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714

## INDEX TO APPENDIX

| Vol. | Tab | Title | Range |
|---|---|---|---|
| 1 | Doc.32-1 | Vélez Decl. | HF.Supp.App.0001–0014 |
| 1 | Doc.32-2 | Batista Decl. | HF.Supp.App.0015–0030 |
| 1 | Doc.66-1 | Herrera-Lucha Decl. | HF.Supp.App.0031–0049 |
| 1 | Doc.66-2 | Martínez Decl. | HF.Supp.App.0050–0060 |
| 1 | Doc.66-3 | Pico Decl. | HF.Supp.App.0061–0076 |
| 1 | Doc.68 | Order, Preliminary Injunction Granted | HF.Supp.App.0077–0134 |
| 1 | Doc.122-1 | Darlington Decl. | HF.Supp.App.0135–0147 |
| 1 | Doc.125 | Motion for Summary Judgment Exhibit List | HF.Supp.App.0148–0151 |
| 2 | Doc.125-1 | Morley Dep. | HF.Supp.App.0152–0373 |
| 3 | Doc.125-2 | Smith Report | HF.Supp.App.0374–0528 |
| 3-5 | Doc.125-3 | Stein Dep. | HF.Supp.App.0529–0946 |
| 5-6 | Doc.125-4 | Alford Dep. | HF.Supp.App.0947–1260 |
| 6 | Doc.125-5 | Rebuttal Report, Smith | HF.Supp.App.1261–1272 |
| 6-7 | Doc.125-6 | AG 30(b)(6) [Guzzo] Dep. | HF.Supp.App.1273–1460 |
| 7 | Doc.125-7 | Tr. of Fla. Senate Comm. on Fiscal Policy Meeting (Apr. 20, 2023) | HF.Supp.App.1461–1558 |
| 7-8 | Doc.125-8 | Tr. of Fla. Senate Session (Apr. 26, 2023) | HF.Supp.App.1559–1727 |
| 7-8 | Doc.125-9 | Tr. of Fla. House Session (Apr. 28, 2023) | HF.Supp.App.1728–1844 |
| 9-10 | Doc.125-10 | SOS 30(b)(6) [Darlington] Dep. | HF.Supp.App.1845–2231 |
| 10-11 | Doc.125-11 | Earley Dep. | HF.Supp.App.2232–2464 |
| 11-12 | Doc.125-12 | AG 30(b)(6) [Cox] Dep. | HF.Supp.App.2465–2754 |
| 12-13 | Doc.125-13 | Vélez Dep. | HF.Supp.App.2755–2925 |
| 13 | Doc.125-14 | Wassmer Dep. | HF.Supp.App.2926–3023 |
| 14 | Doc.125-16 | Martínez Dep. | HF.Supp.App.3024–3139 |
| 14 | Doc.125-17 | Pico Dep. | HF.Supp.App.3140–3187 |
| 14-15 | Doc.125-18 | Herrera-Lucha Dep. | HF.Supp.App.3188–3312 |
| 15-16 | PX 252 | Tr. of Fla. Senate Session (Apr. 26, 2023) | HF.Supp.App.3313–3560 |
| 16 | PX 254 | Tr. of Fla. House Session (Apr. 28, 2023) | HF.Supp.App.3561–3737 |
| 16 | PX 810 | Appendix II to Report, Smith | HF.Supp.App.3738–3748 |
| 16 | PX 968 | Smith Figure 1 | HF.Supp.App.3749–3749 |
| 16 | PX 969 | Smith Table 2 | HF.Supp.App.3750–3750 |
| 16 | PX 977 | Smith Figure 3 | HF.Supp.App.3751–3751 |

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

        *Plaintiffs*,

v.

CORD BYRD, *etc., et al.*,

        *Defendants*.

Case No. 4:23-cv-218-AW-MAF

---

### Declaration of Frederick Vélez III Burgos
### (Pursuant to 28 U.S.C. § 1746)

    1.    My name is Frederick Vélez III Burgos and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

### Personal Background

    2.    I have lived in Florida since 2018.

    3.    I currently live in Miami, Florida, in Miami-Dade County.

    4.    I have an educational background in political science, having received a Bachelor's Degree from the University of Puerto Rico.

    5.    From February 21, 2020 until the present, I have been the National Civic Engagement Director of the Hispanic Federation.

1

## HISPANIC FEDERATION

6.     Hispanic Federation is a 501(c)(3) nonprofit, nonpartisan, community organizing, and advocacy organization.

7.     Hispanic Federation's mission is to empower and advance the Hispanic community, support Hispanic families, and strengthen Latino institutions through work in the areas of education, health, immigration, civic engagement, economic empowerment, and the environment, including by promoting voter engagement. Hispanic Federation works locally, statewide in Florida, and nationally to strengthen Latino nonprofits, promote public policy advocacy, and bring to scale a portfolio of innovative community programs through three essential pillars: membership services, advocacy services, and community assistance programs.

8.     Hispanic Federation runs over 15 programs in Florida, ranging from making health care services and vaccination accessible, to running errands to assist community members, to capacity-building efforts to strengthen Latino nonprofits, to registering eligible citizens to vote. Hispanic Federation has been conducting civic engagement and voter registration work in Florida since 2016.

9.     Hispanic Federation's voter engagement work assists the Hispanic electorate to register to vote, apply for vote-by-mail ballots, and vote on election day and during early voting. These activities are meant to ensure the representation of the Hispanic community's interests in government by helping Hispanic voters become involved in elections and civic participation.

HF.Supp.App.0003

10.    Hispanic Federation engages with voters across Florida, and primarily operates in Broward, Hillsborough, Lake, Miami-Dade, Orange, Osceola, Polk, Pinellas, Pasco, Seminole, and Volusia Counties.

11.    Hispanic Federation is a registered third-party voter registration organization. Hispanic Federation has registered voters in each of Florida's 67 counties. Since the 2016 election cycle, Hispanic Federation has registered over 90,000 voters.

12.    Hispanic Federation helps to reach voters who might not otherwise register to vote, including voters with limited access to technology or limited proficiency in the English language.

13.    In my capacity as National Civic Engagement Director, I am the spokesperson for Hispanic Federation. I am responsible for overseeing all civic engagement efforts from Hispanic Federation and ensuring all applicable local, state, and federal laws are followed.

14.    Hispanic Federation typically employs between 80 and 90 staff members at any given time, with about 100 total staff members that we have employed over the years.

15.    Last year, Hispanic Federation's budget for Florida voter registration programming comprised just over $650,000. This budget is comparable to what we have received in previous cycles, however; the costs associated with running the voter registration program and complying with all rules and regulations have

3

increased, effectively lowering the number of forms we can collect compared to years prior.

16.    Hispanic Federation sends teams of canvassers to daily hot spots in areas with high traffic from Latino communities, such as supermarkets, small businesses, and festival events. Sending canvassers to these hot spots requires building relationships within the communities Hispanic Federation serves—for example, certain business owners only allow Hispanic Federation to station canvassers at their storefronts if specific canvassers that the business owner knows and trusts are present.

17.    Hispanic Federation also integrates voter registration into its other community engagement events, as part of the organization's holistic approach. When we do health care and hunger relief, we also attach canvassers to those teams to help register eligible citizens to vote.

18.    Hispanic Federation also assists voters to register to vote through an online portal for registration.

19.    During voter registration events, Hispanic Federation's canvassers interact with community members, provide eligible citizens with voter registration applications, and retrieve completed voter registration applications. Hispanic Federation always aims to collect as many voter registration applications as possible at these events, and, as a whole, collects a significant number of voter registration applications. Over the course of a given year, Hispanic Federation usually collects

and submits 20,000 voter registration forms, collecting nearly 16,605 in 2022.

20.    Hispanic Federation was planning to continue to conduct voter registration activities in the future, with the aim of collecting as many voter registration applications as possible. Based on its past experiences conducting voter registration activities in Florida, Hispanic Federation expects that through these future activities, we would help approximately 20,000 people register to vote in any given year if it were not for the new restrictions in Florida SB 7050.

### The Law's Impact on Hispanic Federation

21.    Before the addition of new subsection (f) to Section 97.0575(1) of the Florida Statutes (the "Law"), Hispanic Federation planned to continue all this voter registration work and planned to expand its voter registration work in the coming years, including efforts to engage more diverse communities. For example, Hispanic Federation plans to register 8,000 voters in South Florida during 2023 – expanding from efforts in 2022. Also, as 2024 is a presidential election year, Hispanic Federation was planning to engage in even more voter registration work than in recent years, as there is always an increased interest in voter registration during a presidential election.

22.    If the Law takes effect, Hispanic Federation's voter registration efforts will be materially handicapped.

23.    Many of Hispanic Federation's canvassers are non-citizens. Canvassers are citizens of Venezuela, the Dominican Republic, Colombia, or Mexico, but all our

employees are authorized to work in the United States. Our non-citizen canvassers include highly competent and educated individuals, including doctors, engineers, lawyers, and administrators.

24.    The Law will result in Hispanic Federation losing approximately 70 percent of its canvasser workforce. Losing these staff members will make it difficult for us to continue registering voters, and impossible to continue registering voters at the same rates we have done in past election cycles.

25.    Many of Hispanic Federation's non-citizen canvassers who handle and return voter registration forms have worked with Hispanic Federation since 2016 and are among the organization's most experienced canvassers. These non-citizen staff have developed deep relationships within their communities, including with local business owners who allow Hispanic Federation to conduct voter registration efforts at their locations. These non-citizen canvassers and staff also train new canvassers. Losing these senior members would decimate the senior ranks of Hispanic Federation's voter registration leaders, leaving them unable to participate in their First Amendment protected speech.

26.    Hispanic Federation's non-citizen canvassers often had skills that made them especially capable of forming relationship in the community and assisting eligible citizens to register to vote. For example, non-citizens can speak to naturalized U.S. citizens in the naturalized citizen's native language, and can explain how the U.S. voter registration process differs from the process in their native

6

country, all of which helps eligible citizens better understand the registration process and participate in American democracy. Without our non-citizen workforce, we will have a more difficult time reaching these communities of eligible citizens.

27.   It is important to Hispanic Federation's mission that non-citizens can assist with voter registration organizations. Non-citizens represent a sizable portion of the Latino community in the United States and in Florida and can provide a unique perspective about the importance of participating in our democratic process, and how it differs from our community's various countries of origins.

28.   Hispanic Federation is assessing its programs and policies in the wake of the citizenship requirement. As Hispanic Federation creates its Civic Engagement program, it is clear we will need to be in compliance and implement required rules and regulations. Lamentably, this will result in a loss of time as we ensure we are in compliance with a rule that prohibits speech activity by members of the Hispanic Federation team.

29.   Hispanic Federation has remained compliant with all Federal regulations for hiring and will continue to do so. If required to implement the citizenship requirement, the organization faces a series of difficult conversations and a move to hire new civic engagement campaign staff members. Hispanic Federation does not believe that citizenship serves as a marker of an individual's commitment to the civic process. This amounts to discrimination based on citizenship, and an employee's citizenship status does not affect the quality of their work – especially

when they have worked in this field for years.

30.     Because of the Law, Hispanic Federation will have to recruit from a new pool of staff, which lowers retention, heightens training costs, and increases the risk of mistakes by new staff. Hispanic Federation will also have to spend money on online advertisements to hire from this new pool.

31.     Hispanic Federation will also need to focus more time and resources toward asking for proof of citizenship. Hispanic Federation is committed to adhering to all regulations and requirements for lawful employment in the United States as required through the I-9 verification process. Hispanic Federation engages in I-9 verification and confirm that employees are authorized to work in the United States. Hispanic Federation already submits the required information about employees to the Division of Elections, in compliance with existing law. The additional step of verifying proof of citizenship is an unnecessary and discriminatory burden that Hispanic Federation is being forced to undertake. But because the Law imposes fines for even the unknowing use of non-citizen staff, to impose a fine, self-reporting or anything short of proof of citizenship would create too much risk for Hispanic Federation to continue operating, especially with a $50,000 fine per head for any non-citizen who assists our organization. These efforts to determine the citizenship status of all staff who assist with registration applications will require use of Hispanic Federation's limited time and resources.

32.     Because the Law imposes a strict liability standard that threatens

HF.Supp.App.0009

Plaintiffs with substantial financial penalties based on a mistake about an employee's citizenship status, Plaintiffs will have to turn away help even from citizens. For example, because Hispanic Federation will no longer let individuals assist with voter registration efforts unless they can demonstrate proof of citizenship, we will have to turn down even U.S.-citizen staff who cannot (or do not wish to) furnish the requisite proof. People who are willing to provide their name and address to our organization are not always willing to submit proof of citizenship in order to register voters. As a result, these additional steps requiring specific proof of citizenship serve to deter not only non-citizens but citizens without the sufficient proof for work.

33.     If the Law takes effect, Hispanic Federation will need to convey to any and all new hires working in Civic Engagement the need for a proof of citizenship. This will require the need to shift recruitment tactics and language included in the job descriptions for clarity when engaging with potential staff. Hispanic Federation is also still assessing how to best manage the maintenance of records for required citizenship paperwork.

34.     Hispanic Federation is also still developing guidelines to ensure that the activity taking place in our office space is complying with all the new regulations. Hispanic Federation will need to create space where materials will be out of reach from accidental "handling" of voter registration forms by anyone who does not meet the minimum qualifications for the program. Hispanic Federation may need to

HF.Supp.App.0010

prohibit access to non-citizens—including all office visitors and building maintenance staff—to parts of the office to ensure non-citizen team members do not "handle" voter registration forms. Segregating limited office space in this way would further impair Hispanic Federation's ability to effectively carry out voter registration efforts and other community programming.

35.     As a grassroots organization, the goal of Hispanic Federation's voter registration activities is to reach out to and involve people in the democratic process where they are, which can include community and campus events, attending church and cultural festivals, and other last-minute requests for assistance with voter registration, as well as recruiting staff. The Law's requirements will make it much more difficult to undertake impromptu voter registration efforts, or respond positively to late requests for voter registration tables at community events. These constraints hamper the flexibility that is critical to effective voter outreach programs.

36.     The real threat of significant financial penalties to Hispanic Federation will meaningfully limit our voter registration efforts. The Law imposes a $50,000 fine on the organization for "each such person"—that is, each non-citizen— collecting or handling an application on Hispanic Federation's behalf. Fl. Stat. § 97.0575(1)(f). The total amount of money that organizations could be fined appears uncapped.

37.     Because of the threat of severe fines, Hispanic Federation's largest funders expressed they may withhold donations unless voter registration efforts

HF.Supp.App.0011

cease in Florida, unwilling to risk that their donations may be wasted toward these fines rather than going to assisting eligible citizens with registering to vote.

39.    Even if Hispanic Federation is able to maintain its funding sources, Hispanic Federation's budget last year for its Florida programming comprised just over $650,000, which makes each $50,000 penalty a severe hit on our programming budget. A $50,000 fine would result not only in civic engagement programs being cut back, but also public health initiatives—like Hispanic Federation's vaccine program—facing financial cuts as well. The political and health implications will fall disproportionately on communities of color where Hispanic Federation focuses its services.

40.    Hispanic Federation has not yet decided what it is going to do when faced with this dilemma if the Law goes into effect.

41.    In response to threat of financial risks, Hispanic Federation is considering imposing a moratorium on all voter registration activities after July 1, 2023.

42.    Even if Hispanic Federation does not impose a complete moratorium on all voter registration activities, Hispanic Federation does not have the resources to effectively comply with the Law and continue our current levels of voter registration activities. We will have to significantly scale back the volume of voter registration drives we conduct to help eligible Floridians register to vote, simply because a majority of our staff are forbidden from assisting, and because we are

HF.Supp.App.0012

already experiencing difficulty recruiting new staff to engage in these activities given the Law's limitations.

42.    Because Hispanic Federation has not made any decision yet about continuing to conduct voter registration drives if the Law goes into effect on July 1, 2023, Hispanic Federation cannot plan its voter registration activities for the next year as well as it has in the past. This lack of advanced planning is going to impact how effective Hispanic Federation can be in its voter registration activities in 2024, a big loss given that it is a Presidential election year and the primary election is fast approaching.

43.    Additionally, to conduct even curtailed voter registration activities while trying to comply with the Law, Hispanic Federation will be required to divert resources, such as staff time, to more of the administrative tasks required by the Law away from other activities to advance their mission, such as capacity-building efforts to strengthen other Latino non-profits or making health care services more accessible to the communities we serve. Furthermore, when conducting voter registration activities after the Law is in effect, Hispanic Federation will need to spend more time on the required administrative tasks and less time on actual voter registration of individuals, making the voter registration activities less effective.

44.    The Law will also impact and harm the communities and constituents that Plaintiffs serve and work with, including both citizens and non-citizens. Constricting our workforce will decrease the total number of voter registration

HF.Supp.App.0013

events that Hispanic Federation will conduct in the future, which will reduce the number of voters we can reach.

45.     Plaintiffs will register substantially fewer eligible citizens to vote than they could absent the Law. In this way, the Law will impact the community and constituency Hispanic Federation serves through its voter registration programs—namely, Hispanic (and other) people who are eligible to vote. Hispanic Federation works closely with Hispanic citizens to help them register to vote, relying in part on a network of key community activists who help shape the organization's agendas and who play a critical role in implementing its programs. Thus, the Law will impact and harm Hispanic Federation's constituents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June  7, 2023.

*Frederick Velez III Burgos*
Frederick Vélez III Burgos

13

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| HISPANIC FEDERATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> CORD BYRD, in his official capacity as Florida Secretary of State, *et al.*, <br><br> *Defendants*. | Case No.4:23-cv-218-AW-MAF |

**Declaration of Nancy Batista
(Pursuant to 28 U.S.C. § 1746)**

1.     My name is Nancy Batista and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

**Personal Background**

2.     I have lived in Florida since 2005.

3.     I currently live in Kissimmee, Florida, in Osceola County.

4.     I have an educational background in Health Services Administration and Business Administration. I have received a degree of Associates in Arts from Valencia Community College, a degree of Bachelor of Science for Health Care

1

Administration from the University of Central Florida, and a degree of Master of Business Administration with a Dual Concentration in Human Resources and Project Management from Herzing University.

5.      I am a CoFounder of Poder Latinx. The organization was founded in 2019. I was the first Florida Director for the organization when we first launched our program. In 2022, I became the Field Director for Poder Latinx in its National capacity, and I continue to hold that position today.

**PODER LATINX**

6.      Poder Latinx is a fiscally sponsored project of Tides Advocacy, a California nonprofit public benefit corporation. Poder Latinx is a social justice, organizing, and civic engagement organization whose mission is to help ensure that Latinx communities, inclusive of immigrants and people of color, are decision-makers in our democracy.

7.      Poder Latinx works locally and statewide in Florida to expand the electorate by conducting year-round civic engagement activities, community empowerment, leadership development, and issue-based organizing with a focus on three key issues: immigrant justice, climate justice, and economic justice.

8.      Poder Latinx carries out its mission to expand the electorate by encouraging people to register to vote through in-person activities, via digital campaigns, and phone/text banking. In 2020, Poder Latinx's voter turnout program knocked on 105,000 doors ahead of the 2020 election. Poder Latinx's civic

HF.Supp.App.0017

engagement work is focused on educating voters on how to exercise their right to vote, the accepted types of identification necessary to vote, how to request vote-by-mail ballots, and how to return their ballots.

9.      Poder Latinx's voter registration, voter education, and civic engagement work is carried out throughout the state of Florida with a specific focus on Broward, Lake, Orange, Osceola, Miami Dade, Palm Beach, Polk, and Seminole.

10.      Poder Latinx is a registered third-party voter registration organization. Since 2019, Poder Latinx has registered over 48,000 Florida voters.

11.      Poder Latinx helps to reach voters who might not otherwise register to vote, including voters with limited access to technology or limited proficiency in the English language.

12.      In my capacity as a CoFounder and currently the Field Director, I am a spokesperson for Poder Latinx. I am responsible for overseeing the field work and the integrated voter engagement efforts.

13.      Poder Latinx employs approximately 10 staff members in Florida, and between 5 to 30 field employees during the midterm years and 10 to 60 field employees during the presidential years in Florida.

14.      Last year Poder Latinx's annual budget for voter registration and voter engagement activities  for the entire organization comprised just over 1 million dollars. A sizable portion of that total is allocated to Poder Latinx's voter registration operations in the state of Florida. The costs associated with running our Florida voter

3

registration operations and complying with all the rules and regulations have increased and it is likely that it will negatively impact our ability to sustain and expand our voter registration programs.

15.     Poder Latinx's canvassing teams typically consist of one lead and four canvassers. These teams are in the field anywhere from four to six hours a day (or eight hours a day for leads), five days a week. Poder Latinx leads build relationships with business owners, teachers, healthcare workers, and other community leaders to determine where voter registration activities can take place. Based on those relationships, leads then drive their canvassing team to locations throughout the day where they expect to engage Latinx communities.

16.     Poder Latinx also integrates voter registration into its other community engagement events, as part of the organization's holistic approach. When we host events about climate justice, we also attach canvassers to those teams to help register eligible citizens to vote. While we are engaging the community on issues, canvassing door to door, we are also asking them if they are registered to vote.

17.     Poder Latinx also has assisted voters to register to vote through an online portal for voter registration.

18.     During voter registration events, Poder Latinx's leads and canvassers interact with community members, provide eligible citizens with voter registration applications, and retrieve completed voter registration applications. Back at our offices, Poder Latinx's staff will process these applications and will review them to

4

ensure they have been filled out correctly, and then return the forms to the appropriate supervisors of elections office.

19.     Poder Latinx always aims to collect as many voter registration applications as possible at its events, and, as a whole, collects a significant number of voter registration applications. Over the course of a given year, Poder Latinx usually collects and has submitted 1,000 to 29,000 voter registration forms annually, collecting nearly 18,000 forms total in 2022 and a total of about 48,000 voter registrations from 2019 to the present.

20.     Poder Latinx was planning to continue to conduct voter registration activities in the future, with the aim of collecting as many voter registration applications as possible. Based on its past experiences conducting voter registration activities in Florida, Poder Latinx expects that through these future activities, we would help approximately 6,000 to 24,000 people register to vote in any given year if it were not for the new restrictions in Florida SB 7050.

### The Law's Impact on Poder Latinx

21.     Before the addition of new subsection (f) to Section 97.0575(1) of the Florida Statutes (the "Law"), Poder Latinx planned to continue all this voter registration work and planned to expand its voter registration work in the coming years, including efforts to engage more diverse communities. In 2023, Poder Latinx aimed to help 6,000 new eligible citizens register to vote, and planned to expand on the ground work into other counties in southern Florida and in the panhandle. Also,

as 2024 is a presidential election year, Poder Latinx was planning to engage 24,000 potential voters, which is even more voter registration work than in recent years, as there is always an increased interest in voter registration during a presidential election.

22.     If the Law takes effect, Poder Latinx's voter registration efforts will be devastated. Instead of expanding voter registration work across the state, Poder Latinx will be lucky to field a single team in central Florida to register voters with the Law in place.

23.     The majority of Poder Latinx's canvassers are non-citizens. Many of our canvassers are citizens of Venezuela or Colombia, but all of our employees are authorized to work in the United States.

24.     The Law will result in Poder Latinx losing the majority of its workforce—approximately 90 percent of its staff, and approximately 70 percent of its volunteers—including canvassers who knock on doors, field leads who drive the canvassers to different communities, field organizers who recruit and manage volunteers and community organizers who coordinate community engagement programs. Our staff members and volunteers handle completed voter registration forms in the field, and then return completed voter registration forms to the county supervisors of the elections office. Losing these staff members and volunteers will make it difficult for Poder Latinx to continue registering voters, and impossible to continue registering voters at the same rates we have done in past election cycles.

HF.Supp.App.0021

In particular, without our non-citizen workforce, Poder Latinx will lose nearly all of our qualified leads.

25.    The Law's prohibition on non-citizens handling and collecting voter registration forms will result in Poder Latinx losing not only its non-citizen staff, but the institutional knowledge they carry. Many non-citizens serve as senior staff at Poder Latinx who have worked their way up over the course of multiple election cycles: from canvassers, to field leads, to organizers. Knowledge obtained on their journey to Poder Latinx organizers is shared with new staff starting work as canvassers. The loss of this institutional knowledge will meaningfully damage Poder Latinx's effectiveness in registering voters. Starting from scratch on training will require a huge investment of money and time—we will have to reinvent the wheel instead of moving forward with a well-oiled machine. Starting from scratch also increases the risk of mistakes by new staff and volunteers, which can lead to fines for our organization.

26.    The Law also burdens Poder Latinx with the loss of the relationships its non-citizen staff have built. Poder Latinx field leads and community organizers build relationships with businesses in the community—like grocery stores and restaurants—who allow Poder Latinx canvassers to register voters on their properties. Without these relationships, Poder Latinx's ability to engage potential voters at those locations will be limited, because the staff those local businesses know are now prohibited from engaging in voter registration work.

7

27.     Poder Latinx's non-citizen canvassers often had skills that made them especially capable of forming relationships in the community and assisting eligible citizens to register to vote. For example, non-citizens can speak to naturalized U.S. citizens in the naturalized citizen's native language, and can explain how the U.S. voter registration process differs from the process in their native country, all of which helps eligible citizens better understand the registration process and participate in American democracy. Without our non-citizen workforce, we will have a more difficult time reaching these communities of eligible citizens and potential voters.

28.     It is important to our organization and aligned with our overall mission that non-citizens can assist with voter registration efforts. Many of the non-citizens who do this work are well-versed in voter registration language in Spanish and are able to properly assist the community, and many of them have also been trained extensively on the process. As an organization that prioritizes immigrant justice as one of primary issues, it is difficult for us to turn away staff who are qualified with a work permit and have the skills to do the work and have had the experience of doing so for a couple of cycles. They are members of our community and have contributed greatly to our democracy.

29.     Turning away employees and volunteers based on their citizenship status often stigmatizes and demoralizes the very communities we are trying to engage in our immigration justice work.  Take, for example, our partnership with

HF.Supp.App.0023

local schools, where we opened the opportunity to students who need community service hours.  Adding a filtering layer for citizenship status would be detrimental to the work we are trying to do:  if any students who are non-citizens feel that we are discriminating against them because of their status, this will not help empower our youth to take on the challenge of helping to register their family and friends, this will unmotivate them and make them feel like they cannot be a part of the process of democracy.

30.    The Law will have destructive effects on Poder Latinx's relationships with the non-citizens we have employed. These employees are authorized to work in the United States, but can no longer work the job they have relied on and were counting on. The law creates a discriminatory effect on our non-citizen employees, forbidding us from hiring them even though they are authorized to work in this country. Our full-time employees will lose not only their source of income, but the health care that employment with Poder Latinx provided them.

31.    The Law is already impacting Poder Latinx's ability to recruit new staff and volunteers. Because of the Law, Poder Latinx has already been unable to fill open, paid positions, and has had to turn down otherwise qualified candidates who applied for those positions based solely on their citizenship.  We were ready to offer field organizer positions, and unfortunately we had to stop the process because of the possibility of this new law.

32.    Poder Latinx will also need to expend more time and resources toward

HF.Supp.App.0024

asking for proof of citizenship. We already engage in I-9 verification and confirm that our employees are authorized to work in the United States. And Poder Latinx already submits the required information about our employees and volunteers to the Division of Elections, in compliance with existing law. The additional step of verifying proof of citizenship is an unnecessary and discriminatory burden that Poder Latinx is being forced to undertake. But because the Law imposes fines for even the unknowing use of non-citizen staff and volunteers, to impose a fine, self-reporting or anything short of proof of citizenship would create too much risk for Poder Latinx to continue operating, especially with a $50,000 fine per head for any non-citizen who assists our organization. These efforts to determine the citizenship status of all staff and volunteers who assist with registration applications will require use of Poder Latinx's limited time and resources.

33.   Because the Law imposes a strict liability standard that threatens Plaintiffs with substantial financial penalties based on a mistake about an employee's or volunteer's citizenship status, Plaintiffs will have to turn away help even from citizens. For example, because Poder Latinx will no longer let individuals assist with voter registration efforts unless they can demonstrate proof of citizenship, we will have to turn down even U.S.-citizen staff and volunteers who cannot (or do not wish to) furnish the requisite proof. Many people who are willing to provide their name and address to our organization would not be willing to submit proof of citizenship in order to volunteer.

10

34.     The Law's strict liability standard and substantial fines have also dissuaded Poder Latinx from re-engaging certain volunteer bases altogether. For example, Poder Latinx formerly maintained partnerships with local teachers wherein Poder Latinx trained students and volunteers to help out with voter registration efforts in exchange for the community service hours that their school required for graduation. Poder Latinx will no longer maintain its community service partnerships that enabled local student volunteers to assist with voter registration efforts, because of the added hurdle of confirming the students' citizenship status.

35.     As a grassroots organization, the goal of Poder Latinx's voter registration activities is to reach out to and involve people in the democratic process where they are, which can include campus events, community events, fairs, parades, marches, food truck stops, graduation and other last-minute requests for assistance with voter registration, as well as recruiting last-minute volunteers. The Law's requirements will make it much more difficult to accept walk-up volunteers for events in Florida, undertake impromptu voter registration efforts, or respond positively to late requests for voter registration tables at community events.. This hampers the flexibility that is critical to effective voter outreach programs.

36.     Poder Latinx does not currently have a process to record keep for tracking citizenship, nor does it have the bandwidth to create a process that will ensure to do so in a manner that we can protect the sensitive documentation. Having to do this will add additional burden to our hiring process.

11

37.     The real threat of significant financial penalties to Poder Latinx will meaningfully limit our voter registration efforts. The Law imposes a $50,000 fine on the organization for "each such person"—that is, each non-citizen—collecting or handling an application on Poder Latinx's behalf. Fl. Stat. § 97.0575(1)(f). The total amount of money that organizations could be fined appears uncapped.

38.     Poder Latinx's funders have indicated reluctance to risk that their donations may be wasted toward these fines rather than going to assisting eligible citizens with registering to vote. As a result, Poder Latinx's program was supposed to start in early May, but Poder Latinx's funders have delayed funding until after the Law's effects are known, unsure of whether they will continue to fund voter registration efforts in Florida.

39.     Even if Poder Latinx is able to maintain its funding sources, Poder Latinx's budget last year for its Florida programming comprised several hundred thousand dollars, which makes each $50,000 penalty a severe hit on their programming budget. A $50,000 fine would result not only in civic engagement programs being cut back, but also public health initiatives—like Poder Latinx's organizing surrounding immigrant justice, climate justice, and economic justice—facing financial cuts as well. The political and health implications will fall disproportionately on communities of color where Poder Latinx focuses its services.

40.     Poder Latinx has not yet decided what it is going to do when faced with this dilemma if the Law goes into effect.

12

41.     In response to the threat of financial risks, Poder Latinx is considering imposing a moratorium on all of our voter registration activities after July 1, 2023. Poder Latinx is reluctant to submit an affirmation of compliance with state law because of the risk of substantial civil penalties for an inadvertent vetting error. It is very hard to ensure perfection in vetting volunteers on scarce resources.

42.     Even if Poder Latinx does not impose a complete moratorium on all voter registration activities, Poder Latinx does not have the resources to effectively comply with the Law and continue our current levels of voter registration activities. We will have to significantly scale back the volume of voter registration drives we conduct to help eligible Floridians register to vote, simply because a majority of our staff and volunteers are forbidden from assisting, and because we are already experiencing difficulty recruiting new staff or volunteers to engage in these activities given the Law's limitations.

43.     Because Poder Latinx has not made any decision yet about continuing to conduct voter registration drives if the Law goes into effect on July 1, 2023, Poder Latinx cannot plan its voter registration activities for the next year as well as it has in the past. This lack of advanced planning is going to impact how effective Poder Latinx can be in its voter registration activities in 2024, a big loss given that it is a Presidential election year and the primary election is fast approaching.

44.     Additionally, to conduct even curtailed voter registration activities while trying to comply with the Law, Poder Latinx will be required to divert

HF.Supp.App.0028

resources, such as volunteer time, to more of the administrative tasks required by the Law away from other activities to advance our mission. Furthermore, when conducting voter registration activities after the Law is in effect, Poder Latinx will need to spend more volunteer time on the required administrative tasks and less time on actual voter registration of individuals, making the voter registration activities less effective.

45.     The Law will also impact and harm the communities and constituents that Plaintiffs serve and work with, including both citizens and non-citizens. Constricting our workforce will definitely decrease the total number of voter registration events that Poder Latinx will conduct in the future, which will reduce the number of voters we can reach.

46.     Plaintiffs will register substantially fewer eligible citizens to vote than they could absent the Law. In this way, the Law will impact the community and constituency Poder Latinx serves through its voter registration programs—namely, Latinx (and other) people who are eligible to vote. Poder Latinx works closely with eligible Latinx citizens of the United States to help them register to vote, relying in part on a network of key community activists who help shape the organization's agendas and who play a critical role in implementing its programs. Thus, the Law will impact and harm Poder Latinx's constituents.

47.     Poder Latinx's voter registration programs reach various communities including students and  Latinx bilingual and monolingual community members.

14

Without our non-citizen staff capacity, the ability of the organization to reach these communities and support them will be diminished.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 8, 2023.

Nancy Batista

15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

        *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Florida Secretary of State, *et al.*,

        *Defendants*.

Case No. 4:23-cv-218-AW-MAF

## DECLARATION OF VERONICA HERRERA-LUCHA
## (Pursuant to 28 U.S.C. § 1746)

1.    My name is Veronica Herrera-Lucha (a.k.a. Veronica Guadalupe Herrera-Lucha or Veronica Guadalupe Herrera) and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

### Personal Background

2.    I have lived in Florida since 2016 and have been a Lawful Permanent Resident (LPR) since January 29th, 2007. LPRs like me are also known as "green card" holders. We are non-citizens who are lawfully authorized to live permanently within the United States. LPRs may accept an offer of employment without special restrictions, own property, receive financial assistance at public colleges and universities, and join the Armed Forces. We can also apply to become U.S. citizens if we meet certain eligibility requirements.

3.      I currently live in St. Cloud, Florida, in Osceola County.

4.      I have an educational background in Law and Politics, having received a Law Degree from the Universidad de Administracion de Negocios in El Salvador, a Master's Degree studies (completed coursework but degree not conferred) in Political Sciences from the Universidad Centroamericana José Simeón Cañas (UCA) in El Salvador, and a Masters in International Law from the Universidad de Salamanca in Spain.

5.      In 1998, I began to work at *Fondo de Inversion Social para el Desarrollo Local* in El Salvador as a legal counsel.  While employed, USAID issued a call for applications to individuals representing their nations as election observers in the United States.  I applied to the U.S. Visitor Program and was selected to be an organizer by the Political Section in the United States Embassy in El Salvador.  The purpose of the exchange was to support discussions amongst the two nations and meet respective counterparts.  In October 2000, I started the course in Texas, continued in Pennsylvania, Washington DC, and California, and finished in Florida. The US Department of State sponsored the event.  During the course of studies, I learned about the US elections system and citizenship participation.  During my visits to several states, I saw voting sites and community gatherings.  We also met with political analysts at Georgetown University in Washington, DC.  In Texas, we went to Austin and met members of the State's Legislature.  Also in Austin, I received a certificate of honored guest from then Texas Governor George W. Bush.

In Pennsylvania and California, we participated in Spanish radio shows and meetings with community leaders. In Florida, we talked with several Supervisors of Elections during the Gore-Bush election controversy.

6.     After coming to the United States, I was driven by my passion for equity, and so began working on, and volunteering for, political campaigns in Central Florida in 2017.

7.     Starting as a volunteer and a canvasser, I participated in door-to-door voter registration and get-out-the-vote efforts for several Florida organizations and consulting firms. Because of the cyclical nature of campaigning, I was never given leadership opportunities earlier in my career.

8.     I am currently employed by Mi Vecino, Inc., a year-round direct voter contact organization in Florida. Mi Vecino is a registered third-party voter registration organization. At Mi Vecino, our efforts focus on Central Florida, including the Hispanic communities in Polk, Osceola, Orange, and Brevard Counties.

9.     My career with Mi Vecino began in mid-2021 as the Central Florida Regional Field Director. I was promoted to the Florida State Field Director position a year later in 2022, and I currently remain employed in this position.

10.    As Mi Vecino's Florida State Field Director, I am responsible for overseeing Mi Vecino's voter registration activities. My primary responsibilities are to manage a team of full-time staff, plan and coordinate Florida voter registration

campaigns, and create/implement systems for the voter registration teams. I report to Mi Vecino's Chief Executive Officer (CEO), President of the Board of Directors, and Co-Founder, Devon Murphy-Anderson.

11.     I am paid a salary of $55,000 a year by my employer.  I am the only member of my family with a steady income.  My income supports three (3) family members living in Florida and one (1) family member in El Salvador.

12.     I am one of Mi Vecino's seven (7) current permanent employees. We engage in canvassing every day and engage with the community all year around. We attend food banks activities, and participate in city hall events, festivals, parades, children and adult activities, and any other events with more than 10 people expected to attend.  We also visit universities, technical colleges, evangelical churches, and other community partners.  Our outreach efforts include trips to the tax collectors' offices and local businesses.  In July 2023, I was scheduled to participate in the Independence Day events and right to vote celebrations in Osceola, Orange, and Polk Counties in coordination with local governments and community organizations.

13.     During voter registration events, I always interact with multiple individuals and collect voter registration forms, which one of Mi Vecino's employees then deliver to local election officials. I always aim to assist as many eligible members of our community to register as possible.

14.     Non-citizen canvassers like me play an important role in third-party voter registration organizations. Non-citizen canvassers like me often have built

trusting and empathic relationships and networks that make them especially able to help certain communities register to vote. For example, I have built a network with community, academic, religious, and political leaders that support voter registration efforts. Citizen employees often do not have the same background, political knowledge, or persuasive skills that non-citizen employees use to articulate the needs of the community to leaders. For example, Mi Vecino's non-citizen staff and volunteers have Spanish, Creole, or French language proficiency skills that enabled them to help certain communities register to vote, which is critical to assist communities like the Haitian community in Polk County with voter registration.

15.   I was planning to continue to conduct voter registration activities in the future, with the aim of engaging as many community members as possible. Based on my past experiences conducting and organizing voter registration activities in Florida, I expect that through these future activities, we would help thousands of people register to vote in any given year if it were not for the new restrictions in Florida SB 7050.

16.   Before the recent changes to the law, I planned to continue engaging in voter registration work and planned to help expand Mi Vecino's voter registration work in the coming years, including efforts to engage more diverse communities.

17.   Also, 2024 is a presidential election year, and under my supervision, I was planning to engage Mi Vecino in even more voter registration work than in recent years, as there is always an increased interest in voter registration during a

presidential election.

18.    The new law, which comes into effect on July 1, 2023, would prohibit me from collecting or handling voter registration applications on behalf of Mi Vecino.

19.    After July 1, 2023, I would not be able to participate in or execute the voter registration plans I have been organizing because of the new law. At Mi Vecino, I am the only employee in a leadership position with significant knowledge and experience in voter registration. Without my leadership, Mi Vecino will lose the canvassing, organizing, and training that I currently conduct, and the network I have built with leaders that support voter registration efforts. As a result, Mi Vecino will have a more difficult time reaching the Latino, Black, and Haitian communities that it serves.

20.    After July 1, 2023, the Law will also have an adverse impact on my family and me. My family is left without the primary provider and a steady income. I am in the middle of purchasing a home.  I also planned to educate the children, assist my mother, and pay for our transportation, among others.  My family's financial future and wellbeing are directly at risk.

21.    Moreover, after finding an organization that believed in me and gave me an opportunity to work, my career trajectory and professional development will be frustrated by the new law.   My career is more than a job.  I enjoy my work and it allows me to practice in my chosen area of study.  If the new law comes into effect,

I will have no prospects to work in this career field.

22.    My family and I feel harm from the stigma of my citizenship status from SB 7050 and all related discriminatory laws enacted in Florida this year.  The government and community relations have suffered.  On June 1, 2023, for example, I was stopped by the police while driving my son to school.  The policeman asked for proof of my citizenship status and referenced SB1718 as the source of his apparent authority.  I explained that SB1718 did not come to effect until July 1.  However, to prevent any situation in front of my son, I pulled my green card and showed it to the policeman.  Later, my son, who is a US citizen, asked me if I should change the color of my hair to blond and use bright color contacts to hide my identity.  This is the stigma my family and I suffer thanks to these laws.

23.    I first got interested in voter registration in August 2016.  While looking for work in Indeed, I saw a vacancy with Hard Knock for canvassers.  The pay was $15 an hour.  My previous opportunities as a paralegal paid less ($11 an hour).  This is when I decided to pursue a career in voter registration.

24.    Voter registration is meaningful to me because I can educate the public about the important to vote and elect local candidates.  I also like to work with the youth, who are sometimes treated as apathetic, and explain the importance of their vote.  In the day to day, I see myself explaining the importance of local elections versus state elections, and of the political balance in government.

25.    Through my voter registration work, I have helped my community

engage on issues that matter to them. In Orange County, my voter registration efforts have helped the community to stabilize rent through the electoral process. I knew this issue affected my community, including me personally, because my rent was increased from $1,450 to $1,998. I helped to make sure that eligible voters in my community were registered and aware that a related measure was on the ballot. Last year, I worked to register and engage eligible citizens to vote in Osceola, in Zip Codes 34143 and 34144. Through my registration work in those communities, I raised awareness about Spanish speaking candidates running for election, and a Spanish speaking Vice-Mayor was elected. In Poinciana, Polk County, we have a high presence of Puerto Ricans affected by Hurricane Maria who never registered to vote in Florida. My work in that community helped to increase the number of Puerto Ricans and eligible US citizens from Haiti who were registered to vote.

**DISCLAIMER:** This document has been translated into Spanish for the Affiant's review and approval. A copy of the translation is attached.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on June.5  2023.



Veronica Guadalupe Herrera          06/05/2023

**EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS**
**PARA EL DISTRITO NORTE DE FLORIDA**
**DIVISIÓN DE TALLAHASSEE**

HISPANIC FEDERATION, *et al.,*

     *Demandantes,*

contra

CORD BYRD, en calidad oficial de
Secretario del Estado de Florida*, et al.,*

     *Acusados.*

Caso núm. 4:23-cv-218-AW-MAF

**DECLARACIÓN DE LA DEMANDANTE VERÓNICA HERRERA-LUCHA**
**(de conformidad con 28 U.S.C. § 1746)**

1.    Mi nombre es Verónica Herrera-Lucha (también conocida como Verónica Guadalupe Herrera-Lucha o Verónica Guadalupe Herrera), soy mayor de 18 años, y con plena capacidad para hacer esta declaración. Bajo pena de perjurio, declaro lo siguiente:

**Antecedentes personales**

2.    He vivido en Florida desde 2016 y he sido residente permanente legal (LPR) desde el 29 de enero de 2007. Los LPR, como yo, también son llamados titulares de la "tarjeta verde". Somos no ciudadanos que estamos legalmente autorizados para vivir permanentemente dentro de los Estados Unidos. Los LPR pueden aceptar una oferta de empleo sin restricciones especiales, poseer propiedades, recibir asistencia financiera en colegios universitarios y universidades públicas y unirse a las Fuerzas Armadas. También podemos solicitar convertirnos en ciudadanos estadounidenses si cumplimos con ciertos requisitos de elegibilidad.

3.      Actualmente vivo en St. Cloud, Florida, en el condado de Osceola.

4.      Tengo una formación académica en Derecho y Política, habiendo recibido una Licenciatura en Derecho de la Universidad de Administración de Negocios en El Salvador, una Maestría (cursos completados, pero no conferidos) en Ciencias Políticas de la Universidad Centroamericana José Simeon Cafias (UCA) en El Salvador, y una Maestría en Derecho Internacional de la Universidad de Salamanca en España.

5.      En 1998, comencé a trabajar en el *Fondo de Inversión Social para el Desarrollo Local* en El Salvador como Asesora Legal. Mientras estaba empleada, USAID emitió una convocatoria de solicitudes a individuos para que representasen a sus naciones como observadores electorales en los Estados Unidos. Envié mi solicitud al Programa de Visitantes de los Estados Unidos y fui seleccionada para ser organizadora por la Sección Política de la Embajada de los Estados Unidos en El Salvador. El propósito del intercambio fue apoyar las conversaciones entre las dos naciones y reunirse con sus respectivas contrapartes. En octubre del 2000, comencé el curso en Texas, continué en Pensilvania, Washington DC y California, y terminé en Florida. El Departamento de Estado de los Estados Unidos patrocinó el evento. Durante el curso de los estudios, aprendí sobre el sistema electoral de los Estados Unidos y la participación ciudadana. Durante mis visitas a varios estados, vi sitios de votación y reuniones comunitarias. También nos reunimos con analistas políticos en la Universidad de Georgetown en Washington, DC. En Texas, fuimos a Austin, y conocimos a miembros de la Legislatura

del Estado. También en Austin, recibí un certificado de invitada de honor del entonces gobernador de Texas, George W. Bush. En Pensilvania y California, participamos en programas de radio en español y reuniones con líderes comunitarios. En Florida, hablamos con varios Supervisores de Elecciones durante la controversia electoral Gore-Bush.

6.      Después de venir a los Estados Unidos, me impulsó mi pasión por la equidad, por lo que comencé a trabajar y ofrecerme como voluntaria para campañas políticas en Florida Central en el 2017.

7.      Comenzando como voluntaria y promotora, participé en el registro de votantes puerta a puerta y en los esfuerzos para obtener el voto para varias organizaciones y firmas consultoras de Florida. Debido a la naturaleza cíclica de las campañas, nunca me dieron oportunidades de liderazgo al principio de mi carrera.

8.      Actualmente soy empleada de Mi Vecino, Inc., una organización de contacto directo con votantes durante todo el año en Florida. Mi Vecino es una organización registrada de registro de votantes externa. En Mi Vecino, nuestros esfuerzos se enfocan en la Florida Central, incluidas las comunidades hispanas en los condados de Polk, Osceola, Orange y Brevard.

9.      Mi carrera con Mi Vecino comenzó a mediados de 2021 como Directora Regional de Campo de Florida Central.  Fui ascendida al puesto de Directora de Campo del Estado de Florida un año después, en 2022, y actualmente sigo empleada en este puesto.

10. Como Directora de Campo del Estado de Florida de Mi Vecino, soy responsable de supervisar las actividades de registro de votantes de Mi Vecino. Mis principales responsabilidades son administrar un equipo de personal de tiempo completo, planificar y coordinar el registro de votantes de Florida, y crear/implementar sistemas para los equipos de registro de votantes. Le rindo cuentas a la Directora Ejecutiva (CEO) de Mi Vecino, Presidenta de la Junta Directiva, y Cofundadora, Devon Murphy-Anderson.

11. Mi empleador me paga un salario de $55,000 al año. Soy el único miembro de mi familia con un ingreso estable. Mis ingresos mantienen a tres (3) miembros de la familia que viven en Florida y un (1) miembro de la familia en El Salvador.

12. Soy uno de los siete (7) empleados permanentes actuales de Mi Vecino. Participamos en campañas todos los días y nos involucramos con la comunidad durante todo el año. Asistimos a actividades de bancos de alimentos y participamos en eventos del ayuntamiento, festivales, desfiles, actividades para niños y adultos, y cualquier otro evento donde se espere que asistan más de 10 personas. También visitamos universidades, colegios técnicos, iglesias evangélicas y otros socios comunitarios. Nuestros esfuerzos de divulgación incluyen viajes a las oficinas de los recaudadores de impuestos y a las empresas locales. En julio de 2023, tenía programado participar en los eventos del Día de la Independencia y las celebraciones del derecho al voto en los condados de Osceola, Orange y Polk en coordinación con los gobiernos locales y las organizaciones comunitarias.

13.     Durante los eventos de registro de votantes, siempre interactúo con varias personas y recopilo formularios de registro de votantes, que uno de los empleados de Mi Vecino luego entrega a los funcionarios electorales locales. Siempre intento ayudar a tantos miembros elegibles de nuestra comunidad a registrarse como sea posible.

14.     Los promotores no ciudadanos como yo juegan un papel importante en las organizaciones de registro de votantes externas. Los promotores no ciudadanos como yo a menudo han construido relaciones y redes de confianza y empáticas que nos hacen especialmente capaces de ayudar a ciertas comunidades a registrarse para votar. Por ejemplo, he construido una red con líderes comunitarios, académicos, religiosos y políticos que apoyan los esfuerzos de registro de votantes. Los empleados ciudadanos a menudo no tienen los mismos antecedentes, conocimiento político o habilidades persuasivas que los empleados no ciudadanos usan para articular las necesidades de la comunidad a los líderes. Por ejemplo, el personal y los voluntarios no ciudadanos de Mi Vecino tienen habilidades de dominio del idioma español, criollo o francés que les permitieron ayudar a ciertas comunidades a registrarse para votar, lo cual es fundamental para ayudar a comunidades como la comunidad haitiana en el condado de Polk con el registro de votantes.

15.     Tenía planeado continuar llevando a cabo actividades de registro de votantes en el futuro, con el objetivo de lograr la participación de tantos miembros de la comunidad como fuera posible. Basada en mis experiencias anteriores realizando y organizando

actividades de registro de votantes en Florida, esperaba que, a través de estas actividades futuras, ayudáramos a miles de personas a registrarse para votar en un año determinado, si no fuera por las nuevas restricciones en Florida SB 7050.

16.   Antes de los recientes cambios en la ley, tenía pensado continuar participando en el trabajo de registro de votantes y planeaba ayudar a expandir el trabajo de registro de votantes de Mi Vecino en los próximos años, incluyendo esfuerzos para la participación de comunidades más diversas.

17.   Además, como el 2024 es un año de elecciones presidenciales, y bajo mi supervisión, estaba planeando involucrar a Mi Vecino en aún más trabajo de registro de votantes que en los últimos años, ya que siempre hay un mayor interés en el registro de votantes durante una elección presidencial.

18.   La nueva ley, que entrará en vigor el 1 de julio de 2023, me prohibiría recopilar o manejar solicitudes de registro de votantes en nombre de Mi Vecino.

19.    Después del 1 de julio de 2023, no podría participar ni ejecutar los planes de registro de votantes que he estado organizando debido a la nueva ley. En Mi Vecino, soy el único empleado en una posición de liderazgo con un conocimiento y experiencia significativos en el registro de votantes. Sin mi liderazgo, Mi Vecino perderá la promoción, la organización y la capacitación que actualmente realizo, y la red que he construido con los líderes que apoyan los esfuerzos de registro de votantes. Como resultado, Mi Vecino tendrá más dificultades para llegar a las comunidades latinas, negras y haitianas a las que presta servicio.

20.     Después del 1 de julio de 2023, la Ley también tendrá un impacto adverso en mi familia y en mí. Mi familia se queda sin el proveedor principal y un ingreso estable. Estoy en medio de la compra de una casa. También planeaba educar a los niños, ayudar a mi madre y pagar nuestro transporte, entre otros. El futuro financiero y el bienestar de mi familia están directamente en riesgo.

21.     Además, después de encontrar una organización que creyó en mí y me dio la oportunidad de trabajar, mi trayectoria y desarrollo profesional se verán frustrados por la nueva Ley.   Mi carrera es más que un trabajo. Disfruto de mi trabajo y me permite practicar en mi área de estudio elegida. Si la nueva Ley entra en vigor, no tendré perspectivas de trabajar en este campo profesional.

22.     Mi familia y yo sentimos el daño causado por el estigma de mi estatus de ciudadanía proveniente de SB 7050 y todas las leyes discriminatorias relacionadas promulgadas en Florida este año. Las relaciones entre el gobierno y la comunidad han sufrido. El 1 de junio de 2023, por ejemplo, la policía me detuvo mientras llevaba a mi hijo a la escuela. El policía pidió pruebas de mi estado de ciudadanía y se refirió a SB1718 como la fuente de su aparente autoridad. Le expliqué que SB1718 no entra en vigor hasta el 1 de julio. Sin embargo, para evitar cualquier situación frente a mi hijo, saqué mi tarjeta verde y se la mostré al policía. Luego, mi hijo, que es ciudadano estadounidense, me preguntó si debía cambiar el color de mi cabello a rubio y usar lentes de contacto de colores brillantes para ocultar mi identidad. Este es el estigma que mi familia y yo sufrimos gracias a estas leyes.

23.    Me interesé por primera vez en el registro de votantes en agosto de 2016. Mientras buscaba trabajo en Indeed, vi una vacante en Hard Knock para promotores. La paga era de 15 dólares por hora. Mis oportunidades anteriores como asistente legal pagaban menos ($ 11 por hora).  Fue entonces cuando decidí seguir una carrera en el registro de votantes.

24.    El registro de votantes es significativo para mí porque puedo educar al público sobre la importancia de votar y elegir candidatos locales. También me gusta trabajar con los jóvenes, que a veces son tratados como apáticos, y explicar la importancia de su voto. En el día a día, me veo explicando la importancia de las elecciones locales frente a las elecciones estatales, y del equilibrio político en el gobierno.

25.    A través de mi trabajo de registro de votantes, he ayudado a mi comunidad participar en temas que les importan. En el Condado de Orange, mis esfuerzos de registro de votantes han ayudado a la comunidad a estabilizar el alquiler a través del proceso electoral. Sabía que este problema afectaba a mi comunidad,  incluyéndome a mí personalmente, porque mi alquiler aumentó  de $1,450 a $1,998. Ayudé a garantizar que los votantes elegibles en mi comunidad estuvieran registrados y supieran que una medida relacionada estaba en la boleta electoral. El año pasado, trabajé para registrar e involucrar a los ciudadanos elegibles para votar en Osceola, en los códigos postales 34143 y 34144.

26.     A través de mi trabajo de registro en esas comunidades, creé conciencia sobre los candidatos de habla hispana que se postulaban para las elecciones, y se eligió a un vicealcalde de habla hispana. En Poinciana, condado de Polk, tenemos una alta presencia de puertorriqueños afectados por el huracán María que nunca se registraron para votar en Florida. Mi trabajo en esa comunidad ayudó a aumentar el número de puertorriqueños y ciudadanos estadounidenses elegibles de Haití que estaban registrados para votar.

**DESCARGO:** Este documento ha sido traducido al español para su revisión y aprobación por parte del declarante. Se adjunta una copia de la traducción.

Declaro bajo pena de perjurio que lo anterior es verdadero y correcto.

Ejecutado el 5 de junio de 2023

Veronica Guadalupe Herrera

HF.Supp.App.0048

**Vanan Online Services, Inc.**
Think Service Think Vanan

## Certificate of Translation

Translation of **"Affidavit of Veronica Guadalupe Herrera"**

from **"English"** to **"Spanish"**

We, Vanan Online Services, Inc. a professional Translation company, hereby certify that the above-mentioned document(s) has/have been translated by our qualified and experienced translator(s) is/are accurate and true translation of the original document(s).

This is to certify the correctness of the Translation only. We cannot guarantee the veracity of the original document. Our translator is in no way related, by immediate family ties or marriage, to any parties related to the materials translated.

A copy of the Translation is attached to certification.

TAMERA LYNN NELSON
Notary Public
Commonwealth of Virginia
Registration No. 7731006
My Commission Expires Jun 30, 2025

*Crystal Nichols*

**Crystal Nichols, Production Manager.**
Date: 29th day of June 2023

Certificate of Acknowledgment:

Commonwealth of Virginia County of _Orange_

The foregoing instrument was acknowledged before me this

_29_ day of _June_ , 20 _23_

by _Crystal Nichols_

_Tamera Nelson_ Notary Public's signature

My registration number: _7731006_

My commission expires: _06/30/2025_

Vanan Online Services, Inc.
ATA Member #266532
ISO 9001:2015

Vanan Online Services, Inc.
CORPORATE
SFAL
Virginia
2016

**10711 Spotsylvania Ave., Suite A**
**Fredericksburg VA 22408**
**Office: (888) 535-5668**
**Email: support@vananservices.com**
**Website: www.vananservices.com**

HF.Supp.App.0049

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

     *Plaintiffs*,

v.

CORD BYRD, *etc., et al.*,

     *Defendants*.

Case No. 4:23-cv-218-AW-MAF

### Declaration of Norka Martínez
### (Pursuant to 28 U.S.C. § 1746)

1.     My name is Norka Martínez, and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

### **Personal Background**

2.     I have lived in the United States since 2017.

3.     I have lived in Florida since 2017.

4.     I currently live in Kissimmee, Florida, in Osceola County.

5.     I am a citizen of Venezuela.

6.     I have had Temporary Protected Status in the United States since 2022.

7.     I am authorized to work in the United States.

8.  I have a college degree in computer science, having received

qualifications in Venezuela.

### Voter Registration Work

9.      I have been assisting with voter registration efforts since 2022.

10.      I worked during the 2022 election cycle.

11.      I have assisted with voter registration efforts in paid roles. In the past I

have worked for both Hard Knocks and Mi Familia Vota as a canvasser. For the

past 15 months I have served as a canvasser for Mi Vecino.

12.      In each of those roles, I have provided eligible voters with voter

registration applications, and have assisted eligible voters who are interested in

registering to vote.

13.      I have been trained by my organization to conduct voter registration

outreach in the community and I am trained on a continuing basis as the rules and

regulations change around my work as a field organizer helping register voters.

14.      During my time as a canvasser, I have encountered many individuals

with questions and concerns about how they can access their right to vote.

Personally, I have built many relationships with members of the community, and I

enjoy working in the field engaging them on how to access their right to vote.

15.      Working as a canvasser and I have been able to provide for myself

and loved ones. It serves as my primary occupation and without it I would struggle

to support myself and loved ones financially.

16.     I think voter registration work is important because it is essential to being able to vote. Voting is essential because as citizens voters protect the interests of our whole community. Voting is necessary to defend democracy and voter registration work is important to me because it is crucial to protecting all of our rights.

## Impact of Florida SB 7050

17.     If the law goes into effect, I will have to stop doing voter registration work.

18.     If the law goes into effect, I will lose my current job.

19.     I entered into an exclusive contract with my employer to perform my work as a canvasser for a permanent position with the organization.

20.     The law will make it difficult for me to find work that my body can handle. I have physical limitations on my ability to perform hard or arduous labor, because I developed back and wrist issues from performing other types of work earlier in my career. Working in voter registration allows me to prioritize my health and avoid the strain of more physically taxing work. I enjoy speaking with people and it's the lightest non-physically taxing job I can do. In comparison to prior jobs I had, cleaning up construction sites where I injured my wrists and also when I previously worked in Amazon which carrying heavy boxes caused me a lot

of hip pain, my job as a canvasser limits my physical exposure which protects my health.

21.     I will lose significant financial stability if I am not able to work as a canvasser. My job as a canvasser is my sole source of income and if I lose it, I will have trouble covering bills, medical costs, and other household expenses. I will also be less able to provide support for my family, including my sisters, niece, and their children, all of whom are in my home country Venezuela and who I currently help support financially.

22.     I have gained valuable experience working in the field as a canvasser. By participating in this work, I have developed many skills which support my ability to effectively do my job and engage members of the community.

23.     The law will severely limit my ability to engage with community-based organizations doing voter registration work and with the eligible citizens who I could be helping to register to vote, because I will not be able to volunteer or work as a canvasser, which primarily involves handling and collecting voter registration forms which is prohibited by the law given my status.

**DISCLAIMER:** This document has been translated into Spanish for the Affiant's

review and approval.  A copy of the translation is attached.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 6, 2023

_____

Norka Martínez

HF.Supp.App.0054

**EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
PARA EL DISTRITO NORTE DE FLORIDA
DIVISIÓN DE TALLAHASSEE**

HISPANIC FEDERATION, *et al.,*

   *Demandantes,*

contra

CORD BYRD, *etc., et al.,*

   *Acusados.*

Caso núm. 4:23-cv-218-AW-MAF

**Declaración de Norka Martínez
(De conformidad con 28 U.S.C. § 1746)**

1. Mi nombre es Norka Martínez, soy mayor de 18 años y tengo plena capacidad para hacer esta declaración. Bajo pena de perjurio declaro lo siguiente:

**<u>Antecedentes Personales</u>**

2. He vivido en los Estados Unidos desde el 2017.

3. He vivido en la Florida desde el 2017.

4. Actualmente vivo en Kissimmee, Florida, en el condado de Osceola.

5. Soy de Venezuela.

6. He tenido Estatus de Protección Temporal (TPS) en los Estados Unidos desde el 2022.

7. Estoy autorizada para trabajar en los Estados Unidos.

8.      Tengo un título universitario de informática, recibí mis cualificaciones en Venezuela.

## Trabajo de Registro de Votante

9.      He asistido con los esfuerzos de registro de votantes desde el 2022.

10.     Trabajé durante el ciclo de elecciones del 2022.

11.     He asistido con esfuerzos de registro de votantes en empleos remunerados. Anteriormente, trabajé en Hard Knocks y Mi Familia Vota como promotora. En los últimos 15 meses he trabajado como promotora para Mi Vecino.

12.     En cada uno de estos trabajos, le he proporcionado formularios de registro para votar a votantes elegibles y he asistido a votantes elegibles interesados en registrarse para votar.

13.     He sido capacitada por mi organización para dirigir esfuerzos de registro de votantes en la comunidad y soy entrenada continuamente sobre los cambios en la normativa y regulaciones relacionados con mi trabajo como organizadora de campo ayudando a registrar a los votantes.

14.     Durante mi tiempo como promotora, me he encontrado con muchas personas que tienen preguntas o inquietudes sobre cómo pueden acceder su derecho a votar. Personalmente, yo he creado muchas relaciones con miembros de la comunidad y disfruto trabajar en el campo explicando cómo pueden acceder su derecho a votar.

15.   Trabajando como promotora he podido proveer para mi familia y para mí. Este trabajo es mi ocupación principal, y sin él, se me haría difícil proveer económicamente para mis seres queridos para mí.

16.   Pienso que el trabajo de registro de votante es importante porque es esencial para poder votar. Votar es esencial porque, como ciudadanos, los votantes protegen los intereses de toda la comunidad. Es necesario votar para defender la democracia y, para mí, el trabajo de registro de votantes es esencial para proteger todos nuestros derechos.

## **Impacto de la Ley de Florida SB7050**

17.   Si la ley entra en vigencia, tendré que dejar de hacer el trabajo de registro de votante.

18.   Si la ley entra en vigencia, perderé mi trabajo actual.

19.   Entré en un contrato exclusivo con mi empleador para hacer el trabajo de promotora en un puesto permanente en la organización.

20.   La ley hará que tenga dificultades encontrando un trabajo con el que pueda lidiar físicamente. Tengo ciertas limitaciones físicas en mi habilidad de hacer labores difíciles o arduas porque desarrollé problemas en la espalda y muñeca trabajando en otros puestos al principio de mi carrera. Trabajar en el registro de votantes me permite priorizar mi salud y evitar el estrés de un trabajo que sería más agotador físicamente. Me gusta hablar con las personas y es el trabajo menos agotador físicamente que puedo hacer.

En comparación con otros trabajos que he tenido anteriormente, como limpieza de sitios de construcciones, donde me lesioné las dos muñecas, y también cuando anteriormente trabajaba en Amazon, el cargar cajas pesadas me causó mucho dolor en la cadera. Mi trabajo como promotora limita el tener que exponerme a trabajos muy físicos y protege mi salud.

21.     Perderé una estabilidad económica significativa si no puedo trabajar como promotora. Mi trabajo como promotora es mi única fuente de ingresos, y si lo pierdo, tendré dificultades para cubrir mis gastos, costos médicos, y otros gastos del hogar. Tampoco podré proporcionar apoyo para mi familia, incluyendo mis hermanas, sobrina, y sus hijos, que todos viven en Venezuela y a quienes apoyo económicamente actualmente.

22.     He adquirido una valiosa experiencia trabajando en el campo como promotora. Al formar parte de este trabajo, he desarrollado muchas habilidades que respaldan mi capacidad para hacer mi trabajo eficazmente y lograr la participación de miembros de la comunidad.

23.     La ley limitará severamente mi capacidad de involucrarme con organizaciones comunitarias que apoyan el trabajo de registro de votantes y con los ciudadanos elegibles que puedo ayudar a registrarse a votar porque no podré ser voluntaria ni trabajar como promotora, lo cual principalmente implica manejar y recopilar solicitudes del registro de votante, lo cual ahora está prohibido por la ley debido a mi estatus.

**DESCARGO DE RESPONSABILIDAD:** Este documento ha sido traducido al español para la revisión y aprobación del declarante. Se adjunta una copia de la declaración.

Declaro bajo pena de perjurio que lo anterior es verdadero y correcto.

Ejecutado el 6 de junio de 2023

Norka Martínez



**Vanan Online Services, Inc.**
Think Service Think Vanan

## <u>Certificate of Translation</u>

Translation of **"Affidavit of Norka Martinez"**

from **"English"** to **"Spanish"**

We, Vanan Online Services, Inc. a professional Translation company, hereby certify that the above-mentioned document(s) has/have been translated by our qualified and experienced translator(s) is/are accurate and true translation of the original document(s).

This is to certify the correctness of the Translation only. We cannot guarantee the veracity of the original document. Our translator is in no way related, by immediate family ties or marriage, to any parties related to the materials translated.

A copy of the Translation is attached to certification.

TAMERA LYNN NELSON
Notary Public
Commonwealth of Virginia
Registration No. 7731006
My Commission Expires Jun 30, 2025

**Crystal Nichols, Production Manager.**
Date: 29th day of June 2023

Certificate of Acknowledgment:

Commonwealth of Virginia County of _Orange_

The foregoing instrument was acknowledged before me this

_29_ day of _June_ , 20 _23_

by _Crystal Nichols_

_Tamera Nelson_ Notary Public's signature

My registration number: _7731006_

My commission expires: _06/30/2025_

Vanan Online Services, Inc.
ATA Member #266532
ISO 9001:2015

Vanan Online Services, Inc.
CORPORATE
SFAL
Virginia
2016

10711 Spotsylvania Ave., Suite A
Fredericksburg VA 22408
Office: (888) 535-5668
Email: support@vananservices.com
Website: www.vananservices.com

HF.Supp.App.0060

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

      *Plaintiffs*,

v.

CORD BYRD, *etc., et al.*,

      *Defendants*.

Case No. 4:23-cv-218-AW-MAF

---

### Declaration of Plaintiff A. Doe
### (Pursuant to 28 U.S.C. § 1746)

1.     My name is Plaintiff A. Doe and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

### <u>Personal Background</u>

2.     I have lived in the United States since December 2017.

3.     I have lived in Florida since 2017.

4.     I currently live in Kissimmee, Florida, in Osceola County.

5.     I am a citizen of Venezuela.

6.     I came to the United States because I feel this country respects people's rights. Security is nonexistent in Venezuela. In Venezuela I faced difficult economic circumstances and feared persecution by the government,

HF.Supp.App.0061

because of my work in the country. I came to the United States seeking protection from the government.

7.      I applied for Temporary Protected Status in 2021 and it was granted in 2022.

8.      I am authorized to work in the United States.

9.  I have an educational background in marketing administration, having received a degree for that specialization in Venezuela.

10.     I am invested in working with communities and interacting with others to learn about their cultures. My past professional experience as a vendor contributes to my ability to educate and effectively communicate the importance of not only registering, but also casting a ballot. Although I am limited English proficient, I am able to make connections with the Hispanic community which, I believe, is the most misinformed about voting.

11.     I feel a deep sense of connection to the community I serve which I am every bit a part of. Aside from voter registration I engage deeply with the issues impacting the community and provide emotional support to these individuals who often have no one else to speak to.

## Voter Registration Work

12.     I have been assisting with voter registration efforts since 2019.

13.     I have worked during portions of the 2019, 2020, 2021 and 2022

election cycles. This included voter registration work alongside phone banking, educating individuals on COVID protocols and census work.

14.     I have assisted with voter registration efforts in paid and volunteer roles. I canvassed for Poder Latinx in 2019, 2020 and 2021. The times I canvassed for Poder Latinx ranged from as little as 2-3 months to extended periods of time in the range of 7-8 months. I currently work as a canvasser at Mi Vecino, a community-based organization that focuses on registering voters throughout Florida. I have worked here since November 2021 until the present.

15.     In each of those roles, I have provided eligible voters with voter registration applications, and have assisted eligible voters who are interested in registering to vote.

16.     I have been trained by my organization to conduct voter registration outreach in the community and I am trained on a continuing basis as the rules and regulations change around my work as a canvasser helping register voters. I have also trained other canvassers on how to register voters in the state. I also review voter registration applications that we obtain from voters to determine whether any errors were made in completing the form.

17.     My role as a canvasser involves a lot of social interaction with members of the community. Many members of our community are not informed about voting, to inform them requires that we build trust and listen to them. In my

role as a canvasser, I go to them and provide critical information on their rights to ensure they can go and vote. Through my work as a canvasser, I have built many relationships which help me provide education and serve my community.

18.     Working as a canvasser has allowed me to provide for myself and my loved ones. It serves as my primary occupation and accounts for 90% of my income. Without my job as a canvasser, I would struggle to support myself financially and would not be able to cover basic necessities.

19.     I believe registering to vote is important because as a citizen it is your civic duty. As a citizen you have rights and responsibilities, and voting is an important part of them. Without registering to vote you cannot vote which means you cannot ensure you have representation which means our democracy does not truly represent all of our community.

20.     Promoting civic engagement is important to me. In the past I have also volunteered for civic engagement organizations to be a poll monitor and have assisted on workshops conducted by Hispanic Federation and Poder Latinx on naturalization efforts and educating individuals on their rights.

## **Impact of Florida SB 7050**

21. If the law goes into effect, I will have to stop doing voter registration work.

22.     If the law goes into effect, I will lose my current job.

HF.Supp.App.0064

23.     The law will make finding work for myself incredibly difficult for several reasons. First, employment in the state of Florida is seasonal and it will be difficult to find work on such short notice. Second, I have built my skills in this area, and it would be difficult to transfer my expertise to a different job within the state. Third, this job is incomparable to other jobs I could pursue, even if I was able to find work on such short notice it would not necessarily be precisely what my responsibilities are in my role as a canvasser. Lastly, I do not have the ability to pick up and leave or travel long distances to perform similar work.

24.     If I lose my job, I will lose financial stability because my canvassing work accounts for 90% of my income. I will be unable to cover my rent and the cost of basic necessities. I do not have any additional safety nets and rely on my income from my work as a canvasser to cover my living costs. I will also be less able to provide support for my family, including my brothers and niece who I currently help support financially.

25.     I have built key skills working as a canvasser. These skills include communication and community engagement skills which are essential to the work I do. Building up these skills has contributed to me being able to effectively connect and motivate individuals to register to vote and go out and vote. The law will severely limit my ability to engage with community-based organizations doing voter registration work and with the eligible citizens who I could be helping to

register to vote, because I will not be able to volunteer or work as a canvasser, which primarily involves handling and collecting voter registration forms which is prohibited by the law given my status.

26.     I feel discriminated against because when I was granted work authorization there were no such limitations on my ability to engage in this work but now that has changed for reasons that I do not understand. As individuals with work authorization, we contribute greatly to the United States, and we value participating in its economy. The restrictions imposed by the law unfairly restrict me from doing a job that I care for and value and this distinction causes unjust harm to me and other individuals with work authorization who want to be productive members of this country and provide for ourselves.

27.     I am concerned that pursuing this case under my name may pose risks to my personal safety and pending asylum application. I fear that, despite my temporary protected status, I could face additional scrutiny and harassment by state and local officials in retaliation for challenging this law. I also fear that, in the current highly charged political environment, I may be harassed by individuals online and by individuals in the media due to anti-immigrant sentiments. I believe proceeding under a pseudonym will allow me to be protected and avoid unnecessary complications.

**DISCLAIMER:** This document has been translated into Spanish for the

Affiant's review and approval. A copy of the translation is attached.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 8th, 2023.

$A. Doe$

Plaintiff A. Doe

## EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
## PARA EL DISTRITO NORTE DE FLORIDA
## DIVISIÓN DE TALLAHASSEE

**HISPANIC FEDERATION**, *et al.,*
*Demandantes,*
**contra**
**CORD BYRD**, *etc., et al.,*
*Acusados.*

**Caso núm. 4:23-cv-218-AW-MAF**

### Declaración de Demandante A. Doe
### (De conformidad con 28 U.S.C. § 1746)

1. Mi nombre es Demandante A. Doe y soy mayor de 18 años y tengo plena capacidad para hacer esta declaración. Bajo pena de perjurio declaro lo siguiente:

### Antecedentes Personales

2. He vivido en los Estados Unidos desde diciembre de 2017.

3. He vivido en Florida desde el 2017.

4. Actualmente vivo en Kissimmee, Florida, en el condado de Osceola.

5. Soy de Venezuela.

6. Vine a los Estados Unidos porque siento que este país respeta los derechos humanos. La seguridad es inexistente en Venezuela. En Venezuela yo enfrenté circunstancias económicas difíciles y temía persecución por parte del gobierno debido a mi trabajo en el país.

Vine a los Estados Unidos buscando protección del gobierno.

7.      Solicité Estatus de Protección Temporal (TPS) en el 2021 y fue otorgado en el 2022.

8.      Estoy autorizada para trabajar en los Estados Unidos.

9.      Me eduqué en administración del área de mercado y recibí un título universitario de esa especialización en Venezuela.

10.      Estoy dedicada a trabajar con la comunidad e interactuando con otros para aprender de sus culturas. Mis experiencias profesionales anteriores como vendedora contribuyen a mi capacidad para educar y comunicar eficazmente la importancia de, no solo registrarse, sino también votar. Aunque mi habilidad en inglés es limitada, tengo la capacidad de establecer conexiones con la comunidad Hispana, la cual pienso es la que está más mal informada sobre la votación.

11.      Siento un gran sentido de conexión con la comunidad a la que sirvo y de cual soy parte. Aparte del registro de votantes, yo conecto profundamente con los problemas que afectan a la comunidad y le proporciono apoyo emocional a los individuos que no tienen con quien hablar.

## Trabajo de Registro de Votante

12.      He asistido con los esfuerzos de registro de votantes desde el 2019.

13.     He trabajado en porciones de las elecciones del 2019, 2020, 2021, y 2022. Esto ha incluido registro de votantes y trabajo en maratones telefónicos educando a los individuos sobre los protocolos de COVID y trabajo de censo.

14.     Yo he asistido con los esfuerzos de registro de votantes en puestos remunerados y también como voluntaria. He sido promotora para Poder Latinx en el 2019, 2020, y 2021. Las veces que he sido promotora para Poder Latinx han sido desde periodos de 2-3 meses y por periodos extendidos de 7-8 meses. Actualmente trabajo como promotora en Mi Vecino, una organización comunitaria que se centra en registrar a los votantes a lo largo de la Florida. He trabajado ahí desde noviembre del 2021 hasta ahora.

15.     En cada una de estas posiciones, le he proporcionado formularios de registro a votantes elegibles y he asistido a los votantes interesados en registrarse para votar.

16.     He sido capacitada por mi organización para dirigir esfuerzos de registro de votantes en la comunidad y soy entrenada continuamente sobre los cambios en las normativas y regulaciones relacionados a mi trabajo como promotora ayudado a registrar los votantes. También he capacitado a otros promotores sobre cómo registrar votantes en el estado. También reviso las solicitudes de registro de votantes que obtenemos para determinar si se cometió algún error al llenar el formulario.

17.     Mi posición como promotora requiere mucha interacción social con miembros de la comunidad. Muchos miembros de la comunidad no están informados sobre el voto, y para informarlos tengo que establecer confianza y escucharlos. En mi puesto como promotora, yo voy y le proveo información esencial sobre su derecho al voto y me aseguro de que puedan ir a votar. Como promotora, he creado muchas relaciones, las cuales me han ayudado a proporcionar educación y servir a mi comunidad.

18.     Trabajar como promotora me ha permitido proveer para mis seres queridos para mí. Esta es mi ocupación primaria y es la fuente del 90% de mis ingresos. Sin mi trabajo como promotora, se me haría difícil mantenerme económicamente y no pudiera cubrir las necesidades básicas.

19.     Pienso que registrarse a votar es importante porque es tu deber cívico como ciudadano. Como ciudadano tienes derechos y deberes, y votar es una parte importante de esos deberes. Si no te registras para votar, no puedes votar, lo cual significa que no puedes asegurarte de que tendrás representación y significa que nuestra democracia no es realmente representativa para todos en nuestra comunidad.

20.     Promocionar la participación civil es importante para mí. Anteriormente también he sido voluntaria para organizaciones de participación civil como observadora de elecciones y he asistido a talleres dictados por Hispanic Federation y Poder Latinx sobre los esfuerzos para obtener ciudadanía

HF.Supp.App.0071

y educar a los individuos sobres sus derechos.

## Impacto de la Ley de Florida SB7050

21.   Si la ley entra en vigencia, tendré que dejar de hacer el trabajo de registro de votantes.

22.   Si la ley entra en vigor, perderé mi trabajo actual.

23.   Con esta ley se me hará increíblemente difícil encontrar trabajo por varias razones. Para empezar, el empleo en el estado de la Florida es por temporadas y se me hará difícil encontrar trabajo en tan corto plazo. Segundo, he desarrollado mis habilidades en esta área y se me haría difícil transferir mis competencias a un trabajo distinto en el estado. Tercero, este trabajo es incomparable a otros trabajos que pueda buscar, y aunque encuentre trabajo en tan corto plazo no sería precisamente con las responsabilidades de mi trabajo como promotora. Por último, no tengo la capacidad de recoger e irme o viajar a largas distancias para hacer un trabajo similar.

24.   Si pierdo mi trabajo, perderé la estabilidad económica porque mi trabajo como promotora es la fuente del 90% de mis ingresos. No podré cubrir el pago del alquiler y los costos de necesidades básicas. Yo no tengo otros apoyos de seguridad económica y dependo de mi ingreso del trabajo de promotora para

cubrir mis gastos. También tendré menos oportunidad para apoyar a mi familia, incluyendo a mis hermanos y sobrina, a quienes ayudo económicamente.

25.     He desarrollado habilidades clave para el trabajo de promotora. Estas habilidades incluyen comunicación y participación en la comunidad, y son habilidades esenciales a el trabajo que hago. Desarrollar estas habilidades ha contribuido a que me conecte de forma más eficaz y motive a las personas para que se registren para votar y que vayan a votar. La ley limitaría severamente mi capacidad de participar en organizaciones comunitarias que realizan el trabajo de registro de votantes, y de involucrarme con los ciudadanos elegibles a quienes podría estar ayudando a registrarse para votar, porque no podré ser voluntaria o trabajar como promotora, lo cual principalmente implica manejar y recopilar formularios de registros de votantes, lo cual ahora está prohibido bajo la ley debido a mi estatus.

26.     Me siento discriminada ya que, cuando me otorgaron el permiso de trabajo, estas limitaciones en la capacidad de hacer este trabajo no existían y ahora eso ha cambiado por razones que no entiendo. Como individuos con permiso de trabajo, nosotros contribuimos grandemente a los Estados Unidos, y valoramos poder participar en la economía. Estas restricciones impuestas por la ley, me restringen injustamente de hacer un trabajo que aprecio y valoro, y esta distinción me causa un daño injusto a mí, y a otros individuos con permiso de trabajo que quieren ser miembros productivos de este país y poder mantenerse.

HF.Supp.App.0073

27.     Estoy preocupada que ser parte de este caso con mi nombre pueda poner en riesgo mi seguridad personal y mi solicitud de asilo que está pendiente. Temo que, aunque tenga estatus de protección temporal (TPS), pueda enfrentar escrutinio adicional y acoso por parte de los oficiales estatales y locales en represalia por impugnar la ley. También temo que, en un ambiente político tan cargado, pueda ser acosada por individuos en internet y por personas en las redes que tengan sentimientos contra los inmigrantes. Creo que proceder bajo un seudónimo me permitirá estar protegida y evitar complicaciones innecesarias.

**DESCARGO DE RESPONSABILIDAD:** Este documento ha sido traducido al español para la revisión y aprobación del declarante. Se adjunta una copia de la declaración.

Declaro bajo pena de perjurio que lo anterior es verdadero y correcto.

Ejecutado el 8 de junio de 2023

_____

 Denunciante A. Doe



## Vanan Online Services, Inc.
### Think Service Think Vanan

## **Certificate of Translation**

Translation of **"Affidavit of A. Doe"**

from **"English"** to **"Spanish"**

We, Vanan Online Services, Inc. a professional Translation company, hereby certify that the above-mentioned document(s) has/have been translated by our qualified and experienced translator(s) is/are accurate and true translation of the original document(s).

This is to certify the correctness of the Translation only. We cannot guarantee the veracity of the original document. Our translator is in no way related, by immediate family ties or marriage, to any parties related to the materials translated.

A copy of the Translation is attached to certification.

TAMERA LYNN NELSON
Notary Public
Commonwealth of Virginia
Registration No. 7731006
My Commission Expires Jun 30, 2025

Certificate of Acknowledgment:

Commonwealth of Virginia County of _Orange_

*Crystal Nichols*

**Crystal Nichols, Production Manager.**

Date: 29th day of June 2023

The foregoing instrument was acknowledged before me this _29_ day of _June_, 20_23_ by _Crystal Nichols_

_Tamera Nelson_ Notary Public's signature

My registration number: _7731006_

Vanan Online Services, Inc.
ATA Member #266532
ISO 9001:2015

My commission expires: _06/30/2025_

Vanan Online Services, Inc.
CORPORATE
SFAL
Virginia
2016

10711 Spotsylvania Ave., Suite A
Fredericksburg VA 22408
Office: (888) 535-5668
Email: support@vananservices.com
Website: www.vananservices.com

HF.Supp.App.0076

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**FLORIDA STATE CONFERENCE**
**OF BRANCHES AND YOUTH UNITS**
**OF THE NAACP, et al.,**

     *Plaintiffs*,

**v.**                                      **Case Nos.: 4:23cv215-MW/MAF**
                                            **4:23cv218-MW/MAF**

**CORD BYRD, in his official capacity**
**as Florida Secretary of State, et al.,**

     *Defendants.*

_____/

## PRELIMINARY INJUNCTION[1]

    This case arises from Florida's latest assault on the right to vote. Plaintiffs

move to preliminarily enjoin two amendments to section 97.0575, Florida Statutes.

One new provision bars noncitizens from registering citizens to vote, thus

discriminating based on alienage, one of the most questionable classifications in

equal protection jurisprudence. The other exposes individuals working for third-

---

[1] This Court is issuing a truncated order with respect to two of the three motions before this Court based on the parties' evidence demonstrating that they intended to conduct voter registration work on the Fourth of July but for the challenged provisions. Given that the Plaintiffs in Case No.: 4:23cv216 raised some overlapping claims against the same challenged provisions, but under different theories, in addition to claims against two other amended statutes not at issue in these cases, this Court will address their motion by separate order so as not to delay granting relief that is warranted in Case Nos.: 4:23cv215 and 4:23cv218.

party voter registration organizations to felony prosecutions for retaining voter information without telling them to whom the prohibition applies, what they can retain, and when they can retain it.

Florida may, of course, regulate elections, including the voter registration process. Here, however, the challenged provisions exemplify something Florida has struggled with in recent years; namely, governing within the bounds set by the United States Constitution. When state government power threatens to spread beyond constitutional bounds and reduce individual rights to ashes, the federal judiciary stands as a firewall.[2] The Free State of Florida is simply not free to exceed the bounds of the United States Constitution.

For the reasons that follow, Plaintiffs are entitled to a preliminary injunction.

---

[2] The meaning of "firewall" here— "a wall or partition designed to inhibit or prevent the spread of fire"—has featured in legal documents in the United States since the Early Republic. *Firewall*, def. 2, *Oxford English Dictionary* (3d ed. 2015); *see, e.g.*, 1797 N.Y. Laws 99 (requiring that "the exterior walls of [certain] dwelling houses, stores and other buildings . . . shall be made, erected and constructed either of stone or brick or of timber faced with brick, with party or fire walls rising twelve inches above the roof, and shall be covered . . . with . . . safe materials against fire, and not with boards or shingles . . . ."). In world literature, however, "firewall" tends to denote a wall *made of* fire, or "an unbroken line of flames forming a barrier." *Firewall*, def. 1, *Oxford English Dictionary* (3d ed. 2015). For example, the thirteenth-century Old Norse *Saga of the Völsungs* recounts that the legendary Germanic hero Sigurd (or Siegfried) passed through a wall of flame to seek the hand of Brynhild (or Brunhilda) on Gunnar's behalf. *Cf. Django Unchained* (2012) (recounting, in a conversation between Django and Dr. King Schultz, how Siegfried walks through "a circle of hellfire" to rescue Brunhilda). Both definitions have shaped more recent, figurative definitions of "firewall," including that in the computer science context.

HF.Supp.App.0078

I

These cases involve multiple constitutional challenges to newly enacted changes to section 97.0575, Florida's statute regulating third-party voter registration organizations (3PVROs).[3] These organizations offer a convenient alternative for Florida citizens to complete and submit voter registration applications so that they can participate in our democratic system. Based on the evidence they submitted in support of their motions, Plaintiffs' organizations are driven to serve their communities, connect with Floridians—particularly some of the most marginalized citizens in our state—about the importance of voting, and properly register as many new voters as possible. Now, Plaintiffs assert, their jobs, operations, and missions will be disrupted, if not frustrated entirely, because of the challenged provisions. Accordingly, Plaintiffs in both cases filed these actions almost immediately after the challenged provisions were signed into law. Plaintiffs have now moved for preliminary injunctive relief to prevent Defendants from enforcing these provisions once they take effect on July 1, 2023.

---

[3] In Case No.: 4:23cv215, Plaintiffs include several 3PVROs, including the Florida State Conference of Branches and Youth Units of the NAACP (Florida NAACP), and individuals who work for two of the Plaintiff 3PVROs. For purposes of this Order, this Court will refer to these Plaintiffs as the "Florida NAACP Plaintiffs." In Case No.: 4:23cv218, Plaintiffs also include different 3PVROs, including the Hispanic Federation, and individuals who work for other 3PVROs. This Court will refer to these Plaintiffs as the "Hispanic Federation Plaintiffs."

3

The Hispanic Federation Plaintiffs assert in their motion, ECF No. 32 in Case No.: 4:23cv218, that the new "citizenship requirement" for collecting or handling voter registration applications on behalf of 3PVROs violates the First and Fourteenth Amendments for multiple reasons. *See* § 97.0575(1)(f), Florida Statutes (2023). Likewise, the Florida NAACP Plaintiffs assert in their motion, ECF No. 55 in Case No.: 4:23cv215, that the citizenship requirement violates the Constitution for some of the same reasons, in addition to other constitutional infirmities. As the record evidence demonstrates, Plaintiffs in both cases rely heavily on noncitizens[4] to assist or lead voter registration efforts, including collecting or handling voter registration applications on behalf of the 3PVROs with which they work or volunteer. In addition, several individual Plaintiffs are themselves noncitizens and will be prohibited from continuing their voter registration work because of the citizenship requirement.

---

[4] Because this challenged provision includes a classification for all "noncitizens," this Court uses the same language here. However, this Court recognizes that the individual Plaintiffs in these cases are legally permitted to work in the United States, and that the 3PVROs in these two cases who employ noncitizens to work as canvassers employ only those who are legally permitted to work in the United States. *See, e.g.*, ECF No. 54-5 ¶ 17 in Case No.: 4:23cv215 ("UnidosUS conducts background checks on its canvassers and only hires canvassers who are U.S. citizens or legal permanent residents in the United States."); ECF No. 54-10 ¶¶ 15–16 in Case No.: 4:23cv215 (noting that between sixty and seventy of employed canvassers are noncitizens; stating that "Alianza conducts background checks on canvassers and only hires canvassers who are legally able to work in the United States."); ECF No. 32-1 ¶ 23 in Case No.: 4:23cv218 ("Many of Hispanic Federation's canvassers are non-citizens. Canvassers are citizens of Venezuela, the Dominican Republic, Colombia, or Mexico, but all our employees are authorized to work in the United States."); ECF No. 32-2 ¶ 23 in Case No.: 4:23cv218 ("The majority of Poder Latinx's canvassers are non-citizens. Many of our canvassers are citizens of Venezuela or Colombia, but all of our employees are authorized to work in the United States.").

HF.Supp.App.0080

The Florida NAACP Plaintiffs also assert that a new "information retention ban" violates the First and Fourteenth Amendments for multiple reasons. This provision makes it a third-degree felony for someone collecting voter registration applications on behalf of a 3PVRO to copy a voter's application or retain "a voter's personal information" for "any reason other than to provide such application or information to the [3PVRO] in compliance with [the] section." § 97.0575(7), Fla. Stat. (2023). The Florida NAACP Plaintiffs argue that this provision violates their First Amendment speech and association rights because it "severely limits 3PVROs' ability to communicate a pro-voting message by eliminating the most organic way to obtain and retain voters' contact information." ECF No. 55-1 at 45. Further, the NAACP Plaintiffs argue that the information retention ban is overbroad in violation of the First Amendment and impermissibly vague in violation of the Fourteenth Amendment.

On the parties' request, this Court consolidated these preliminary injunction motions for purposes of briefing and scheduling a hearing. This Court held a hearing on the motions on June 28, 2023, after which this Court took the motions under advisement. This Order follows.[5]

---

[5] As noted *supra*, note 1, this Court will address the third motion before this Court in Case No.: 4:23cv216 by separate order.

HF.Supp.App.0081

II

At the outset, this Court must address Defendants' abstention arguments. Specifically, Defendants assert that this Court should (A) abstain from hearing these cases under *Burford v. Sun Oil Co*., 319 U.S. 315 (1943); or (B) defer ruling on these cases until after September 30, 2023—when, in the Defendants' view, the Plaintiffs will be on the hook for statutory violations. For the following reasons, this Court will do neither.

A

First, Defendants' *Burford* argument. Defendants assert that *Burford* abstention is warranted because the State of Florida "is in the process of rulemaking," which "has the potential to resolve many of the issues—such as vagueness and overbreadth" and "streamline" the remaining issues. ECF No. 92 at 15 in Case No.: 4:23cv215. Defendants insist that "[f]ederal courts should abstain from deciding cases where doing so furthers the 'paramount interests of another sovereign' and the 'principles of comity and federalism.' " *Id.* (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996)). "If ever a case called for abstention." Defendants claim, "this is it." *Id.*

The Florida NAACP Plaintiffs raise four arguments against *Burford* abstention. First, the Florida NAACP Plaintiffs contend that "[a]bstention is improper when a party alleges that certain [federal constitutional] rights are

6

threatened." ECF No. 94 at 4 in Case No.: 4:23cv215 (quoting *League of Women Voters of Fla., Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1283 (N.D. Fla. 2018)). Second, they argue that "[c]ourts have long recognized that abstention is particularly inappropriate in an overbreadth or vagueness case grounded upon the First Amendment." ECF No. 94 at 5 (quoting *Hobbs v. Thompson*, 448 F.2d 456, 462 (5th Cir. 1971)).[6] Third, "Defendants' promised rulemaking will not inform judicial review of the statute" because, as the Florida NAACP Plaintiffs note, "Florida law prohibits courts from "deferr[ing] to an administrative agency's interpretation of [a] statute"; they "must instead interpret such statute or rule de novo." ECF No. 94 at 6 (quoting Fla. Const. art. V, § 21). Fourth, the Florida NAACP Plaintiffs insist that Defendants' proposed rulemaking "will neither address nor alleviate the statute's facial discrimination against noncitizens . . . or its restriction on noncitizens' ability to make and enforce employment contracts . . . ." ECF No. 94 at 6. The Hispanic Federation Plaintiffs raise similar arguments. *See* ECF No. 62 at 6–9 in Case No.: 4:23cv218.

"Under the '*Burford* abstention' doctrine, a federal court can decline to adjudicate—and can dismiss—a case that is otherwise within its jurisdiction, but only in a very particular, and 'narrow,' set of circumstances." *Deal v. Tugalo Gas*

---

[6] This Court notes that in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

7

*Co., Inc.*, 991 F.3d 1313, 1326 (11th Cir. 2021). The Supreme Court explained the

parameters of *Burford* abstention as follows.

> Where timely and adequate state-court review is available, a federal
> court sitting in equity must decline to interfere with the proceedings or
> orders of state administrative agencies: (1) when there are "difficult
> questions of state law bearing on policy problems of substantial public
> import whose importance transcends the result in the case then at bar";
> or (2) where the "exercise of federal review of the question in a case
> and in similar cases would be disruptive of state efforts to establish a
> coherent policy with respect to a matter of substantial public concern."
> *Colorado River Water Conservation Dist. v. United States, supra,* 424
> U.S., at 814, 96 S.Ct., at 1245.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361

(1989). "Any way you slice it, *Burford* is 'an extraordinary and narrow exception,'

to a federal court's 'virtually unflagging obligation' to exercise jurisdiction . . . ."

*Deal*, 991 F.3d at 1327 (internal citations omitted). The decision to abstain under

*Burford* rests in the sound discretion of the district court. *See id.*

This Court declines Defendants' invitation to shirk its "virtually unflagging

obligation" to hear these cases for three reasons. First, as Plaintiffs note, Defendants

make no showing as to how this Court's resolution of some of Plaintiffs' claims—

in particular, their equal protection challenge to the citizenship requirement—would

in any way *interfere* with an "ongoing administrative proceeding or action." *See*

*Deal*, 991 F.3d at 1326. In other words, Defendants have not explained how they

plan to "regulate away" the alleged suspect classification on the face of section

97.0575(1)(f)'s citizenship requirement.

8

Second, even for the claims that *are* implicated in Defendants' proposed rulemaking, *Burford* abstention is inappropriate because neither (1) difficult questions of state law in an area of substantial public import, nor (2) any disruption to the State of Florida's attempt to achieve uniform regulations in an area of substantial public concern, outweighs the importance of this Court resolving Plaintiffs' federal constitutional claims.

This Court recognizes the public importance of regulating 3PVROs. Even so, these cases do not present difficult questions of state law bearing on public policy problems whose importance transcends any result in these cases. The importance of the Department of State's eventual interpretation and application of the challenged provisions does not overcome Plaintiffs' interest in this Court's prompt ruling on their federal constitutional claims—claims which concern, among other things, their rights to be free from invidious discrimination and to reasonable notice of what actions may result in their staff's, members', and volunteers' criminal prosecution. The Eleventh Circuit has ruled similarly in past cases challenging Florida's election laws. *Cf. Siegel v. LePore*, 234 F.3d 1163, 1173 (11th Cir. 2000) (finding *Burford* abstention inappropriate where candidates for the offices of President and Vice President of the United States challenged the State of Florida's manual election recount procedures).

Nor is abstention warranted in these cases to avoid disrupting state efforts to

9

establish a coherent policy with respect to a matter of substantial public concern. As the Eleventh Circuit explained, a "central purpose furthered by *Burford* abstention is to protect complex state administrative processes from undue federal interference." *Siegel*, 234 F.3d at 1173. And here, like in *Siegel*, the constitutional claims at issue do "not threaten to undermine all or a substantial part" of Florida's regulatory scheme. Rather, Plaintiffs' claims "target certain discrete" provisions "set forth in a particular state statute." *See id.* Plaintiffs' discrete challenges to one of Florida's laws regulating 3PVROs does not threaten to undermine all—or even a substantial part—of the state's regulatory scheme.

Third, the specific circumstances of these cases make abstention inappropriate. The federal constitutional rights at issue are vital, and Plaintiffs' potential injuries are serious. Moreover, as Plaintiffs note, any delay to permit Defendants to regulate away any constitutional concerns may well be barred by the Florida Constitution. Specifically, article V, section 21 of the Florida Constitution mandates that "a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo." Finally, Defendants have identified no legal principle supporting their notion that a state agency can cure an otherwise unconstitutional statute and that a federal court, as a result, should abstain from ruling on a federal constitutional challenge to the statute's

text.

To sum up, Defendants urge this Court to dismiss these cases under *Burford* and allow state courts to eventually decide Plaintiffs' claims with the benefit of a rulemaking to which state courts can afford *no* deference—all the while allowing Plaintiffs to suffer ongoing irreparable harm, lose their livelihoods, and risk felony prosecutions. This turns comity into comedy. This Court declines to abandon its "virtually unflagging obligation" to exercise jurisdiction, *see Deal*, 991 F.3d at 1327. *Burford* abstention is not appropriate here.

## B

Next, Defendants request that this Court defer ruling on the motions for preliminary injunction until September 30, 2023. This Court declines to exercise its discretion to do so for many of the same reasons it declines to abstain under *Burford*—namely, the importance of the federal constitutional rights at issue and the unlikelihood that further rulemaking can or will resolve the issues here. Additionally, as the Florida NAACP Plaintiffs note, *see* ECF No. 94 at 7 in Case No.: 4:23cv215, section 97.0575(12) arguably allows for retroactive punishments for any violations of the section after July 1, 2023—not September 30, 2023, as Defendants claim.[7]

---

[7] Defendants invoke *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984) in support of their argument that this Court should defer ruling on Plaintiffs' motions for preliminary injunction. At the hearing, Defendants asserted that they do not interpret section

\*      \*      \*

For the reasons set out above, this Court declines to abstain from addressing Plaintiffs' federal constitutional claims under *Burford* or to defer ruling until after September 30, 2023. Having addressed Defendants' arguments in favor of delay, this Court turns to the merits of Plaintiffs' motions.

## III

A district court may grant a preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable injury "unless the injunction issues; (3) the threatened injury to the movant

---

97.0575(12) to impose any requirements on 3PVROs until September 30, 2023. Tr. at 99. Defendants believe it would "create[] a *Pennhurst* issue" if this Court were to grant the motions for preliminary injunction now, as if section 97.0575 imposed liabilities on Plaintiffs on the statute's effective date of July 1, 2023. Tr. at 100. As best as this Court can discern, Defendants believe *Pennhurst* calls for deferral here because an injunction "would enjoin a state official from doing something that he is not doing based on what [Plaintiffs] say is the appropriate interpretation of state law . . . ." Tr. at 10.

Defendants' *Pennhurst* argument fails for several reasons. First, *Pennhurst*'s holding concerns the Eleventh Amendment's bar on federal courts' jurisdiction over state law claims. *Pennhurst*, 465 U.S. at 106. What *Pennhurst* unequivocally *does not* prevent is exactly what Plaintiffs are doing here—seeking prospective relief for a violation of federal constitutional law against a state official in their official capacity under *Ex parte Young*. *See id.* at 102. Second, to the extent Defendants call upon "the spirit" of *Pennhurst*—presumably, general notions of federalism and comity—where state officials promise not to violate individuals' rights for a few months, this Court is unpersuaded. Section 97.0575(12) allows Defendants to punish Plaintiffs for conduct that occurs on July 1, 2023. Regardless, Plaintiffs begin to suffer irreparable harm starting on July 1, 2023. The challenged provisions go into effect on that date, and Plaintiffs must begin to order their lives and organizational activities—including hiring, firing, and retraining employees and volunteers—to avoid impending fines and felony prosecutions. Indeed, failure to comply with the law's requirements within ninety days of notice from the Department of State results in *automatic* cancellation of the organizations' registrations, an imminent injury that is affecting Plaintiffs *now*.

12

outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel*, 234 F.3d at 1176. Although a "preliminary injunction is an extraordinary and drastic remedy," it should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). No one factor, however, is controlling; this Court must consider the factors jointly, and a strong showing on one factor may compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Finally, "[a]lthough the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).

This Court begins with whether Plaintiffs have shown a substantial likelihood of success on the merits. This Court addresses this factor first because, typically, if a plaintiff cannot "establish a likelihood of success on the merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). And because standing is always "an indispensable part of the plaintiff's case,"

13

this Court begins its merits analysis with standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

A

The "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that [a] plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting). Any evaluation of Plaintiffs' claims, thus, necessitates an inquiry into Plaintiffs' ability to bring such claims.

Over time, the Supreme Court has developed a three-part test for determining when standing exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan*, 504 U.S. at 560–61. And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, "a plaintiff cannot 'rest on such mere allegations [as would be appropriate at the pleading stage], but must set forth by affidavit or other evidence

14

specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Cacchillo*, 638 F.3d at 404 (some alteration in original) (quoting *Lujan*, 504 U.S. at 561).

Plaintiffs fall into two categories: individuals and organizations. This Court will address each category's standing, in turn, with respect to each of the challenged provisions. This Court starts with the individual Plaintiffs' standing to challenge the citizenship requirement.

1

As to the citizenship requirement, both the Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs consist of (1) individuals who are noncitizens and, thus, injured directly by the citizenship requirement and (2) 3PVROs asserting organizational and associational injuries, among other theories of standing. This Court first addresses the individual Plaintiffs' standing.

The Florida NAACP Plaintiffs include Esperanza Sánchez, an individual, who submitted a sworn declaration attesting to her asserted injuries. ECF No. 54-8 in Case No.: 4:23cv215. This Court has reviewed Ms. Sánchez's declaration and finds it credible.

Ms. Sánchez asserts she is originally from Colombia but is now a permanent resident of the United States. ECF No. 54-8 ¶¶ 6, 10 in Case No.: 4:23cv215. She is currently studying to take the citizenship exam, *id*., and works for Plaintiff

UnidosUS to supervise a team of fifteen canvassers, *id*. ¶¶ 2–3. Ms. Sánchez's team helps people register to vote. *Id*. ¶ 3. Her employer, UnidosUS, is a registered 3PVRO in the State of Florida. ECF No. 54-5 ¶ 10 in Case No.: 4:23cv215.[8]

As an organizer, Ms. Sánchez makes sure that everyone on her team knows the requirements for voter registration organizations in Florida and that they follow the law. ECF No. 54-8 ¶ 17 in Case No.: 4:23cv215. As part of her duties, Ms. Sánchez distributes voter registration applications to her canvassing team and picks them up after they are finished canvassing. *Id*. ¶¶ 3, 14. Additionally, she ensures that the applications her team receives from voters are complete and that they are returned to the correct county offices on time. *Id*. ¶ 8.

According to Ms. Sánchez, were it not for the citizenship requirement, she would continue her work as an organizer in 2023 and 2024. *Id*. ¶ 7. Ms. Sánchez asserts she will not be able to collect voter registration applications or otherwise participate in voter registration due to possible fines imposed on her employer, Plaintiff UnidosUS. *Id*. In addition, she asserts that over eighty percent of her canvassing team are also noncitizens. *Id*. ¶ 9. She is concerned about losing her job as an organizer for UnidosUS, as the law restricts her ability to register voters, and

---

[8] This Court has also considered Jared Nordlund's declaration, ECF No. 54-5 in Case No.: 4:23cv215, and finds it credible. Mr. Nordlund is the Florida State Advocacy Director for Plaintiff UnidosUS, "a nonprofit organization and one of the nation's largest Latino civil rights and advocacy organizations." *Id*. ¶ 2.

HF.Supp.App.0092

she is concerned that UnidosUS will not be able to carry out its voter registration efforts as effectively without the help of their noncitizen canvassers. *Id.* ¶¶ 18–19.

Similarly, the Hispanic Federation Plaintiffs include another individual noncitizen, Veronica Herrera-Lucha, who submitted a sworn declaration attesting to her asserted injuries. ECF No. 32-3 in Case No.: 4:23cv218. This Court has also reviewed Ms. Herrera-Lucha's declaration and finds it credible.[9]

Ms. Herrera-Lucha is a lawful permanent resident and has lived in Florida since 2016. *Id.* ¶ 2. She obtained a law degree in El Salvador and a Masters in International Law in Spain. *Id.* ¶ 4. She is currently employed as the Florida State Field Director for Mi Vecino, Inc., a 3PVRO, and is responsible for overseeing the organization's voter registration activities. *Id.* ¶¶ 8–10. Ms. Herrera-Lucha is paid a salary of $55,000 per year for this work and supports four family members with it. *Id.* ¶ 11. Her work is important to her as a way to serve her community, raise

---

[9] At the hearing, Defendants did not object to the Hispanic Federation Plaintiffs supplementing the record with certified translations of their individual Plaintiffs' declarations, including Ms. Herrera-Lucha's declaration. Tr. at 109 ("[T]o the extent that the translations are materially the same and there's an attestation, we do not object."). This Court gave the Hispanic Federation Plaintiffs until noon on Friday, June 30, 2023, to supplement the record with the certified declarations and gave Defendants until 5:00 p.m. on Friday, June 30, 2023, to file any objections to them. *Id.* at 110. The Hispanic Federation Plaintiffs timely filed duplicates of their translated declarations, including Ms. Herrera-Lucha's declaration, along with a certification as to their translations. ECF No. 66-1 in Case No.: 4:23cv218. Defendants did not file any objections to the certified translations. This Court has also reviewed the certified translation, *id.*, and finds it to be both credible and substantially the same as the original translation of the declaration.

HF.Supp.App.0093

awareness about Spanish-speaking candidates, and increase the number of eligible voters originally from Puerto Rico and Haiti. *Id*. ¶ 25.

Ms. Herrera-Lucha's work has her canvassing throughout the year. *Id*. ¶ 12. For instance, in July 2023, she is scheduled to participate in Independence Day events and right-to-vote celebrations in Osceola, Orange, and Polk Counties. *Id*. During voter registration events, Ms. Herrera-Lucha asserts that she always interacts with multiple individuals and collects voter registration forms. *Id*. ¶ 13. Before the citizenship requirement was enacted, she had planned to continue conducting voter registration activities in the future, with the goal of engaging with as many community members as possible and expanding Mi Vecino, Inc.'s voter registration work. *Id*. ¶¶ 15–17. However, she believes the citizenship requirement will prohibit her from collecting or handling voter registration applications on behalf of Mi Vecino, Inc. *Id*. ¶ 18. She fears the citizenship requirement will impact her ability to continue to earn a steady income in the field of voter registration and will frustrate her career trajectory and professional development by prohibiting her from doing the voter registration work that she loves. *Id*. ¶¶ 19–21.

Ms. Sánchez's and Ms. Herrera-Lucha's declarations demonstrate that both individuals face concrete, particularized, actual, and imminent injuries. Simply put, effective July 1, 2023, these individuals can no longer collect or handle voter registration applications on behalf of the 3PVROs for which they currently work

because they are noncitizens. The provision facially discriminates against these Plaintiffs because they are noncitizens, forces them to halt their efforts to communicate with would-be voters and properly register as many applicants as possible for fear of incurring devastating liability for their employers, and directly interferes with their employment. These concrete injuries are sufficient for purposes of challenging the citizenship requirement under each theory they raise in their motions.

These injuries, namely the disruption to their employment, their livelihoods, and their mission to register voters on behalf of the organizations they work for, are also fairly traceable to the Defendants in both of these motions. Section 97.0575 itself authorizes the Defendant Secretary of State to investigate alleged violations of the statute and refer them to the Attorney General for prosecution. § 97.0575(8), Fla. Stat. (2023) ("If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter to the Attorney General for enforcement."). On top of this, 3PVROs that fail to comply with the citizenship requirement within ninety days of the Department of State providing notice of the requirements of the law "shall automatically result in the cancellation of the [3PVRO's] registration." *Id*. § 97.0575(12).

Relatedly, the Defendant Attorney General is specifically authorized to "institute a civil action for a violation of" the citizenship requirement. *Id*. §

19

97.0575(8). "An action for relief may include a permanent or temporary injunction, a restraining order, or any other appropriate order." *Id*. Were it not for the $50,000 penalty for each noncitizen who violates the citizenship requirement and Defendants' authority to penalize 3PVROs for such violations, the individual Plaintiffs would continue collecting or handling voter registration applications on behalf of the 3PVROs for which they work.

Finally, Plaintiffs have also demonstrated why an order enjoining these Defendants from enforcing the citizenship requirement is substantially likely to redress their injuries. Removing the threat of enforcement—the risk of a $50,000 fine, automatic cancellation of the 3PVROs' registrations, and further civil enforcement by the Attorney General—would directly redress Plaintiffs' injuries. In other words, they could continue the voter registration work that they have been hired to do, without fear of Defendants penalizing their organizations with devastating fines, automatic cancellation of their registrations, and other civil enforcement actions.

"At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Thus, if there is one plaintiff in each case who demonstrates standing "to assert these rights as his own," this Court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." *Vill. of*

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977). With respect to the citizenship requirement, this Court concludes that at least one individual Plaintiff from each case has standing for purposes of pursuing preliminary injunctive relief against each Defendant. Consequently, the Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs have established standing to seek an order enjoining Defendants from enforcing the citizenship requirement.[10]

This Court now turns to the Florida NAACP Plaintiffs' standing to challenge enforcement of the information retention ban.

2

With respect to the Florida NAACP Plaintiffs' challenge to section 97.0575(7)'s information retention ban, only the organizational plaintiffs raise these claims. Accordingly, this Court first addresses whether they have demonstrated organizational standing to challenge this provision.

---

[10] By focusing the analysis in this Order on the individual Plaintiffs' standing to challenge the citizenship requirement, this Court in no way suggests that the remaining Plaintiffs have failed to establish standing for purposes of a preliminary injunction. On the contrary, this Court is satisfied that most, if not all, of the Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs have standing to pursue preliminary injunctive relief with respect to the citizenship requirement. Both groups of Plaintiffs have submitted lengthy briefs addressing the contours of their standing in this regard, along with multiple declarations that set out with precision the imminent injuries they face based on the challenged provision. Nonetheless, given the need for expediency at this juncture, this Order focuses on the individual plaintiffs discussed above. Satisfied that these Plaintiffs have standing to challenge the citizenship requirement, this Court need not address the remaining Plaintiffs in this Order. *See Arlington Heights*, 429 U.S. at 264 & n.9.

HF.Supp.App.0097

"To establish standing, an organization, like an individual, must prove that it either suffers actual present harm or faces a threat of imminent harm." *City of S. Miami v. Governor*, 65 F.4th 631, 638 (11th Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Organizational standing allows an organization to assert claims based on injuries to the organization itself. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) ("An organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes.") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Organizations can establish standing by demonstrating a direct injury to the organization or an injury based on a diversion-of-resources theory. For standing based on a diversion of resources, "[a]n organization suffers actual harm 'if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.' " *City of S. Miami*, 65 F.4th at 638 (alteration in original) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)). The Florida NAACP Plaintiffs assert that they have suffered both a direct organizational injury and a diversion-of-resources injury.

This Court, however, need not address their diversion-of-resource theory because the record is clear that the Florida NAACP Plaintiffs have directly suffered

HF.Supp.App.0098

a concrete, particularized, actual, and imminent injury.[11] Take, for example, Marcos Vilar's declaration on behalf of Alianza for Progress and Alianza Center (the "Alianza organizations"), which this Court has reviewed and finds credible. As Florida-registered 3PVROs, the Alianza organizations carry out their mission of increasing civic engagement by registering voters. ECF No. 54-10 ¶¶ 3, 4, 7 in Case No.: 4:23cv215. When the Alianza organizations register voters, they ordinarily retain their contact information and "engage with these voters in the future, to encourage them to get out to vote, and to make sure they have all necessary voting information." *Id.* ¶ 12. But now that section 97.0575(7) threatens their staff, members, and volunteers *with felony prosecutions* if they copy or retain a voter's personal information, the Alianza organizations will no longer be able to carry out their mission of increasing political participation by contacting voters they have registered. The information retention ban directly impedes the Alianza

---

[11] Although this Court need not address it, this Court also concludes that the Florida NAACP Plaintiffs have established an injury under a diversion-of-resources theory as well. Specifically, these organizations demonstrate that they will divert resources to mitigate the risk that *their own staff, members, and volunteers* will face felony prosecutions for carrying out the organizations' practice of retaining voter information so that they can later encourage them to vote in the future. The Florida NCAAP Plaintiffs' "diversion of personnel and time" to counteract section 97.0575(7)'s "negation of the organizations' efforts" to fulfill their purpose is exactly the type of cognizable diversion-or-resources injury. *See Browning*, 522 F.3d at 1166.

organizations'—as well as the other Florida NAACP Plaintiffs'—ability to accomplish their missions.[12]

This injury is imminent. Starting on July 1, 2023, section 97.0575 takes effect and starts a ninety-day clock for 3PVROs to reorder their operations to comply with, among other requirements, the information retention ban. And although section 97.0575(12) contemplates a ninety-day window for 3PVROs to comply with the section's new requirements, it does not mention a similar grace period for *individuals* facing a felony conviction for violating the information retention ban. It is no answer to say that the Florida NAACP Plaintiffs' injury—the impairment of their ability to reengage voters after registration—occurs only when they seek to reengage them. Given the singular opportunity the Florida NAACP Plaintiffs have to retain a voter's information upon registration, their injury is realized when they forego that opportunity to retain a voter's information.

This injury is neither speculative nor self-inflicted. For standing purposes, the Florida NAACP Plaintiffs have shown that two phrases in the challenged provision—"personal information" and "in compliance with this section"—are at

---

[12] While Defendants may posit that the Florida NAACP Plaintiffs can still conduct general voter outreach. But these organizations have demonstrated that the *targeted* voter outreach made possible by retaining a voter's contact information is central to their purpose of increasing civic engagement. Even if the Florida NAACP Plaintiffs can conduct similarly targeted outreach through more burdensome measures, like using the voter rolls at a local Supervisor of Elections Office to look up voters' contact information by name, they have still suffered an injury. The fact that a statute leaves open a more burdensome avenue of communication does not relieve its burden on the targeted group. *See Meyer v. Grant*, 486 U.S. 414, 424 (1988).

HF.Supp.App.0100

least arguably vague. *See Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). And despite Defendants' insistence that their own interpretation of section 97.0575(7) and the Florida Department of State's proposed rulemaking permit the sort of information retention that Florida NAACP Plaintiffs' staff, members, and volunteers have conducted in the past, these promises offer little solace to individuals facing a felony prosecution for violating the statute. Defendants have made no showing that their interpretation or rulemaking would save an individual from being formally charged under section 97.0575(7).[13]

The Florida NAACP Plaintiffs make clear that before the challenged provision was passed, they had a practice of retaining information from the voters they register and that, but for the information retention ban, they would continue to do so. These organizations have also demonstrated that the alleged vagueness of section 97.0575(7) leaves them to guess at whether their staff, members, or volunteers will be criminally prosecuted for continuing to retain information to reengage voters as part of their organizations' get-out-the-vote mission. And Defendants make clear they intend to enforce this provision against these organizations' individual staff, members, and volunteers—an inference permitted by

---

[13] As this Court noted on the record, the Florida NAACP Plaintiffs' injury comes from not only the risk that their staff, members, and volunteers could be convicted of a felony, but also from the *threat* of their arrest and felony prosecution. *See* Tr. at 91. Defendants conceded this point at the hearing, acknowledging that when someone "is subject to arrest, that's a pretty big deal." *Id.*

HF.Supp.App.0101

their defense of this provision, *see Harrell*, 608 F.3d at 1257, and evidenced by their stated intent to start the deadline for compliance as soon as possible, *see* ECF No. 92 at 12 in Case No.: 4:23cv215. This Court concludes that these organizations have established a substantial likelihood of success in proving a cognizable injury sufficient for standing to challenge section 97.0575(7) as vague.[14]

For the same reasons that Ms. Sánchez's and Ms. Herrera-Lucha's injuries are fairly traceable to Defendants and redressable with an injunction from this Court, these organizations meet those standing requirements as well. The challenged statute authorizes the Defendant Secretary of State to investigate alleged violations of section 97.0575(7) and refer them to the Defendant Attorney General for felony prosecution. § 97.0575(7)–(8), Fla. Stat. (2023). Removing the threat of Defendants' investigation and felony prosecution would directly redress these organizations' injuries—namely, their inability to retain voter information to reengage them in the future. Accordingly, the Florida NAACP Plaintiffs have established standing to pursue preliminary injunctive relief with respect to their void-for-vagueness claim.

B

This Court now turns to the substance of Plaintiffs' claims. The Hispanic

---

[14] Because this Court only reaches the merits of the Florida NAACP Plaintiffs' vagueness challenge, it need not determine whether they have standing to bring their First Amendment challenges at this juncture. To be sure, though, this Court does not suggest that the Florida NAACP Plaintiffs have failed to establish standing for their First Amendment claims.

HF.Supp.App.0102

Federation Plaintiffs challenge the citizenship requirement. The Florida NAACP Plaintiffs challenge both the citizenship requirement and the information retention ban. Both groups of Plaintiffs raise overlapping claims with respect to these provisions. This Court will address the claims asserted with respect to each challenged provision, starting with the citizenship requirement.

1

This Court starts with Plaintiffs' challenges to the citizenship requirement. Effective July 1, 2023, section 97.0575(1)(f) requires 3PVROs to provide to the Department of State's Division of Elections an affirmation stating that each person collecting or handling voter registration applications on behalf of that organization is a United States citizen. They must provide this affirmation in the required format *before* engaging in any voter registration activities. § 97.0575(1), Fla. Stat. (2023). Third-party voter registration organizations will be liable for a $50,000 fine for each noncitizen who collects or handles voter registration applications on behalf of that organization. *Id*. § 97.0575(1)(f). The Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs assert this provision amounts to a facially discriminatory law in violation of the Equal Protection Clause of the Fourteenth Amendment, as it impermissibly discriminates based on alienage.

"It is established, of course, that an alien is entitled to the shelter of the Equal Protection Clause." *Sugarman v. Dougall*, 413 U.S. 634, 641 (1973). "Under the

27

Equal Protection Clause, 'No state shall . . . deny to any person within its jurisdiction the equal protection of the laws.' " *Estrada v. Becker*, 917 F.3d 1298, 1308 (11th Cir. 2019) (quoting U.S. Const. amend. XIV, § 1). And, "[a]s a general matter, a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984).

Defendants do not dispute that the citizenship requirement, on its face, discriminates against all noncitizens. In response, however, they argue this Court must look beyond the face of the statute and parse the text into two subgroups to determine the applicable standard of review. Defendants assert that within the noncitizen classification, this Court should apply rational basis review to noncitizens who are here illegally. And as for noncitizens who are here legally—namely, lawful permanent residents, also known as "green card" holders, and lawful temporary residents—Defendants argue that the classification is permissible because it falls within the "political function" exception. This Court will address each argument in turn.

First, this Court rejects Defendants' argument that this Court should subject the challenged provision to varying levels of scrutiny based on subgroups that exist nowhere in the statute. Defendants cite no authority—binding or persuasive— suggesting that this Court should take a scalpel to the statutory text and divide a sub-

HF.Supp.App.0104

classification of "illegal aliens" from separate sub-classifications of lawful residents when the Florida Legislature declined to be so precise.

To be sure, this Court understands why Defendants insist this Court should ignore the statute's plain language so that, perhaps, some aspect of the classification at issue might survive judicial review. When a state discriminates against "undocumented aliens"—or noncitizens who are here illegally—and the classification at issue burdens no fundamental rights, rational basis review applies. *See Estrada*, 917 F.3d at 1308–10. For example, in *Estrada*, the Eleventh Circuit held that rational basis review applied to an equal protection challenge to Georgia's policy that prevented any person who was "not lawfully in the United States" from attending specific state schools within Georgia's university system. *Id*. at 1301. But when the classification on its face applies to *all* noncitizens, *regardless* of their documentation or immigration status, the classification is subject to strict scrutiny. *See, e.g.*, *Sugarman*, 413 U.S. at 642, 646 (applying "close scrutiny" and holding that state statute "which denies *all* aliens the right to hold positions in New York's classified competitive civil service" violated the Fourteenth Amendment's equal protection guarantee (emphasis added)); *Bernal*, 467 U.S. at 227–28 (applying strict scrutiny to Texas statutory requirement that prevented *all* noncitizens from becoming notaries public). Here, the Florida Legislature means what it says—*all* noncitizens, not just illegal aliens, are subject to this provision. Accordingly, this

HF.Supp.App.0105

Court agrees with Plaintiffs that *Bernal* provides the appropriate analytical framework with respect to their challenge to Florida's ban on *all* noncitizens from collecting or handling voter registration applications on behalf of 3PVROs. That is, absent some other exception, this Court must apply strict scrutiny to the classification to determine if it violates the Equal Protection Clause.

Second, Defendants assert that an exception to strict scrutiny applies here—namely, the "political function" exception. Both sides agree that *Bernal* provides the test this Court must use to determine whether the "political function" exception applies in this case. They disagree, however, as to its application.

In *Bernal*, the Supreme Court articulated a two-pronged test to determine a "political function" exception. "To determine whether a restriction based on alienage fits within the narrow political-function exception," this Court must first examine "the specificity of the classification." *Bernal*, 467 U.S. at 221 (citation omitted). "[A] classification that is substantially overinclusive or underinclusive tends to undercut the governmental claim that the classification serves legitimate political ends." *Id.* (citation omitted). "Second, even if the classification is sufficiently tailored," it may be applied "only to persons holding state elective or important nonelective executive, legislative, and judicial positions, those officers who participate directly in the formulation, execution, or review of broad public policy, and hence perform

HF.Supp.App.0106

functions that go to the heart of representative government." *Id*. at 221–22 (internal quotation marks and citation omitted).

As to the first prong, like in *Bernal*, the classification here "does not indiscriminately sweep within its ambit a wide range of offices and occupations but specifies only one particular post with respect to which the State asserts a right to exclude aliens." *Id*. at 222. The citizen requirement is not overinclusive—"it applies narrowly to only one category of persons: those wishing to [collect or handle voter registration applications on behalf of third-party voter registration organizations]." *Id*.

"Less clear is whether [the citizenship requirement] is fatally underinclusive." *Id*. As counsel for the Florida NAACP Plaintiffs argued at the hearing, United States postal workers also collect and handle voter registration applications submitted by mail, and noncitizens are allowed to be postal workers. Moreover, at the hearing, Defendants had no response to the Hispanic Federation Plaintiffs' argument that noncitizens are also permitted to serve on Florida's Elections Commission and work for other state agencies. *See* ECF No. 62 at 15 in Case No.: 4:23cv218.

Instead, Defendants suggest that the law is not underinclusive solely because it discriminates only against those noncitizens who would otherwise "undergo[] the fiduciary duty of handling and collecting completed applications." ECF No. 60 at 28 in Case No.: 4:23cv218. But employees of several state agencies are also responsible

HF.Supp.App.0107

for handling completed voter registration applications, and the State of Florida apparently has not decided to exclude all noncitizens from these positions. *See* § 97.053(1), Fla. Stat. (2023) ("Voter registration applications, changes in registration, and requests for a replacement voter information card must be accepted in the office of any supervisor, the [Division of Elections], a driver license office, a voter registration agency, or an armed forces recruitment office when hand delivered by the applicant or a third party during the hours that the office is open or when mailed."); § 448.09, Fla. Stat. (2023) (prohibiting public and private employment only for noncitizens who are not authorized to work under the immigration laws of the United States). Thus, it is a closer call as to whether the citizenship requirement is fatally underinclusive. But that is not the end of the inquiry.

Even assuming, without deciding, that Florida's ban on all noncitizens from collecting or handling voter registration applications is not fatally underinclusive, the law fails the second prong of the "political function" test. That is, the citizenship requirement does not apply only to persons holding state elective or important nonelective executive, legislative, and judicial positions and, thus, participating directly in the formulation, execution, or review of broad public policy. Without dispute, 3PVRO staff, members, and volunteers are not public employees of any branch of state government. Nor do they participate directly in the formulation, execution, or review of broad public policy.

32

The focus of the inquiry for this second prong is "whether a position was such that the officeholder would necessarily exercise broad discretionary power over the formulation or execution of public policies importantly affecting the citizen population—power of the sort that a self-governing community could properly entrust only to full-fledged members of that community." *Bernal*, 467 U.S. at 223–24. Here, Defendants expressly concede that "those who collect and handle completed applications aren't vested with discretion or engage in policy making." ECF No. 60 at 28 in Case No.: 4:23cv218.

In short, Defendants urge this Court to deviate from settled law and construe this exception far more broadly than the Supreme Court has ever permitted. Their request runs counter to the Supreme Court's admonition that "the political-function exception must be *narrowly* construed; otherwise *the exception will swallow the rule* and depreciate the significance that should attach to the designation of a group as a 'discrete and insular' minority for whom heightened judicial solicitude is appropriate." *Bernal*, 467 U.S. at 222 n.7 (emphasis added). Accordingly, the "political function" exception does not apply here. Full stop.

Because the political function exception does not apply here and Defendants come forward with no other applicable exception, this Court must apply strict scrutiny. *Id*. at 227. "To satisfy strict scrutiny, the State must show that [the challenged provision] furthers a compelling state interest by the least restrictive

33

means practically available." *Id*. Even at the preliminary injunction stage, Defendants carry the burden of proving that the challenged provision satisfies strict scrutiny. *Otto v. City of Boca Raton, Florida*, 981 F.3d 854, 868 (11th Cir. 2020) (applying strict scrutiny in First Amendment challenge to local ordinance and reversing denial of preliminary injunction based, in part, on government's failure to prove ordinance satisfied strict scrutiny).

In their briefs, Defendants do not even attempt to demonstrate how the citizenship requirement satisfies strict scrutiny. At the hearing, Defendants focused on the state's legitimate interest in ensuring voter registration applications are turned in on time and the risk that noncitizens may leave the country before they can turn in such applications on behalf of the 3PVROs for which they work or volunteer. *See* Tr. at 84 ("And timeliness is the bucket under which it falls . . . . Timeliness is a concern for 3PVROs, and timeliness we try to tie to the issues that come with resident alien and illegal alien [sic], someone here on a temporary basis . . . . Timeliness is a broad heading."). But Defendants point to no record evidence indicating that noncitizens, as a class, have such a fleeting presence in this country as to justify a wholesale ban on their collecting or handling voter registration applications. *See Bernal*, 467 U.S. at 2319 ("There is nothing in the record that indicates that resident aliens, as a class, are so incapable of familiarizing themselves with Texas law as to justify the State's absolute and classwide exclusion.").

HF.Supp.App.0110

This Court is in no way dismissing the gravity of the problem posed by late-filed voter registration applications. If 3PVROs turn applications over to the appropriate election officials too late, would-be voters who chose to register with those 3PVROs may be precluded from voting in the next election based on the untimely submission of their applications. This is a serious issue. And Defendant Byrd filed evidence demonstrating that untimely submissions occur. *See* ECF No. 60-1 at 93 ¶ 7 in Case No.: 4:23cv218 ("The Office reviewed approximately 3,077 voter registration applications that were collected and submitted untimely by 3PVROs, in violation of section 97.0575, Florida Statutes. The Office assessed statutory fines in the amount of $41,600.00 against those 3PVROs that did not comply with the statutory requirements."). Indeed, several 3PVROs have been fined for turning in late applications this year, including the Republican Party of Duval County (ten late applications, *id*. at 385), the Clay County Democratic Executive Committee (one late application, *id*. at 383), and Plaintiff Alianza Center, Inc. (five late applications, *id*. at 408).

Thus, the State of Florida has identified a problem with respect to untimely submission of voter registration applications. The hard part for Defendants is identifying any connective tissue between the problem and the state's proposed solution—namely, banning *all* noncitizens from collecting or handling voter registration applications on behalf of 3PVROs. At the hearing, Defendants

35

acknowledged the dearth of evidence connecting noncitizens to late-filed voter registration applications. And their papers don't even attempt to justify the law under strict scrutiny. At the very least, Defendants must be able to marry the solution to the problem. But Defendants have failed to do that here.

Relatedly, the citizenship requirement is also *not* the least restrictive means to tackle the problem of late voter application submissions. Indeed, along with the citizenship requirement, Florida also enacted higher fines for late submissions, while also reducing the amount of time available for 3PVROs to submit such applications ahead of the book closing deadline. *See* § 97.0575(5), Fla. Stat. (2023). With respect to this provision, increasing the penalties for late submissions is at least rationally related to solving the problem of late submissions. It is certainly less restrictive than banning an entire class of people from collecting or handling voter registration applications. In short, Defendants' attempt to justify the citizenship requirement based on "timeliness" is simply not enough to meet strict scrutiny's "stringent requirements." *Bernal*, 467 U.S. at 2319.

The same is true with respect to Defendants' secondary argument in defense of the citizenship requirement. At the hearing, Defendants also sought to justify the classification under the "broad heading" of "voter integrity," based on the state's concern that noncitizens are illegally voting. Tr. at 84–85. But Defendants conceded that banning all noncitizens from collecting or handling voter registration

HF.Supp.App.0112

applications is not a perfect fit to alleviate the state's concern about "voter integrity." *Id*. at 85. Nonetheless, Defendants erroneously asserted this imperfect fit is "good enough" because rational basis review should apply. *Id*. As this Court has already explained at length, the classification at issue is subject to strict scrutiny. Therefore, this Court rejects Defendants' "good enough" approach to justifying discrimination in this case. Defendants must come forward with proof that the provision is the least restrictive means to furthering the state's interest. This they have not done.

"Without a factual underpinning, the State's asserted interest lacks the weight [the Supreme Court has] required of interests properly denominated as compelling." *Bernal*, 467 U.S. at 228. Accordingly, Defendants have not demonstrated that the citizenship requirement furthers a compelling state interest by the least restrictive means practically available.

This Court concludes that Plaintiffs are substantially likely to succeed on their claim that the citizenship requirement violates the Equal Protection Clause of the Fourteenth Amendment. At this juncture, because they are substantially likely to succeed on the merits of their equal protection claim, this Court need not address the merits of the balance of the Florida NAACP Plaintiffs' and Hispanic Federation Plaintiffs' claims as to the citizenship requirement. Next, this Court turns to the merits of Plaintiffs' challenge to the information retention ban.

HF.Supp.App.0113

2

This Court now turns to the Florida NAACP Plaintiffs' vagueness challenge to section 97.0575(7), the information retention ban. "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion); *accord Kolender v. Lawson*, 461 U.S. 352, 357 (1983). For the reasons set out below, this Court concludes that section 97.575(7) is unconstitutionally vague because it suffers from the twin evils of (1) failing to provide notice of what is prohibited and (2) authorizing or encouraging arbitrary and discriminatory enforcement.

This Court starts, as it must, by looking at the statute at issue. This Court has a duty to construe statutes as constitutional if it can. *See Boos v. Barry*, 485 U.S. 312, 330 (1988). However, the nature of this Court's duty to narrowly construe a challenged statute varies depending on whether the challenged statute is state or federal law. When a federal law is at issue, this Court has a "duty to avoid constitutional difficulties by [adopting a limiting construction] if such a construction is *fairly possible*." *Boos*, 485 U.S. at 331 (emphasis added). If, on the other hand, a state law is at issue, this Court cannot "adopt a narrowing construction . . . unless

38

such a construction is *reasonable and readily apparent*." *Id.* at 330 (emphasis added); *accord Stenberg v. Carhart*, 530 U.S. 914, 944 (2000). Only a state court can supply the requisite construction to save an otherwise vague state statute. *Gooding v. Wilson*, 405 U.S. 518, 520 (1972).

"The distinction is an important one" because "[w]hen a state statute has unconstitutional applications and has not been given a narrowing construction by the state court that saves it from those applications, federal courts 'must be careful not to encroach upon the domain of a state legislature by rewriting a law to conform it to constitutional requirements.' " *Toghill v. Clarke*, 877 F.3d 547, 556 (4th Cir. 2017) (quoting *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011)); *see also Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1572 (11th Cir. 1993) ("[A]s a federal court, we must be particularly reluctant to rewrite the terms of a *state* statute.") (emphasis in original); *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014) (explaining that "the 'unless' clause" in "unless such construction is reasonable and readily apparent" is an "important federalism principle [that] should be invoked sparingly and with caution").

So, the question before this Court is not whether there is *any* reading that would render the statute constitutional. Nor is it whether there is a possible, plausible, or simply reasonable reading that would render the statute constitutional. Instead, the question is whether there is a constitutional reading of the statute that is

HF.Supp.App.0115

both *reasonable* and *readily apparent* and, thus, does not require this Court to rewrite the statute. *See Citizens for Responsible Gov. State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194–95 (10th Cir. 2000) (declining state's invitation to give statute at issue "a construction more restrictive than that provided by [its] plain language") (quoting *Wilson v. Stocker*, 819 F.2d 943, 948 (10th Cir. 1987)).

With that in mind, this Court turns to the text of the challenged provision. Section 97.0575(7) provides:

> If a person collecting voter registration applications on behalf of a third-party voter registration organization copies a voter's application or retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

§ 97.0575(7), Fla. Stat. (2023) (emphasis added).

To understand what this section prohibits, a person of ordinary intelligence must know three things: (1) to whom does the statute apply; (2) which information falls within its reach; and (3) what is the person prohibited from doing with that information. Knowing the answers to each of these questions is critical to avoiding arrest for a third-degree felony.

Plaintiffs assert that the phrase "personal information" is vague. That is, Plaintiffs argue the statute provides no notice of what information falls within its

HF.Supp.App.0116

reach. ECF No. 55-1 at 51 in Case No.: 4:23cv215. In addition, Plaintiffs assert the phrase "in compliance with this section" likewise renders the statute vague. *Id*. This phrase implicates both (1) to whom the statute applies and (2) what that person is prohibited from doing with the information at issue. Defendants, for their part, argue that the meaning of the phrase "personal information" is clear, and that the Florida Department of State's rulemaking will obviate any vagueness concerns with this term or the phrase "in compliance with this section." ECF No. 92 at 31–32 in Case No.: 4:23cv215.

With respect to Defendants' suggestion that the Department of State can "clarify" the statute, they are mistaken. Rewriting state statutes is the sole province of the state's legislative branch. Likewise, assigning authoritative constructions to a state's statutory text is the sole province of the state's judicial branch. Rewriting the laws it enforces is not within the purview of the executive branch, and Defendants' assurance that the Department of State will fix the problem is a nonstarter.

What the Defendants can do—and what they have attempted to do in this case—is propose a construction of the statute for this Court to consider. Indeed, this Court must "consider any limiting construction" that the "enforcement agency has proffered." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982). But Defendants cannot propose a possible reading of the statute and assert that their construction is authoritative while rejecting Plaintiffs' possible

HF.Supp.App.0117

reading of the statute. Again, absent clarification from the Florida Legislature or an interpretation by Florida's state courts, this Court can only adopt Defendants' proposed construction if it is both reasonable and readily apparent from the face of the statute.

This Court must make clear the question before it. The question is not how the statute *actually applies.* That is to say, this Court is not construing the statute to apply it in a particular, well-defined context. Rather, the question is whether a person of ordinary intelligence can understand what the statute prohibits and to whom it applies. Thus, the canons of construction, while still relevant, take on less significance. And while this is a Court of law—not of grammar—the "ordinary principles of English prose" are not "irrelevant" to the definition's construction. *See Flora v. United States*, 362 U.S. 145, 150 (1960). This is especially true here, where the question is how a person of ordinary intelligence would read the statute.

This Court acknowledges the obvious up front. Clearly, the challenged provision prohibits individuals who engage directly with voters and collect completed applications from the voters from copying those completed applications for their own personal use. Perhaps they plan to contact these voters later to advertise their personal business or solicit donations for their church. But retention of information for such personal reasons, on the face of section 97.0575, is "not in

42

compliance with this section." Another possible reading is that *anyone* who works for a 3PVRO and receives collected applications is prohibited from retaining certain information—and therein lies the rub.

The statute does not necessarily limit its prohibitions only to people who are collecting information directly from voters out in the community. Arguably, the statute applies to all persons who collect voter registration applications on behalf of 3PVROs. This includes the chain of command and the chain of custody within a given 3PVRO, from the canvasser to the field organizer, to the quality control personnel, to the person who finally delivers the completed applications to the appropriate elections officials. At every step in this chain, individuals are collecting voter registration applications on behalf of a 3PVRO, and thus, they are subjecting themselves to the threat of prosecution under this statute.[15] The problem here is that the statute offers no readily apparent construction as to whom it applies. Is it limited solely to folks who are directly engaging with voters and collecting completed applications from them? Or does it apply to anyone further up the chain who would

---

[15] For example, Plaintiff Esperanza Sánchez attested in her declaration that (1) she supervises a team of 15 canvassers on behalf of UnidosUS, a 3PVRO, (2) she distributes voter registration applications to her canvassing team and picks them up when they are done, and (3) she checks that applications her canvassing team receives from voters are complete and turned into the correct county offices on time. *See* ECF No. 54-8 in Case No.: 4:23cv215. Thus, Ms. Sanchez is not always simply engaging directly with voters to fill out applications and then turning them over to the 3PVRO. Instead, she is acting as an agent of the 3PVRO in various capacities—canvasser, supervisor, quality control, and the final link in the chain of custody prior to delivery to the appropriate elections official.

HF.Supp.App.0119

retain voter information for get-out-the-vote purposes? What about a 3PVRO employee who collects completed applications from volunteers in the community?

The statute also contemplates that such persons are permitted to copy voter registration applications or other "personal information" for a specific purpose—"to provide such application or information to the third-party voter registration organization in compliance with this section." *See* § 97.0575(7), Fla. Stat. (2023). Aside from turning the applications over to the 3PVRO for delivery to the appropriate elections official within the time afforded by the statute, there does not appear to be any other way for an individual "to provide such application or information to the [3PVRO] in compliance with this section." That seems consistent with this aspect of the Department of State's proposed gloss:

> Each voter registration application contains a voter's personal information that is not generally available to the public. For purposes of section 97.0575(7), F.S., a person collecting a voter registration application on behalf of a 3PVRO for the reason of providing such application (including the voter's personal information contained therein) to the 3PVRO shall be deemed to be "in compliance with this section" with respect to providing such application to the 3PVRO if the person:
>
> 1. Provides such application to the 3PVRO and
>
> 2. Does not retain such application after providing it to the 3PVRO.

ECF No. 92-1 at 73 in Case No.: 4:23cv215.

This Court reiterates that it must "consider any limiting construction" that the "enforcement agency has proffered." *Flipside*, 455 U.S. 489, 494 n.5. But this Court

HF.Supp.App.0120

is without power to impose a narrowing construction on a state law "unless such a construction is *reasonable and readily apparent*." *Boos*, 485 U.S. at 330 (emphasis added). And while the proposed rule, cited above, attempts to answer the question about what individuals are prohibited from doing with voter information, the Department's additional "clarifications" call this interpretation into serious doubt. As explained below, this only underscores the statute's vagueness.

Section 97.0575(7)'s plain language only applies to individuals, not the 3PVRO as an organization. Thus, it is reasonable to read the statute as prohibiting only individuals who collect such information from copying or retaining that information, except for purposes of providing the information to the 3PVRO. In other words, the plain language of the provision includes no similar prohibition on copying or retaining information for the 3PVRO itself. But this reveals an inherent ambiguity of the statute in the context to which it applies. 3PVROs are, of course, made up of individuals—staff, members, volunteers, etc. And these individuals work together in various ways to collect voter registration applications at various points along the chain of custody until they are finally delivered to the appropriate elections official. *See* ECF No. 54-8 in Case No.: 4:23cv215. Accordingly, the Department of State's proposed definition of "in compliance with" this statute only leads to further ambiguity as it fails to address what individuals working for the 3PVRO may do

HF.Supp.App.0121

with the voter registration applications or voter information once they receive it from those individuals who collected it directly from voters.

Seemingly recognizing this ambiguity, the Department of State has also proposed prohibiting 3PVROs, as organizations, from copying voter registration applications or retaining certain voter information after they have delivered the applications to the appropriate elections official. ECF No. 92-1 at 74 in Case No.: 4:23cv215. But this prohibition is found nowhere in section 97.0575(7), nor is it reasonable or readily apparent that the statute's prohibitions extend so broadly. Indeed, the Department of State's proposed rule serves only to contradict an intuitive reading of the statute; namely, that it applies solely to those individuals who are directly engaging with voters in the community as opposed to the 3PVROs as organizations or those who work for them and collect completed applications from further up the chain of custody.

The vagueness of the challenged provision is only underscored by the Department of State's attempt to redefine what the statute actually applies to— "personal information." In the context of the statute itself, "personal information" is described as including—but not limited to—"the voter's Florida driver license number, Florida identification card number, social security number, or signature." Based on these examples, Defendants argue that "personal information" means "private, non-public information." ECF No. 92 at 31 in Case No. 4:23cv215 (internal

quotation marks omitted). Of course, had the Florida Legislature intended to include only "private" or "non-public information," it could have said so directly. Instead, the statute leaves open a broad universe of what could be considered "personal" information and does not, on its face, limit that reach to only "information that is not generally available to the public."

The Department of State's attempt at limiting the universe of information is but one possible interpretation. Nonetheless, even if the Florida Legislature intended for "personal information" to mean "private, non-public information," in this day and age, the possibilities for what constitutes "private" or "non-public" information are both sweeping and shifting. Defendants' suggestion that such information *necessarily excludes* voters' email addresses, telephone numbers, or mailing addresses is not readily apparent from the statute's text. And Defendants' proposed construction begs the question of whether something is private or "not generally available to the public" depends upon the efforts to which someone must go to locate the information. For example, what about home addresses or phone numbers? What about private email addresses? This Court cannot pretend we live in a different era when everyone still had a phonebook with phone numbers and addresses for nearly everyone in town. While someone's home phone number and home address may have been publicly available in the 1990s, a person of ordinary intelligence would have good reason to think such information is "private" nowadays inasmuch as

HF.Supp.App.0123

phonebooks are no longer widely disseminated, if at all. But even if this Court accepts Defendants' proffered construction of "personal information," this only answers one question posed by the statute—that is, to which information the statute applies. Defendants' construction offers no answers for the fundamental questions of to whom the statute applies and when their conduct—retention of information—becomes a felony.

This Court must give meaning to all terms in a statute. *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1273 (N.D. Fla. 2021). But on its face, section 97.0575(7) offers only a standardless prohibition on retention of voter information—whatever that information may be. This indiscernible standard provides no notice of the conduct prohibited by the section and encourages arbitrary enforcement.

It bears repeating that the Fourteenth Amendment tolerates a lower degree of vagueness for laws, like section 97.0575(7), that impose *criminal liability. See Flipside*, 455 U.S. at 498 ("The degree of vagueness that the Constitution tolerates— as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."). Here, under the standard set by the Florida Legislature and proposed by Defendants, a person of ordinary intelligence would not be able to understand when they could copy voters' applications or retain their personal information, if at all. And while a "scienter requirement may mitigate a law's vagueness," *Flipside*, 455 U.S. at 499, the challenged provision lacks even

HF.Supp.App.0124

that. Even more troubling, this indiscernible standard lends itself to arbitrary enforcement. Without a reasonable and readily apparent meaning for what is prohibited and who is subject to that prohibition, section 97.0575(7) fails to provide "any standard by which [the law's enforcers] can judge whether an individual" improperly retained a voter's personal information. *See Morales*, 527 U.S. at 66. In short, the Florida NAACP Plaintiffs' staff, members, and volunteers are left to guess when they may violate section 97.0575(7) and risk arrest and felony prosecution. [16]

Here, the Florida Legislature has drafted a criminal statute that contemplates *some* individuals retaining *some* information for *some* undefined purpose. The penalties for running afoul of these illusory standards include arrest, prosecution, and ultimately a felony conviction. Even Defendants conceded at the hearing that the threat of arrest is "a pretty big deal." Tr. at 91.[17] The statute's text is so devoid

---

[16] "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id* at 499. "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* While this Court recognizes that the question of whether the law does, in fact, interfere with First Amendment rights is a nuanced one, the Florida NAACP Plaintiffs have made a colorable argument that their get-out-the-vote activities are imbued with First Amendment protection and that this provision directly interferes with their corresponding free speech and association rights. But because the challenged provision runs afoul of the Due Process Clause's fair notice requirement for criminal statutes, this Court need not determine if it would likewise violate the more stringent vagueness standard for laws that interfere with First Amendment rights.

[17] At the hearing, Defendants made the dubious argument that their proposed rulemaking would provide a legal defense to avoid conviction. However, it certainly offers no shelter from arrest or prosecution, which, as noted above, Defendants agreed "is a pretty big deal."

HF.Supp.App.0125

of meaning that it cannot possibly give people of ordinary intelligence fair notice of what information they are allowed to retain and for what purposes they may do so. And it is no answer for Defendants to suggest they won't take any action against these Plaintiffs based on the Florida Department of State's "clarification" of the statute. Simply put, neither the Department nor this Court is permitted to rewrite section 97.0575(7) to cure its vagueness.[18] This Court concludes that the Florida NAACP Plaintiffs have established a substantial likelihood of success on the merits of their vagueness challenge to the information retention ban in section 97.0575(7). As such, this Court need not address the merits of the balance of the Florida NAACP Plaintiffs' claims with respect to this statute.

---

[18] Although this Court would appreciate the opportunity to certify this important question of state law construction to the Supreme Court of Florida, it is without authority to do so. *See* Fla. R. App. P. 9.150 (permitting only "the Supreme Court of the United States or a United States court of appeals" to certify a question of law to the Supreme Court of Florida); *see also Dream Defs. v. Gov. of the State of Fla.*, 57 F.4th 879, 890 (11th Cir. 2023) (certifying question of statutory construction to Florida Supreme Court and noting that "certification affords the State's highest court an opportunity to interpret [Florida's amended riot statute] in a way that may obviate the plaintiffs' constitutional concerns"). Thus, clarification from the Florida Supreme Court is unavailable at this juncture. To be sure, though, it is no answer to suggest this Court should abstain from ruling on the Florida NAACP Plaintiffs' vagueness claim until a Florida state court assigns some limiting construction to the challenged provision or the Florida Supreme Court answers a certified question regarding the statute's construction. Voter registration is happening *now*, individuals' rights and liberty are at stake *now*, and the statute's enforcers have yet to finalize their own construction of the statute. Accordingly, this Court must address the issue *now* rather than leave individuals guessing as to whether they will be subject to arrest or felony prosecution until the Florida Legislature amends the statute or the state courts assign some limiting construction to the statute as written.

HF.Supp.App.0126

C

Recall that the remaining preliminary injunction factors are (1) that Plaintiffs will suffer irreparable injury absent an injunction, (2) that the harm not granting an injunction causes to Plaintiffs outweighs the harm an injunction would cause to Defendants, and (3) that the injunction would not be adverse to the public interest. *Siegel*, 234 F.3d at 1176. Here, the remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of Plaintiffs' claims. On balance, these factors weigh in favor of granting Plaintiffs' motion for preliminary injunction.

First, absent an injunction, Plaintiffs will suffer irreparable injury because their voter registration operations will be substantially interrupted once the challenged provisions take effect. For example, the Organizational Plaintiffs stand to lose the ability to have their noncitizen canvassers—in some instances, the vast majority of their canvassing workforces—continue collecting or handling voter registration applications, thus limiting their ability to register new voters, or immobilizing their voter registration efforts altogether, until they can recruit and hire new employees and volunteers. And the individual Plaintiffs are explicitly banned from collecting or handling voter registration applications, thus extinguishing their opportunities to directly register new voters. "[W]hen a plaintiff loses an opportunity to register a voter, the opportunity is gone forever." *League of Women Voters of Fla.*

51

*v. Browning*, 863 F. Spp. 2d 1155, 1167 (N.D. Fla. 2012) (Hinkle, J.). "If an injunction does not issue now, there will be no way to remedy the plaintiffs' continuing loss through relief granted later in this litigation." *Id.*

Second, weighing Plaintiffs' injuries against Defendants' interest, the scale tips decisively in Plaintiffs' favor. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). That is because the state "has no legitimate interest in enforcing an unconstitutional ordinance." *Id.* Third, and finally, this Court is persuaded that an injunction would not be adverse to the public interest. After all, as noted above, "[t]he public has no interest in enforcing an unconstitutional ordinance." *Id.* at 1272–73.

In sum, because Plaintiffs have carried their burden as to all four of the preliminary injunction factors with respect to their equal protection and vagueness claims, this Court finds that they are entitled to a preliminary injunction with respect to these claims.

IV

This Court next considers whether Plaintiffs must secure a bond in furtherance of the preliminary injunction. Rule 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). But "it is well-

52

established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.' " *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F. 3d 964, 971 (11th Cir. 2005) (alteration in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). Moreover, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1326 n.25 (N.D. Ga. 2020) (quoting *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)). Here, considering that the challenged provision's unlawful impact on Plaintiffs' Fourteenth Amendment rights weighs against requiring a bond, this Court waives the bond requirement.

V

Finally, having determined a preliminary injunction is warranted, this Court addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency*

*v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner*, 999 F. Supp. 2d at 1292 (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so. Defendants have every right to appeal, and this Court sees no reason to delay Defendants in seeking an appeal by requiring them to move to stay under Rule 62.

VI

Tomorrow, Floridians across the state will commemorate our Nation's birthday. They will endure the heat of the Florida summer to celebrate the Fourth of July with family and friends at barbecues and picnics. They will gather with their communities at public parks for music and fireworks. They will cheer and sweat at parades and block parties. And amid these patriotic festivities, some may feel moved, for the first time, to embrace their solemn privilege as citizens by registering to vote.

That's where Plaintiffs come in. Absent the challenged provisions at issue in these cases, individuals like Ms. Herrera-Lucha and 3PVROs like the Florida NAACP and Hispanic Federation would be engaging with their communities and

54

registering new voters. In doing so, they would embody those democratic ideals that, for nearly two hundred forty-seven years, have made our system the envy of the world.

The importance of the interests at stake in these cases cannot be overstated. As counsel for the Florida NAACP Plaintiffs put it, "the very nature and purpose of the 3PVROs, in this case and generally, is to reach communities and exist in a space that is outside of the government, that is to reach marginalized voters who have traditionally lacked that kind of connection and access to the state government . . . ." Tr. at 104. "These 3PVROs exist precisely to address the voters who do not feel taken care of by the government and who have been marginalized by these traditional means . . . ." *Id.* In a land that professes deliverance of the "tired," the "poor," the "huddled masses yearning to breathe free,"[19] 3PVROs encourage those who join us as citizens to also join in citizenship's highest right and cardinal task: voting. We have "a Republic" only if we "keep it"[20]; our government remains "of," "by," and "for the people"[21] only if the people are heard. And to vote is to lift one's voice and sing in our vast, clamoring chorus of democracy.

---

[19] Emma Lazarus, *The New Colossus*.

[20] Attributed to a conversation between Elizabeth Willing Powel and Benjamin Franklin.

[21] Abraham Lincoln, *Gettysburg Address*.

HF.Supp.App.0131

The State of Florida is correct to seek integrity in our electoral system. Sound election laws ensure the people are heard without distortion from negligent and bad-faith actors. Here, however, Florida's solutions for preserving election integrity are too far removed from the problems it has put forward as justifications. It is no answer to assert the Florida Legislature's work here was "good enough." Tr. at 85. Such shoddy tailoring between restriction and government interest presents a dubious fit under rational basis review, and it falls woefully short of satisfying the strict scrutiny this Court must apply. And a provision as vague as the information retention ban, notwithstanding the Secretary of State's *post-hoc* intent to clarify its reach, can serve no end but arbitrary punishment. The United States Constitution demands more than "good enough."

Ms. Herrera-Lucha, a noncitizen who, herself, lacks the right to vote, has spent years registering and encouraging citizens to exercise that solemn right. She may, at least for now, continue to do so and add more voices to the millions of others singing a more perfect Union into existence.

Accordingly,

**IT IS ORDERED:**

1. The Florida NAACP Plaintiffs' motion for a preliminary injunction, ECF

HF.Supp.App.0132

No. 55 in Case No.: 4:23cv215, is **GRANTED**.[22]

2. Defendant Secretary of State Cord Byrd, in his official capacity, and Defendant Attorney General Ashley Moody, in her official capacity, must take no steps to enforce the following until otherwise ordered:

    a. Section 97.0575(1)(f), Florida Statutes (2023); and

    b. Section 97.0575(7), Florida Statutes (2023).

3. The preliminary injunction binds the above-listed Defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

4. The Hispanic Federation Plaintiffs' motion for a preliminary injunction, ECF No. 32 in Case No.: 4:23cv218, is **GRANTED**.

5. Defendant Secretary of State Cord Byrd, in his official capacity, and Defendant Attorney General Ashley Moody, in her official capacity, must take no steps to enforce the following until otherwise ordered:

    a. Section 97.0575(1)(f), Florida Statutes (2023).

6. The preliminary injunction binds the above-listed Defendants and their

---

[22] As this Court noted above, given that the Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs are entitled to relief based on their equal protection and vagueness claims, this Court need not address the balance of their asserted constitutional infirmities with respect to the challenged provisions.

HF.Supp.App.0133

officers, agents, servants, employees, and attorneys—and others in active

concert or participation with any of them—who receive actual notice of

this injunction by personal service or otherwise.

**SO ORDERED on July 3, 2023.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**

58

**DECLARATION OF ANDREW DARLINGTON
IN SUPPORT OF SUMMARY JUDGMENT MOTIONS**

I, Andrew Darlington, consistent with 28 U.S.C. § 1746, hereby state:

**<u>Background</u>**

1.      I am over 18 years of age, am competent to testify, and declare the following facts based on my own personal knowledge.

2.      I have served as the Director of the Office of Election Crimes and Security since March 2023.

3.      I hereby incorporate by reference my prior declaration in this matter, attached hereto.

4.      Below, I provide additional statements regarding state interests promoted by Senate Bill 7050 ("SB 7050"), Florida's most recent set of revisions to the Florida Election Code, which was codified as chapter 2023-120, Laws of Florida ("2023 Law").

**<u>State Interests</u>**

5.      The 2023 Law promotes the State's interests in safeguarding election integrity, preventing voter fraud, and promoting uniformity, efficiency, and confidence in the election system as a whole. The 2023 Law reflects the State's continuing efforts to protect the right to vote by ensuring that 3PVROs are abiding by their fiduciary duties under Florida law, and ensuring that vote-by-mail ballots are not fraudulently obtained. When 3PVROs conduct themselves in a criminal or fraudulent manner, or otherwise in disregard of their fiduciary duties, their actions may disenfranchise voters by delaying or preventing timely voter registration. Non-citizens are more likely to leave the jurisdiction (and their actions may otherwise be difficult to investigate) thereby frustrating the voter registration process. Moreover, when non-family members or non-legal

1

guardians submit requests for vote-by-mail ballots on behalf of voters, there is an increased risk that voter-by-mail ballots will be fraudulently requested.

6.      In furtherance of those interests, the 2023 Law amended, among other things: (1) section 97.0575(1)(e), Florida Statutes ("**Felon Restriction**"); (2) section 97.0575(1)(f), Florida Statutes ("**Citizen Restriction**"); and (3) section 101.62(1)(a), Florida Statutes ("**Mail-In Ballot Request Restriction**"). Each of these provisions furthers important State interests.

### 1. Felon Restriction

7.      Under the Felon Restriction, 3PVROs must "affirm[] that each person collecting or handling voter registration applications on behalf of the [3PVRO] has not been convicted of a felony violation of the Election Code" or "a felony violation of an offense specified in" section "98.0751(2)(c)" (murder), section "98.0751(2)(b)" (sexual offenses), section "825.103" (exploitation of an elderly person or disabled adult), chapter "817" (fraudulent practices), chapter "831" (forgery and counterfeiting), or chapter "837" (perjury). Fla. Stat. § 97.0575(1)(e).

8.      The felonies enumerated in the Felon Restriction involve seriously flouting the Election Code, taking advantage of vulnerable populations, committing extremely violent offenses (which do not result in the automatic restoration of voting rights under Amendment 4), and veracity issues.

9.      An individual who collects and handles a completed voter-registration application acts as a fiduciary for the applicant. This is a position of trust, and the Florida Legislature has determined that this position of trust should only be occupied by those who have not committed Election-Code felonies or serious or trust-related felonies. *See* Fla. Stat. § 97.0575(1)(e). Applications entrusted to 3PVROs also include applicants' personal information that should be used only for purposes of registration but could easily be misused before submission to an election

HF.Supp.App.0136

official. The risk of misuse is even more pronounced when completed voter registration applications are entrusted to felons who have already shown their disrespect for election laws, vulnerable populations, bodily integrity, life, and veracity.

10.     Keeping the above classes of convicted felons from collecting or handling completed voter-registration applications thus furthers the State's interests in safeguarding election integrity, preventing voter fraud, ensuring voter registration applications are timely processed, and promoting confidence in the election system.

### 2. Citizen Restriction

11.     Under the Citizen Restriction, 3PVROs must "affirm[] that each person collecting or handling voter registration applications on behalf of the [3PVRO] is a citizen of the United States of America." Fla. Stat. § 97.0575(1)(f).

12.     As stated above, an individual who collects and handles a completed voter-registration application acts as a fiduciary for the applicant. The Florida Legislature determined that only those individuals who are U.S. citizens can occupy that position of trust. *See* Fla. Stat. § 97.0575(1)(f).

13.     With non-citizens, there is an issue of whether collected and handled applications will be submitted to election officials on time. Non-citizens include illegal aliens, who are actively breaking the law and are subject to deportation at any time. Even those here on a temporary basis, such as those on student visas, pose similar risks; the temporary visitors might leave the country (or the State) without first delivering the completed voter registration applications in their custody. For resident aliens, the Florida Legislature made the determination that only U.S. citizens—those who can vote—can conduct the most critical aspect of the voter-registration process: ensuring that a completed application gets properly submitted on time. *See id.* In other words, citizens have the

3

most direct stake in the results of elections, and the Florida Legislature determined that they should be entrusted with that position. *See id.*

14.     The Citizen Restriction safeguards election integrity and prevents voter fraud by prohibiting ineligible-to-vote non-citizens from collecting and handling voter registration applications for (and from serving as fiduciaries to) citizen-only applicants. It promotes voter confidence by reasonably ensuring that applicants' voter registration applications are not collected or handled by such persons. It also ensures that voter registration applications are delivered in a timely manner and any untimely deliveries are properly investigated without a non-citizen leaving the State. Putting the applications in the hands of those with illegal or temporary status, who may leave the country voluntarily or involuntarily any day and without warning, increases the odds of a registration application being delivered after the statutory deadlines—after the date by which a voter must get on the rolls to cast a ballot in the next election. Though all legal non-citizens are welcome in Florida, they can't vote, serve on a jury, or hold public office. These factors militate against them serving as fiduciaries for citizens seeking to register to vote.

15.     Keeping non-U.S. Citizens from collecting or handling completed voter-registration applications thus furthers the State's interests in safeguarding election integrity, preventing voter fraud, ensuring voter registration applications are timely processed, and promoting confidence in the election system.

### 3. Mail-In Ballot Request Restriction

16.     Under the Mail-In Ballot Request Restriction, a supervisor of elections "shall accept a request for a vote-by-mail ballot only from a voter or, if directly instructed by the voter, a member of the voter's immediate family or the voter's legal guardian." Fla. Stat. § 101.62(1)(a). Among other things, a person making a request for a vote-by-mail ballot on behalf of a voter must

HF.Supp.App.0138

disclose "[t]he requestor's relationship to the voter." § 101.62(1)(b). The term "immediate family" means "[t]he voter's spouse, parent, child, grandparent, grandchild, or sibling, or the parent, child, grandparent, grandchild, or sibling of the voter's spouse." Fla. Stat. § 101.62(1)(d)(1).

17.     The Legislature was justified in concluding that there is a greater risk of *non-family members and non-legal guardians of voters* fraudulently requesting vote-by-mail ballots on behalf of voters than there is of *family members and legal guardians of voters* fraudulently requesting vote-by-mail ballots on behalf of voters.

18.     Logic bears this out. A voter's immediate family and a voter's legal guardian are reasonably expected to have the best interest of the voter in mind. The familial and legal bonds between a voter and his or her immediate family or legal guardian tend to promote trust and communication. A voter's immediate family and a voter's legal guardian thus tend to be the persons whom a voter has the most trust in and regular communication with. In general, because of the closeness of familial and guardianship bonds, a voter's immediate family and a voter's legal guardian are expected to be more trustworthy and responsive to the voter's needs than others who serve in non-familial, non-guardianship roles.

19.     The Mail-In Ballot Request Restriction's limitation of the category of persons who are eligible to submit a request for a vote-by-mail ballot on behalf of a voter to a voter's immediate family and a voter's legal guardian advances the State's interests. Safeguarding election integrity is promoted because every fraudulent vote that is cast both disenfranchises the voter and adds a vote to the total vote count that does not belong. Preventing voter fraud is promoted by reducing the risk that a fraudulent vote-by-mail ballot request will be made by non-family members and non-legal guardians of voters—persons who the Legislature concluded may be less trustworthy than family members and legal guardians of voters. Ensuring vote-by-mail-ballot requests are

HF.Supp.App.0139

timely processed is promoted by limiting vote-by-mail-ballot requests to a voter's immediate family or legal guardian—persons who may be more responsive to voters' needs than non-family members and non-legal guardians of voters. And promoting confidence in the election system as a whole is furthered by reducing the possibility that voters' votes might be cancelled out by fraudulently requested vote-by-mail ballots.

20.     Keeping non-family members and non-legal guardians from submitting requests for vote-by-mail ballots on behalf of voters thus furthers the State's interests in safeguarding election integrity, preventing voter fraud, ensuring vote-by-mail ballot requests are timely processed, and promoting confidence in the election system.

I say nothing further.

On January 18, 2024, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

*/s/ Andrew Darlington*
Andrew Darlington

6

**DECLARATION OF ANDREW DARLINGTON**
**IN SUPPORT OF RESPONSE IN OPPOSITION TO**
**MOTION FOR PRELIMINARY INJUNCTION**

I, Andrew Darlington, consistent with 28 U.S.C. § 1746, hereby state:

## Background

1.      I am over 18 years of age, am competent to testify, and declare the following facts

based on my own personal knowledge.

2.      I have served as the Director of the Office of Election Crimes and Security since

March 2023. As Director, my role includes, but is not limited to, overseeing the Office's: (a)

receiving and reviewing of notices and reports generated by concerned citizens, government

officials, or other Florida agency partners regarding alleged occurrences of election law violations

by third-party voter registration organizations or their agents ("3PVROs"); (b) initiating

independent inquiries and conducting preliminary investigations into allegations of election law

violations by 3PVROs; (c) assessing fines for election law violations by 3PVROs; and (d) referring

complaints regarding 3PVROs to other agencies for further criminal investigation or prosecution.

3.      Prior to becoming Director, I served as an Assistant General Counsel in the Florida

Department of State where I handled election-related matters. Before that, I served as a prosecutor,

worked in several federal and state agencies, served as a civil litigator in several law firms, and

was an infantry officer in the United States Marine Corps where I served twice in Afghanistan.

4.      In my current role as Director, I am familiar with Florida's Election Code. I am also

familiar with the claims brought by the Plaintiff in the three federal district court cases challenging

various provisions of Senate Bill 7050 ("SB 7050"), Florida's most recent set of revisions to the

Florida Election Code, which was codified as chapter 2023-120, Laws of Florida ("2023 Law").

1

5.      A 3PVRO that collects voter registration applications serves as a fiduciary to applicants under Florida law. § 97.0575(3)(a), Fla. Stat. I am providing this declaration to explain some of the ways and instances in which 3PVROs have failed to abide by their fiduciary duties in recent years, and the State's interests in the provisions that the Plaintiff groups are seeking to preliminarily enjoin.

<u>**3PVRO Complaints**</u>

6.      Our Office regularly receives complaints of 3PVROs violating Florida's election laws via a variety of sources, including election fraud complaints (Form DS-DE 34 – Fla. Admin. Code R. 1S-2.025), 3PVRO complaints (Form DS-DE 121 – Fla. Admin Code R. 1S-2.042), and complaints from supervisors of elections or their staff (which are submitted via the previous two forms). *See, e.g.*, Fla. Admin. Code. R. 1S-2.042(8). We investigate complaints and assess civil penalties, refer civil complaints to the Florida Attorney General's Office, or refer criminal complaints to law enforcement, as appropriate.

7.      Florida law requires the Office to submit an annual report to the President of the Senate, the Speaker of the House of Representatives, and the Governor detailing information on investigations of alleged election law violations or election irregularities conducted during the prior calendar year. § 97.022(7), Fla. Stat. The Office submitted its most recent report on January 15, 2023, for the 2022 calendar year—well before the proposed initial legislation for SB 7050 was submitted for consideration to the Florida Senate Committee on Ethics and Elections on March 30, 2023. The report is a statutory requirement and is incorporated by reference as an attachment to this declaration. As evidenced in the report, during 2022, the Office reviewed a large number of complaints involving 3PVROs. A number of these 3PVROs were reported by election officials for failing to timely comply with statutory obligations—most significantly, failing to timely turn in

2

voter registration applications. The Office reviewed approximately 3,077 voter registration applications that were collected and submitted untimely by 3PVROs, in violation of section 97.0575, Florida Statutes. The Office assessed statutory fines in the amount of $41,600.00 against those 3PVROs that did not comply with the statutory requirements. *See* § 97.0575(3)(a), Fla. Stat.

8.      Incorporated by reference as an attachment to this declaration is a sampling of 3PVRO complaints received, 3PVRO fine letters issued, and 3PVRO referrals made by the Department of State between the years 2016 and 2021. Our Office is concerned with the quantity and types of violations of Florida's election laws by 3PVROs alleged in or evidenced by these documents (especially those that resulted in the assessment of fines, referrals to other agencies for further investigation, and criminal prosecution). The types of violations alleged in or evidenced by these documents include, among other things:

a.  3PVROs failing to deliver voter registration applications to election officials before the book closing deadline for federal or state elections. (Whenever a new applicant's voter registration application is not delivered by a 3PVRO prior to the book closing deadline, that voter is deprived of the right to vote in the next election.)

b.  3PVROs failing to deliver voter registration applications to the division or the supervisor of elections in the county in which the applicant resides within 14 days after applications are completed by applicants.

c.  3PVROs failing to deliver voter registration applications to the correct supervisor of elections in the county in which the applicant resides.

d.  3PVRO agents charged or alleged with violation of a criminal statute.

9.      Also incorporated by reference as an attachment to this declaration are news articles, a press release, and a letter that discuss various 3PVRO-related issues.

3

HF.Supp.App.0143

## State Interests

10.     The 2023 Law promotes the State's interests in safeguarding election integrity, preventing voter fraud, ensuring voter registration applications are timely processed, and promoting uniformity, efficiency, and confidence in the election system as a whole. The 2023 Law reflects the State's continuing efforts to protect the right to vote by ensuring that 3PVROs are abiding by their fiduciary duties under Florida law. When 3PVROs conduct themselves in a criminal or fraudulent manner, or otherwise in disregard of their fiduciary duties, their actions may disenfranchise voters by delaying or preventing timely voter registration.

11.     In furtherance of those interests, the 2023 Law amended, among other things: (1) section 97.0575(1)(e), Florida Statutes ("**Felon Volunteer Restriction**"); (2) section 97.0575(1)(f), Florida Statutes ("**Non-U.S. Citizen Volunteer Restriction**"); (3) section 97.0575(4), Florida Statutes ("**Receipt Requirement**"); and (4) section 97.0575(7), Florida Statutes ("**Voter Information Retention Restriction**"). Each of these provisions furthers important State interests.[1]

### 1. Felon Volunteer Restriction

12.     Under the Felon Volunteer Restriction, 3PVROs must "affirm[] that each person collecting or handling voter registration applications on behalf of the [3PVRO] has not been convicted of a felony violation of the Election Code" or "a felony violation of an offense specified in" section "98.0751(2)(c)" (murder), section "98.0751(2)(b)" (sexual offenses), section "825.103" (exploitation of an elderly person or disabled adult), chapter "817" (fraudulent

---

[1] Other provisions the 2023 Law amended (but the Plaintiff groups do not seek to preliminarily enjoin) include: (1) section 97.0575(5)(a), Florida Statutes ("**Late/Incorrectly Returned Application Fines Provision**"); (2) section 101.62(1)(a), Florida Statutes ("**Mail-In Ballot Request Restriction**"); and (3) section 97.0575(1)(d), Florida Statutes ("**Re-Registration Requirement**").

4

practices), chapter "831" (forgery and counterfeiting), or chapter "837" (perjury). § 97.0575(1)(e), Fla. Stat.

13.     An individual who collects and handles a completed voter-registration application acts as a fiduciary for the applicant. § 97.0575(3)(a), Fla. Stat. This is a position of trust and the Florida Legislature has determined that that position of trust should only be occupied by those who have not committed Election-Code felonies or serious or trust-related felonies. *See* § 97.0575(1)(e), Fla. Stat.

14.     It is my understanding that keeping the above classes of convicted felons from collecting or handling completed voter-registration applications furthers the State's interests in safeguarding election integrity, preventing voter fraud, ensuring voter registration applications are timely processed, and promoting confidence in the election system as a whole.

## 2. Non-U.S. Citizen Volunteer Restriction

15.     Under the Non-U.S. Citizen Volunteer Restriction, 3PVROs must "affirm[] that each person collecting or handling voter registration applications on behalf of the [3PVRO] is a citizen of the United States of America." § 97.0575(1)(f), Fla. Stat.

16.     As stated above, an individual who collects and handles a completed voter-registration application acts as a fiduciary for the applicant. The Florida Legislature determined that only those individuals who are U.S. citizens can occupy that position of trust. *See* § 97.0575(1)(f), Fla. Stat.

17.     With non-citizens, there is an issue of whether collected and handled applications will be submitted to election officials on time. Non-citizens include illegal aliens, who are actively breaking the law and are subject to deportation at any time. Even those here on a temporary basis, such as those on student visas, pose similar risks; the temporary visitors might leave the country

HF.Supp.App.0145

(or the State) without first delivering the completed voter registration applications in their custody.. For resident aliens, the Florida Legislature made the determination that only U.S. citizens—those who can vote—can conduct the most critical aspect of the voter-registration process: ensuring that a completed application gets properly submitted on time. *See id.* In other words, citizens have the most direct stake in the results of elections, and the Florida Legislature determined that they should be entrusted with that position. *See id.*

18.     It is my understanding that keeping non-U.S. Citizens from collecting or handling completed voter-registration applications furthers the State's interests in safeguarding election integrity, preventing voter fraud, ensuring voter registration applications are timely processed, and promoting confidence in the election system as a whole.

### 3. Receipt Requirement

19.      Under the Receipt Requirement, 3PVROs that collect voter-registration applications must provide a receipt to an applicant upon accepting his or her application. § 97.0575(4), Fla. Stat. The receipt must include the name of the applicant, the date the application is received, the name of the 3PVRO, the name of the 3PVRO agent, the applicant's political party affiliation, and the county in which the applicant resides.

20.     The Division of Elections will provide a uniform receipt form by October 1, 2023.

21.     The Receipt Requirement ensures that, if the 3PVRO fails to perform its fiduciary duty to collect or submit applications, the applicants can contact the 3PVRO about any issues, even those concerning the specific 3PVRO agents responsible for interacting with applicants. It also provides applicants with the necessary information to report potential violations of Florida's election laws by 3PVROs, which will enable election officials to identify issues with specific 3PVRO volunteers. More documentation of crucial aspects of voter registration is better.

HF.Supp.App.0146

22.     The Receipt Requirement thus ensures 3PVRO accountability in upholding their fiduciary duty and the proper administration of the third-party voter registration process.

4. <u>Voter Information Retention Restriction</u>

23.     Under the Voter Information Retention Restriction, a 3PVRO agent is prohibited from collecting a voter's application (which includes a voter's personal information) for any reason other than to provide such application to the 3PVRO in compliance with this section. § 97.0575(7), Fla. Stat.

24.     A voter's personal information includes a voter's Florida driver license number, Florida identification card number, social security number, or signature.

25.     The Voter Information Retention Restriction protects the applicant: a 3PVRO agent should not be able to retain a voter's private information that is not generally available to the public.

26.     The Voter Information Retention Restriction thus ensures that a voter's application (including the voter's personal information contained therein) is protected from misuse by a 3PVRO agent.

I say nothing further.

On June 23, 2023, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

/s/ Andrew Darlington
_____
Andrew Darlington

7

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

          *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida, *et al.*,

          *Defendants*.

Case No. 4:23-cv-00218-MW-MAF

## <u>EXHIBITS TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico ("Hispanic Federation Plaintiffs") submit the following exhibits to their partial motion for summary judgment that have not yet been filed on the Court's docket:

Exhibit 1: Deposition of Tiffany Morley

Exhibit 2: Expert Report of Daniel A. Smith, Ph. D.

Exhibit 3: Deposition of Robert Stein, Ph. D.

Exhibit 4: Deposition of John Alford, Ph. D.

Exhibit 5: Rebuttal Expert Report of Daniel A. Smith, Ph. D.

Exhibit 6: Deposition of Elizabeth Guzzo, Designated 30(b)(6) Witness for the Attorney General

HF.Supp.App.0148

Exhibit 7: Certified Transcript of Committee on Fiscal Policy Meeting on S.B. 7050 (April 20, 2023)

Exhibit 8: Certified Transcript of Senate Session on S.B. 7050 (April 26, 2023)

Exhibit 9: Certified Transcript of House Session on S.B. 7050 (April 28, 2023)

Exhibit 10: Deposition of Andrew Darlington, Designated 30(b)(6) Witness for the Secretary of State

Exhibit 11: Deposition of Mark Earley, Designated 30(b)(6) Witness for the Leon County Supervisor of Elections

Exhibit 12: Deposition of Nicholas Cox, Designated 30(b)(6) Witness for the Attorney General

Exhibit 13: Deposition of Frederick Velez, Designated 30(b)(6) Witness for Hispanic Federation

Exhibit 14: Deposition of Carolina Wassmer, Designated 30(b)(6) Witness for Hispanic Federation

Exhibit 15: Michael C. Herron & Daniel A. Smith, *The Effects of House Bill 1355 on Voter Registration in Florida*, 13 State Politics & Policy Quarterly 279 (2013) (Exhibit 5 to Stein Dep.)

Exhibit 16: Deposition of Norka Martínez

Exhibit 17: Deposition of Elizabeth Pico

Exhibit 18: Deposition of Verónica Herrera-Lucha

Exhibit 19: Stipulation by the Office of the Attorney General


All portions of these exhibits that are cited in Plaintiffs' motion are highlighted in the attached documents, in accordance with this Court's rules.

HF.Supp.App.0149

Dated: January 23, 2024

Roberto Cruz (FBN 18436)
Miranda Galindo (FBN 1039848)
Delmarie Alicea (FBN 1024650)
**LatinoJustice PRLDEF**
523 West Colonial Drive
Orlando, FL 32804
(321) 754-1935
rcruz@latinojustice.org
mgalindo@latinojustice.org
dalicea@latinojustice.org

Cesar Z. Ruiz*
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org

Estee M. Konor*
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
ekonor@demos.org

John A. Freedman[†]
Jeremy Karpatkin[†]
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 942-5316
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com

*Admitted Pro Hac Vice*

Respectfully submitted,

*/s/ Megan C. Keenan*
Megan C. Keenan*
Adriel I. Cepeda Derieux*
**American Civil Liberties
Union Foundation**
915 15th Street NW
Washington, DC 20005
(212) 549-2500
acepedaderieux@aclu.org
mkeenan@aclu.org

Julie A. Ebenstein (FBN 91033)
Dayton Campbell-Harris*
Sophia Lin Lakin*
**American Civil Liberties
Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

HF.Supp.App.0150

*Counsel for Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico*

4