CASE NO. 24-11892 (CONSOLIDATED WITH 25-12813)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

HISPANIC FEDERATION, ET AL.,

*Plaintiffs-Appellees*,

v.

FLORIDA SECRETARY OF STATE, ET AL.,

*Defendants-Appellants*.

On Petition for Review of an Order of the
U.S. District Court for the Northern District of Florida, Nos. 4:23-cv-215-MW-
MAF, 4:23-cv-216-MW-MAF, and 4:23-cv-218-MW-MAF
(Walker, J.)

## BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Thomas A. Berry
　　*Counsel of Record*
Daniel Greenberg
Kimberly Brooking
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, DC 20001
(443) 254-6330
tberry@cato.org

January 7, 2026                    *Counsel for Amicus Curiae*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule No. 26.1-1(a)(4), *amicus* certify that the following persons have an interest in the outcome:

1. Berry, Thomas A., counsel for *amicus curiae*

2. Cato Institute, *amicus curiae*

3. Brooking, Kimberly, counsel for *amicus curiae*

4. Greenberg, Daniel, counsel for *amicus curiae*

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

Respectfully submitted,

Dated: January 7, 2026                    /s/ Thomas A. Berry

C-1 of 1

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS
 AND CORPORATE DISCLOSURE STATEMENT ..........................................C-1

TABLE OF CONTENTS........................................................................... i

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF *AMICUS CURIAE*............................................................1

STATEMENT OF THE ISSUES................................................................2

INTRODUCTION
AND SUMMARY OF ARGUMENT ..........................................................2

ARGUMENT ..........................................................................................4

   I.   THE PRINCIPLES OF FEDERALISM REQUIRE STATES TO
      DEFER TO FEDERAL IMMIGRATION LAW. .........................................4

   II.  SENATE BILL 7050 IMPROPERLY LIMITS NONCITIZENS'
      RIGHT TO WORK...............................................................................7

   III. THE POLITICAL FUNCTION EXCEPTION MUST BE READ
      NARROWLY.....................................................................................14

CONCLUSION .....................................................................................17

CERTIFICATE OF COMPLIANCE.......................................................18

CERTIFICATE OF SERVICE ...............................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ambach v. Norwick*, 441 U.S. 68 (1979) ............................................................ 15, 16

*Arizona v. United States*, 567 U.S. 387 (2012)............................................ 3, 4, 5, 17

*Bernal v. Fainter*, 467 U.S. 216 (1984) ........................................................ 4, 7, 14

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982)........................................... 14, 15, 16

*Chang v. Glynn Cnty. Sch. Dist.*, 457 F. Supp. 2d 1378 (S.D. Ga. 2006) ..............14

*Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012) ............................................... 7, 14

*De Canas v. Bica*, 424 U.S. 351 (1976).................................................................6

*Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019).......................................... 6, 14

*Examining Bd. of Eng'rs, Architects & Surveyors v. Flores De Otero*, 426
    U.S. 572 (1976)...........................................................................................7, 9

*Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) .....................5, 6

*Foley v. Connelie*, 435 U.S. 291 (1978) ....................................................... 7, 15, 16

*Fong Yue Ting v. United States*, 149 U.S. 698 (1893)..........................................3, 5

*Graham v. Richardson*, 403 U.S. 365 (1971) ..........................................................14

*In re Griffiths*, 413 U.S. 717, 719 (1973) ........................................... 4, 7, 9, 15, 16

*Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 (1947) ...........................................3

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948)..................................3, 6

*Truax v. Raich*, 239 U.S. 33 (1915) .......................................................................7

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ..............................................................7

## Statutes & Legislative Materials

8 U.S.C. § 1427(a)(1)..............................................................................................10

Fla. Stat. § 97.0575(1)(f) (2025)............................................... 2, 3, 6, 7, 8, 13

S.B. 7050, 2023 Leg. (Fla. 2023)............................................................................2

**Other Authorities**

Adam B. Cox & Eric A. Posner, *The Rights of Migrants: An Optimal Contract Framework*, 84 N.Y.U. L. REV. 1403 (2009) ......................................3, 6

David Chen, *Immigration Status Federalism*, 42 YALE J. ON REGUL. 449 (2025) ...........................................................................................................5

DAVID J. BIER, IMMIGRATION WAIT TIMES FROM QUOTAS HAVE DOUBLED: GREEN CARD BACKLOGS ARE LONG, GROWING, AND INEQUITABLE, CATO INST. POL'Y ANALYSIS NO. 873 (2019) ...................................................10

*Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year*, U.S. CITIZENSHIP & IMMIGR. SERVS. (Sept. 30, 2025) .........................................................................10

THE FEDERALIST No. 3 (John Jay) ..............................................................5

THE FEDERALIST No. 46 (James Madison) ....................................................5

**Constitutional Provisions**

U.S. CONST. amend. XIV, § 1 ..................................................................14

U.S. CONST. art. I, § 8, cl. 4 .....................................................................5

U.S. CONST. art. VI, cl. 2 ........................................................................5

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs in federal courts across the country.

Cato Institute scholars have published extensive research on economic protectionism and its relation to constitutional law. *See, e.g.,* Clark Packard, *Protectionism Undermines Economic Freedom in the United States*, CATO INSTITUTE (Sept. 26, 2025, 6:46PM), https://tinyurl.com/52x5ze5t. Cato has also filed many *amicus curiae* briefs about the continued importance of federalism. *See, e.g., Robicheaux v. Caldwell,* 791 F.3d 616 (5th Cir. 2015). This case interests Cato because of the constitutional dimensions of federal preemption and noncitizens' right to work.

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in any part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

## STATEMENT OF THE ISSUES

Whether Florida's mandate that only citizens can collect the completed voter registration forms of their fellow citizens violates the Fourteenth Amendment's Equal Protection Clause.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Until Florida made Veronica Herrera-Lucha's employment illegal, she supported four family members by working for Mi Vecino, Inc., a third-party voter registration organization ("3PVRO"). Case No. 4:23-cv-215, Doc.101 at 17–18. In 2023, Florida enacted legislation ("Senate Bill 7050") that prohibits noncitizens from "collecting or handling voter registration applications." S.B. 7050, 2023 Leg. (Fla. 2023); FLA. STAT. § 97.0575(1)(f) (2025). The fine for noncompliance is steep: If a noncitizen collects or handles a voter registration application on behalf of a 3PVRO, the organization is fined $50,000 for each noncitizen. *Id.* Senate Bill 7050 makes Ms. Herrera-Lucha's voter registration work illegal and threatens her livelihood. Case No. 4:23-cv-215, Doc.101 at 18.

The Plaintiffs—3PVROs and canvassers—challenged Senate Bill 7050's prohibition and penalty by alleging discrimination based on alienage in violation of the Equal Protection Clause. Case No. 4:23-cv-215, Doc.302 at 10–23; Case No. 4:23-cv-218, Doc.149 at 1. The district court agreed: It held that the relevant portion of Senate Bill 7050 violates the Fourteenth Amendment and granted the Plaintiffs'

request for a permanent injunction. Case No. 4:23-cv-218, Doc.199 at 11. This court should affirm.

The federal government has the power to make immigration policy, *Fong Yue Ting v. United States*, 149 U.S. 698, 713–14 (1893), and it therefore has the power to determine the rights of noncitizens. With respect to the policy at hand, there is "no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). Nonetheless, Florida has limited the rights of noncitizens through Senate Bill 7050. Furthermore, the federal government has expressly permitted certain categories of noncitizens to work, so the relevant portion of Senate Bill 7050 has been preempted and is therefore invalid. *See Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948); *Arizona v. United States*, 567 U.S. 387, 399 (2012); Adam B. Cox & Eric A. Posner, *The Rights of Migrants: An Optimal Contract Framework*, 84 N.Y.U. L. REV. 1403, 1406 (2009).

The justifications offered for Senate Bill 7050 fail. One such justification is that Senate Bill 7050 aims to "protect the voter"—apparently because a noncitizen who handles voter registration forms is somehow more likely to contaminate the integrity of the election—but there is no evidence for any relation between responsible ballot handling and citizenship status. *See* FLA. STAT. § 97.0575(1)(f) (2025); Case No. 4:23-cv-215, Doc.219-4 at 61.

3

The Defendants have tried to save Senate Bill 7050 by claiming that it falls under the "political function" exception. That exception allows for some employment discrimination based on alienage, but only for work that involves discretionary decision-making that is intimately related to democratic self-government. The extension of the "political function" exception to include Senate Bill 7050 would contravene previous precedent; furthermore, that extension would imply that the exception would apply to any job remotely related to government. *See Bernal v. Fainter*, 467 U.S. 216, 220 (1984).

Since the Founding, "our Nation welcomed and drew strength from the immigration of aliens. Their contributions to the social and economic life of the country were self-evident." *In re Griffiths*, 413 U.S. 717, 719, 722 (1973) ("Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society."). In contrast, Senate Bill 7050 treats immigration as a source of weakness and contamination. That legislation is difficult to defend as a matter of policy and impossible to defend as a matter of law. This court should affirm the decision below.

## ARGUMENT

## I.   THE PRINCIPLES OF FEDERALISM REQUIRE STATES TO DEFER TO FEDERAL IMMIGRATION LAW.

Federalism, a principle "central to the constitutional design," assigns federal and state governments their own spheres of sovereignty. *Arizona*, 567 U.S. at 398.

As James Madison explained in 1788, "The federal and State governments are in fact but different agents and trustees of the people, constituted with different powers, and designed for different purposes." THE FEDERALIST No. 46 (James Madison).

Congress's powers include the regulation of immigration. *Fong Yue Ting*, 149 U.S. at 714 ("Congress . . . has undoubtedly the right to provide a system of registration and identification of [aliens] within the country, and to take all proper means to carry out the system which it provides."); David Chen, *Immigration Status Federalism*, 42 YALE J. ON REGUL. 449, 451 (2025). This federal power is justified by concerns about the efficient and prudent administration of the Nation's domestic and foreign policy. *Fong Yue Ting*, 149 U.S. at 711, 713; U.S. CONST. art. I, § 8, cl. 4. If there are tensions between an American state and a foreign power, "nothing can so effectually obviate that danger as a national government." THE FEDERALIST No. 3 (John Jay).

Because immigration falls exclusively within the purview of the federal government, "state laws are pre-empted when they conflict with" federal immigration law. *See Arizona*, 567 U.S. at 399; U.S. CONST. art. VI, cl. 2. This applies to cases "where compliance with both federal and state regulations is a physical impossibility." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963). For example, state laws that "impose discriminatory burdens upon" lawful aliens "conflict with this constitutionally derived federal power to regulate

5

immigration" and therefore are invalid. *Takahashi*, 334 U.S. at 419 (striking down a state provision that barred commercial fishing licenses for noncitizens). A necessary implication of such preemption is that states "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." *Estrada v. Becker*, 917 F.3d 1298, 1306 (11th Cir. 2019) (quoting *De Canas v. Bica*, 424 U.S. 351, 358 n.6 (1976)).

But even though immigration policy rests exclusively in the federal government, Florida has tried to dictate the rights of noncitizens. Indeed, Florida has tried to banish noncitizens from a large sector of the labor market through Senate Bill 7050, even though federal law has already provided certain categories of noncitizens with the right to work. *See* FLA. STAT. § 97.0575(1)(f) (2025); Cox & Posner, *supra*, at 1406. This clash of state and federal law has created the kind of "physical impossibility" that is constitutionally impermissible, *see Fla. Lime*, 373 U.S. at 142–43, because noncitizens cannot be simultaneously permitted to work and not permitted to work. Thus, Senate Bill 7050 conflicts with the "constitutionally derived federal power to regulate immigration," and it therefore must be invalid. *See Takahashi*, 334 U.S. at 419.

6

## II.  SENATE BILL 7050 IMPROPERLY LIMITS NONCITIZENS' RIGHT TO WORK.

Noncitizens have long had the right to work in the United States because they "cannot live where they cannot work." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *Foley v. Connelie*, 435 U.S. 291, 297 (1978); *Dandamudi v. Tisch*, 686 F.3d 66, 81 (2d Cir. 2012). The right to work therefore "is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax*, 239 U.S. at 41. Limiting the right to work is "intolerable in any country where freedom prevails," because the exercise of state power that deprives men and women of their rights is "the essence of slavery itself." *See Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

If a State deprives a noncitizen of the right to work, it must overcome "a heavy burden." *Griffiths*, 413 U.S. at 722. And it has "the greatest difficulty" when restricting noncitizens from engaging in private enterprises and lawful occupations. *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores De Otero*, 426 U.S. 572, 603 (1976). Accordingly, when the Supreme Court has been presented with restrictions on lawful work that lacked valid justification, it has struck them down. *Griffiths*, 413 U.S. at 724, 727; *Bernal*, 467 U.S. at 227–28.

Florida cannot overcome the "heavy burden" that Senate Bill 7050 presents, because that statute has stripped noncitizens of the right to work without valid justification. *See* FLA. STAT. § 97.0575(1)(f) (2025); *Griffiths*, 413 U.S. at 722. That

statute attempts to regulate the private sector by banishing noncitizens from an essentially ministerial role: canvassing.

Most canvassers in the 3PVROs that brought this suit are noncitizens. Case No. 4:23-cv-215, Doc.54-5 at 4 ("The vast majority of [UnidosUS's] canvassers— 75% or more each year—are noncitizens); Case No. 4:23-cv-215, Doc.54-11 at 10 ("Over 90% of the people on my canvassing team at Alianza Center are not citizens."). But Senate Bill 7050 prohibits 3PVROs from hiring work-authorized noncitizens, which places their livelihoods at stake. *See* FLA. STAT. § 97.0575(1)(f) (2025); Case No. 4:23-cv-215, Doc.54-8 at 10 ("I don't want to lose a job that I care about a lot"); Case No. 4:23-cv-215, Doc.229-1 at 83–84 (describing how UnidosUS, Alianza, Poder Latinx, and Hispanic Federation only hire people authorized to work in the United States); Case No. 4:23-cv-215, Doc.286 at 82 (on direct examination, Jared Nordlund, the Florida state advocacy director for UnidosUS, responded "No" to the question "If a citizenship requirement is enforced, do you plan to employ any non-citizen canvassers anymore?"); Case No. 4:23-cv-215, Doc.101 at 4 n.4, 18. As explained by Johana Florez, the canvassing manager at Alianza Center, Senate Bill 7050 makes her unable to "collect or handle voter registration applications"—a key part of her work. Case No. 4:23-cv-215, Doc.54-11 at 9.

Senate Bill 7050's advocates have tried to provide justifications for it. Senator Danny Burgess has said that the legislation's goal is "to protect the voter, and that's the sole purpose of all the provisions within this and the guiding light behind all the third-party voter registration organizations provisions." Case No. 4:23-cv-215, Doc.219-4 at 61. Its main sponsor, Senator Travis Hutson, has explained that "we wanted to make sure . . . you weren't an illegal doing third party voter registration." Case No. 4:23-cv-215, Doc.219-6 at 15. The Defendants added that noncitizens are more likely to leave the state and fail to turn in applications on time. Appellants' Br. at 10.

These justifications are conclusory and empty. They "amount[] to little more than an assertion that discrimination may be justified by a desire to discriminate." *Examining Bd. of Eng'rs*, 426 U.S. at 605; *see Griffiths*, 413 U.S. at 723 ("the sole basis for disqualification is [the] status as a resident alien"). Such justifications appear to rest on a theory that noncitizens who handle registration forms are somehow more likely to contaminate the integrity of the election. But there is no relation between citizenship status and the ability to responsibly handle these applications, and the record provides no evidence to the contrary. Case No. 4:23-cv-215, Doc.55-1 at 32.[2] Nor does the record provide any example of misconduct by a

---

[2] During the legislative debate over SB 7050, another Florida senator aptly summed up the absurdity of the canvassing restriction: "a non–U.S. citizen who is employed

9

noncitizen on behalf of a 3PVRO. Case No. 4:23-cv-215, Doc.205-1 at 25–26 ("The Secretary [of State] could not point to any evidence of a noncitizen mishandling or failing to timely deliver voter registration applications on behalf of 3PVROs.").

Furthermore, the notion that noncitizens are more likely to move away is quite speculative—a voter registration application must be submitted in ten days, and many noncitizens have resided in the United States for years. Case No. 4:23-cv-215, Doc.99 at 47; DAVID J. BIER, IMMIGRATION WAIT TIMES FROM QUOTAS HAVE DOUBLED: GREEN CARD BACKLOGS ARE LONG, GROWING, AND INEQUITABLE 3, CATO INST. POL'Y ANALYSIS NO. 873 (2019) (demonstrating that, on average, becoming a lawful permanent resident requires four years and ten months).[3] Indeed,

---

by the Division of Elections, or the Department of Highway Safety Motor Vehicles, or let's say a tax collector's office, could see voter registration applications with voter personal information all day long at their job but would be prohibited from volunteering at a voter registration drive." Case No. 4:23-cv-218, Doc.133-6 at 19.

[3] Available at https://tinyurl.com/2s3vudh6. Naturalization is a long and complicated process, so those seeking to become citizens often have substantial ties to the United States. 8 U.S.C. § 1427(a)(1) ("No person, except as otherwise provided in this title, shall be naturalized unless such applicant immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time[,] and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months"); *Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year*, U.S. CITIZENSHIP & IMMIGR. SERVS. (Sept. 30, 2025),

Defendants' contention that noncitizens are more likely to leave the country and less likely to meet the obligations they undertake is based on nothing more than a demographic hunch. Appellants' Br. at 10 ("with noncitizens, it's rational to assume that there's always a higher risk that they can leave the state, given their strong ties to other countries, and not turn in applications on time"). That hunch appears unfounded, given the incentive—future citizenship—that staying put creates for some noncitizens; if anything, that incentive supports the argument that they are *less* likely to move away.

Furthermore, these justifications overlook the centrality of noncitizens to the voter registration work at issue here. Case No. 4:23-cv-215, Doc.286 at 67, 79 (testifying that Unidos has registered "just under 400,000" voters and "[r]oughly 70 percent of our canvassers were noncitizens"). Canvassers—whose members include "doctors, engineers, lawyers, and administrators"—acquire both significant training and extensive experience in voter registration. Case No. 4:23-cv-218, Doc.32-1 at 7; Case No. 4:23-cv-215, Doc.54-5 at 5 ("The development of this training requires extensive work on behalf of UnidosUS and must change every time that Florida's

---

https://tinyurl.com/jjppha6z (median processing time for an application for naturalization was 5.6 months in 2025).

elections law change . . . Most of these noncitizen canvassers have helped with UnidosUS's voter registration efforts for multiple election cycles"); Case No. 4:23-cv-215, Doc.54-11 at 12 (Johana Florez stated, "I make sure that everyone on my team is trained on the requirements for voter registration organizations in Florida and that they follow all rules and laws."). Canvassers advance democracy because "[n]on-citizens are exceptionally well positioned with the knowledge and interpersonal relationships to effectively navigate these communities." Case No. 4:23-cv-215, Doc.54-8 at 11; Case No. 4:23-cv-215, Doc.54-6 at 3 (Voters of Tomorrow Action, Inc. "promotes Gen Z's participation in democracy by registering people to vote, primarily young people."); Case No. 4:23-cv-215, Doc.54-5 at 4 (UnidosUS engages "in extensive voter registration efforts to encourage political participation in the Hispanic community").

Restricting noncitizens' ability to canvas will therefore weaken 3PVROs; more broadly, it will weaken civic participation and self-government. 3PVROs will have to retool their teams of canvassers, and they may face difficulties in finding enough Spanish speakers to replace those excluded by Senate Bill 7050. Case No. 4:23-cv-215, Doc.54-5 at 7. Even if the 3PVROs recruit sufficient personnel, Senate Bill 7050 will impose new administrative costs: A new wave of background checks will be necessary, and more training will be required just to explain how the new law works. *Id*.; Case No. 4:23-cv-215, Doc.54-6 at 6. This training will be a

challenge because confusion surrounds the new law. Case No. 4:23-cv-215, Doc.54-6 at 6; Case No. 4:23-cv-215, Doc.54-8 at 9. Even after hiring new staff, 3PVROs will face increased burdens in recruiting, hiring, and training new canvassers—because, historically, citizens have found the kind of canvassing at issue here more difficult. *See* Case No. 4:23-cv-215, Doc.54-5 at 7 ("[W]e have a higher turnover rate for United States citizens staying on in canvassing roles in our years of experience."). Such changes are costly. *Id.* at 8–9 ("I would estimate that this staff time would amount to at least $56,000 . . . For canvass supplies to test the system, I would estimate that we will spend about $13,000 . . . running a paper voter registration canvass—either collecting forms on-site at retail locations or by going door-to-door—under SB 7050 would add 20% more to the cost of our voter registration."). Furthermore, a 3PVRO that unintentionally hires a noncitizen would face a "catastrophic" fine. Case No. 4:23-cv-215, Doc.54-6 at 7; s*ee* FLA. STAT. § 97.0575(1)(f) (2025); Case No. 4:23-cv-215, Doc.54-6 at 10 ("UnidosUS could not withstand the $50,000 fine associated with the Citizenship Requirement."). The additional expenses and management duties that Senate Bill 7050 inflicts on 3PVROs will limit their ability to collect voter registration forms and advance democracy. *See* Case No. 4:23-cv-215, Doc.54-5 at 10.

## III. THE POLITICAL FUNCTION EXCEPTION MUST BE READ NARROWLY.

The Fourteenth Amendment states: "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The word "person" in this Amendment includes lawfully admitted aliens, *Graham v. Richardson*, 403 U.S. 365, 371 (1971). Any law that discriminates based on alienage is therefore "inherently suspect and subject to close judicial scrutiny." *Chang v. Glynn Cnty. Sch. Dist.*, 457 F. Supp. 2d 1378, 1380 (S.D. Ga. 2006). Employment restrictions on aliens are subject to strict scrutiny, *Estrada,* 917 F.3d at 1309, unless the restriction falls under the "political function" exception. *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982).[4]

This narrow exception only "applies to laws that exclude aliens from positions intimately related to the process of democratic self-government." *Bernal*, 467 U.S. at 220. The Supreme Court has resisted expanding this exception's scope. The Court has held that notaries are outside the "heart of representative government" because their role is "clerical and ministerial." *Id.* at 225. Likewise, lawyers are outside the

---

[4] To survive strict scrutiny, a statute must be narrowly tailored to further a compelling government interest. *Dandamudi*, 686 F.3d at 79.

scope of the political function exception, because they do not form government policy. *Griffiths*, 413 U.S. at 729.

There are only a few professions that fall within the exception: Noncitizens can be barred from positions that "involve[] discretionary decisionmaking, or execution of policy, which substantially affects members of the political community." *Foley*, 435 U.S. at 296. In practice, the exception's scope has been confined to a few circumstances. States can require police to be citizens because "citizenship bears a rational relationship to the special demands of the particular position." *Id.* at 300. Furthermore, states may prohibit aliens who decline to seek naturalization from working as public school teachers, because teachers have wide discretion to influence students' attitudes towards the political process. *Ambach v. Norwick*, 441 U.S. 68, 78–81 (1979). Finally, states may prevent noncitizens from working as probation officers because of their coercive authority over individuals. *Cabell*, 454 U.S. at 445–47.

The Defendants argue that the political function exception can save Senate Bill 7050, because voter registration "goes to something that is critical to the election administration process." Case No. 4:23-cv-215, Doc.219-1 at 15. They contend that the exception is triggered because the "voter-registration application must be collected and handled properly" to ensure proper tabulation of votes. Case No. 4:23-cv-215, Doc.92 at 20–21.

15

But this claim inflates the political function exception to the bursting point. Canvassing does not include "discretionary decisionmaking, or execution of policy," nor does it "substantially affect[] members of the political community." *See Foley*, 435 U.S. at 296.[5] Rather, canvassing involves "ask[ing] people in the community as they're coming by to register to vote" and helping voters fill out voter registration applications. Case No. 4:23-cv-215, Doc.286 at 30–31. If canvassing falls under the political function exception, that exception could be applied to any private job that is remotely related to public administration—such as campaigning, polling, producing political advertising, news reporting, or broadcasting. Indeed, this expansive vision of the political function exception appears to allow barring noncitizens from working on the construction crews that pave the roadways to polling places; similarly, it appears to allow barring noncitizens from serving as the electrical linemen who ensure that power is transmitted to government offices. Because these implications are unacceptable (more precisely, they are irreconcilable with the logic of *Bernal* and *Griffiths*), the Defendants' overbroad reading of the political function exception must be wrong. The political function exception, like all exceptions, must not be read to swallow the rule.

---

[5] Canvassers do not influence students, arrest people, or institute judicial proceedings. *Ambach*, 441 U.S. at 78–79; *Foley*, 435 U.S. at 297–98; *Cabell*, 454 U.S. at 446. Canvassers do not propose, draft, or edit government policy. *Griffiths*, 413 U.S. at 729.

## CONCLUSION

"The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here." *Arizona*, 567 U.S. at 416. In its own small way, Senate Bill 7050 attempts to narrow the Nation's history and future to citizens only. There is no need, and no justification, for a sign on the workplace door that warns "No noncitizen need apply." This court should affirm the decision below.

Respectfully submitted,

Thomas A. Berry
        *Counsel of Record*
Daniel Greenberg
Kimberly Brooking
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, DC 20001
(443) 254-6330
tberry@cato.org

Dated: January 7, 2026                    *Counsel for Amicus Curiae*

17

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 3,764 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman typeface.

/s/ Thomas A. Berry

Dated: January 7, 2026                    *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on January 7, 2026, he electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the Eleventh Circuit using the CM/ECF system. The undersigned also certifies that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

<u>/s/ Thomas A. Berry</u>

Dated: January 7, 2026                    *Counsel for Amicus Curiae*